# 24-1785-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT



JOSIAH GALLOWAY,

*Plaintiff-Cross-Defendant-Appellee,*

v.

COUNTY OF NASSAU, DETECTIVE MATTHEW ROSS, (SHIELD #834), DETECTIVE CHARLES DECARO, (SHIELD #1047), DETECTIVE RONALD LIPSON, (SHIELD #1296), DETECTIVE THOMAS D'LUGINSKI, (SHIELD #7900), DETECTIVE GEORGE DARIENZO, (SHIELD #1038),

*Defendants-Cross-Defendants-Appellants,*

DETECTIVE THOMAS BISCHOFF, (SHIELD #1001), KATHLEEN RICE, ASSISTANT DISTRICT ATTORNEY JOSEPH LAROCCA, ASSISTANT DISTRICT ATTORNEY ROBERT SCHALK, DETECTIVE CHARLES OLIE, SHIELD NO. 1047,

*Defendants,*

*(Caption Continued on the Reverse)*

On Appeal from the United States District Court
for the Eastern District of New York

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANTS-CROSS-DEFENDANTS-APPELLANTS

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
*Attorneys for Defendants-
Cross-Defendants-Appellants*
150 East 42nd Street, 23rd Floor
New York, New York 10017
212-490-3000



NASSAU COUNTY POLICE DEPARTMENT, JOHN DOES #1-20, BEING AND INTENDED TO BE OTHER PARTIES FROM THE COUNTY OF NASSAU, NASSAU COUNTY POLICE DEPARTMENT, INCORPORATED VILLAGE OF HEMPSTEAD AND INCORPORATED VILLAGE OF HEMPSTEAD POLICE DEPARTMENT WHOSE NAMES ARE PRESENTLY UNKNOWN, ALL JOINTLY AND SEVERALLY, JANE DOES #1-20, BEING AND INTENDED TO BE OTHER PARTIES FROM THE COUNTY OF NASSAU, NASSAU COUNTY POLICE DEPARTMENT, INCORPORATED VILLAGE OF HEMPSTEAD AND INCORPORATED VILLAGE OF HEMPSTEAD POLICE DEPARTMENT WHOSE NAMES ARE PRESENTLY UNKNOWN, ALL JOINTLY AND SEVERALLY, DETECTIVE SERGEANT RICHARD DORSI, DETECTIVE RENE YAO, DETECTIVE CARL M. STRANGE, SHIELD NO. 1225,

*Defendants-Cross-Defendants,*

INCORPORATED VILLAGE OF HEMPSTEAD, P.O. STEVEN HOROWITZ, (SHIELD #144), DETECTIVE KEVIN CUNNINGHAM, (SHIELD #112), DETECTIVE JOSEPH SORTINO,

*Defendants-Crosss-Claimants.*

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................... iii

Preliminary Statement ........................................................................ 1

Jurisdictional Statement .................................................................... 4

--- The Individual Defendants' Entitlement to Summary
Judgment on Immunity is Properly Before this Court ............................. 4

--- The Exercise of Pendent Jurisdiction is Warranted for
the Remaining Claims ...................................................................... 5

Issues Presented ................................................................................ 6

Statement of the Facts ....................................................................... 7

--- The Shooting ............................................................................... 7

--- The Robbery ............................................................................... 8

--- The Photo Array ......................................................................... 8

--- Galloway's Identification by Photo Array ........................................ 9

--- Ogletree's Statement Implicating Galloway in the Shooting .............. 10

--- Galloway is Charged in the Shooting ............................................. 11

--- Galloway is Identified in the LineUp .............................................. 11

--- Ross' Fiancée Chimes In .............................................................. 12

--- Galloway is Tried and Convicted .................................................. 13

--- The Conviction is Vacated ........................................................... 13

--- The Order on Appeal .................................................................. 14

Standard of Review ............................................................................... 14

   ---   Standard of Review of Summary Judgment Decisions ............................. 14

   ---   Standard of Review for Reconsideration Motions ..................................... 15

   ---   Standard of Review on Qualified Immunity .............................................. 15

Argument ............................................................................................... 17

   Point I     Detective Ross is Entitled to Summary Judgment
              on Immunity Grounds, as a Matter of Law ....................................... 17

        ---   The Lineup Procedures did not Violate
                 Galloway's Clearly Established
                 Constitutional Rights ............................................. 18

        ---   All Other Theories Involving Detective
                 Ross must also be Summarily Dismissed ............................. 23

   Point II    Detective Lipson is Entitled to Summary Judgment
              on Immunity Grounds, as a Matter of Law ....................................... 24

        ---   All Other Theories Involving Detective
                 Lipson must also be Summarily Dismissed ......................... 28

        ---   All Claims Arising from Statements Allegedly
                 made to Hernandez are Also Subject to
                 Immunity .............................................................. 30

   Point III   DeCaro and Darenzio are Entitled to Summary
              Judgment for all Claims Stemming from the
              Ogletree Statement ................................................. 31

   Point IV   Dluginski is Entitled to Summary Judgment ..................................... 32

   Point V    The County is Entitled to Summary Judgment ................................... 32

Conclusion ............................................................................................ 33

Certificate of Compliance with Frap 32(A) ............................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*,
684 F.3d 36 (2d Cir. 2012) ...............................................................15

*Anderson v. Creighton*,
483 U.S. 635 (1987)...........................................................................16

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................15

*Arteaga v. State*,
72 N.Y.2d 212 (1988) ........................................................................20

*Ashby v. Senkowski*,
269 F.Supp.2d 109 (E.D.N.Y., Spatt, A., U.S.D.J. July 3, 2003).......18

*Baez v. City of Amsterdam*,
245 A.D.2d 705 (N.Y. 3d Dep't 1997) ...................................20, 21, 22

*Bermudez v. City of New York*,
790 F.3d 368 (2d Cir. 2015) ..............................................................32

*Blouin ex rel. Estate of Pouliot v. Spitzer*,
356 F.3d 348 (2d Cir. 2004) ..............................................................20

*Brown v. Halpin*,
885 F.3d 111 (2d Cir. 2018) (per curiam) ...........................................5

*Burress v. Lincoln & Devon Shell Gas Sta.*,
90-CV-2367, 1992 WL 69989 (N.D.Ill., Mar. 31, 1992) .............25, 27

*D'Amico v. City of N.Y.*,
132 F.3d 145 (2d Cir.), cert. denied, 524 U.S. 911 (1998)................15

*Demoret v. Zegarelli*,
451 F.3d 140 (2d Cir. 2006) ................................................................5

*Demosthene v. City of New York*,
    831 Fed.Appx. 530 (2d Cir. 2020)......................................23

*Dickerson v. Fogg*,
    692 F.2d 238 (2d Cir. 1982) ......................................25, 26

*Empresa Cubana del Tabaco v. Culbro Corp.*,
    541 F.3d 476 (2d Cir.2008) ......................................15

*Escalera v. Lunn*,
    361 F.3d 737 (2d Cir. 2004) ......................................32

*Fappiano v. City of New York*,
    01-CV-2476, 2015 WL 94190 (E.D.N.Y. Jan. 7, 2015), *aff'd*,
    640 Fed.Appx. 115 (2d Cir. 2016)......................................29

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982)......................................16, 24

*Higazy v. Templeton*,
    505 F.3d 161 (2d Cir. 2007) ......................................23

*Holcomb v. Lykens*,
    337 F.3d 217 (2d Cir. 2003) ......................................16

*Jenkins v. City of New York*,
    478 F.3d 76 (2d Cir. 2007) ......................................20, 22

*Jones v. Parmley*,
    465 F.3d 46 (2d Cir. 2006) ......................................20

*Ketcham v. City of Mount Vernon*,
    992 F.3d 144 (2d Cir. 2021) ......................................14

*Manganiello v. City of N.Y.*,
    612 F.3d 149 (2d Cir. 2010) ......................................17, 32

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985)......................................5

*NetJets Aviation, Inc. v LHC Communs., LLC*,
    537 F.3d 168 (2d Cir. 2008) ......................................15

iv

*Okin v. Vill. Of Cornnall-on-Hudson Police Dep't*,
557 F.3d 415 (2d Cir. 2009) ...................................................................15

*People v. Rodriguez*,
64 N.Y.2d 738 (1984) ......................................................................25, 26

*Pleva v. County of Suffolk*,
222 A.D.3d 795 (N.Y. 2d Dep't 2023) ..............................................21

*Plummer v. Quinn*,
326 F.App'x 571 (2d Cir. 2009) .........................................................5

*Reyes v. Fischer*,
934 F.3d 97 (2d Cir. 2019) ...................................................................4

*Salim v. Proulx*,
93 F.3d 86 (2d Cir. 1996) ...................................................................16

*Savino v. City of NY*,
331 F.3d 63 (2d Cir. 2003) ...................................................................5

*Shakir v. Stankye*,
805 F.App'x 35 (2d Cir. 2020) .........................................................15

*Solomon v. Smith*,
645 F.2d 1179 (2d Cir. 1981) .....................................................3, 25, 26

*Southerland v. City of NY*,
680 F.3d 127 (2d Cir. 2011) ........................................................15, 16

*Stansbury v. Wertman*,
721 F.3d 84 (2d Cir. 2013) .................................................................33

*Stipo v. Town of N. Castle*,
205 A.D.2d 608 (N.Y. 2d Dep't 1994) ..............................................22

*Taravella v. Town of Wolcott*,
599 F.3d 129 (2d Cir. 2010) ..............................................................16

*United States v. Thai*,
29 F.3d 785 (2d Cir. 1994) .................................................3, 25, 27, 28

*Walczyk v. Rio*,
   496 F.3d 139 (2d Cir. 2007) ...............................................................5, 17

**Rules**

Fed. R. Civ. P. 56(a).............................................................................15

## Preliminary Statement

This brief is submitted in behalf of defendants Nassau County, Detectives Charles DeCaro, Thomas Dluginski[1] and George Darienzo, retired Detectives Matthew Ross and Ronald Lipson (collectively "the Nassau defendants") who respectfully request that this court reverse the portion of the March 29, 2024 order of the District Court (Donnelly, A., U.S.D.J.) that denied the Nassau County defendants' summary judgment motion and that the motion be granted.

This wrongful conviction case centers on three fundamental challenges to the events that led to plaintiff Josiah Galloway's conviction for the attempted murder of Jorge Anyosa. Galloway's core allegations are that the police officers involved coerced a witness statement incriminating him, then made improper confirmatory statements as he was identified in a photo array and, finally, in bad faith staged an unduly suggestive lineup that led to his further identification. Galloway brought suit based on these and related wrongdoings against the individual defendant police officers and their employer, Nassau County. Summary judgment motions were made, including on the grounds of qualified immunity, leading, ultimately to this interlocutory appeal.

---

[1] Dluginski's name is spelled inconsistently throughout the record. This is the correct spelling. It contains no apostrophe.

The remaining individual defendants are each entitled to qualified immunity as a matter of law (and the interlocutory review of their motions that follows from that entitlement) or summary judgment on the merits (on pendent appellate review).

For example, Detective Ross, who was involved only in the lineup, cannot possibly have liability (and cannot possibly be denied immunity) for events that occurred before he ever got involved in the matter. As to the lineup itself, the District Court correctly determined that it was not unduly suggestive (in that it was permissible to use the hats, sheets and elevated seating to harmonize the participants' appearance). The District Court erred, however, in finding that Ross is not entitled to summary judgment because there is a triable question of fact concerning the possibility that Ross was acting in bad faith. As is laid out in detail in the pages that follow, an officer's subjective intent while *not* violating a defendant's rights is irrelevant to the officer's entitlement to qualified immunity, under both New York and federal law. Consequently, Ross' motion for summary judgment on qualified immunity should have been – and must now be – granted.

Galloway's challenge in connection with the photo arrays concern alleged post-identification confirmatory remarks. The District Court erred as a matter of law when it held that the constitutionally impermissible nature of such remarks was sufficiently established at the relevant time, such that a reasonable officer

would have known that such comments violated suspects' rights. In reality, the precedent cases, such as they are, involve police conduct far beyond mere confirmatory statements and none establish that the statements themselves, standing alone are impermissible. In fact, some cases state specifically that they are not. See, *e.g.*, *United States v. Thai*, 29 F.3d 785, 806 (2d Cir. 1994); *Solomon v. Smith,* 645 F.2d 1179 (2d Cir. 1981).

Thus, even if, as Galloway claims, defendants Lipson, Dluginski or Darienzo made post-identification statements or pre-identification representations about a suspect being in custody, there was no precedent case that would have alerted them (nor any other reasonable officer) that such conduct is not permissible. Therefore, Lipson, Dluginski or Darienzo each have established their entitlement to summary judgment on qualified immunity grounds as to the claims against them about any statements they are alleged to have made.

The outcome must be the same as to the allegedly coerced witness statement, in connection with which DeCaro and Darienzo are the target defendants. While disagreements abound on this issue, there is no dispute about one outcome-determinative fact; the grand jury that determined that probable cause existed did not know about the statement at all. Since the statement was irrelevant to the determination of probable cause, DeCaro and Darienzo are entitled to summary

judgment and should be granted that relief upon this court's exercise of pendent jurisdiction.

Galloway's case against the County and any other theories not reached through immunity are inextricably intertwined with the facts that underlie the immunity issues. For this reason, on this court's consideration of immunity, it should also exercise pendent jurisdiction over the remaining claims, including County's summary judgment application.

## Jurisdictional Statement

The jurisdictional predicate for this appeal is the individual appellants' right to pursue interlocutory appellate review of the denial of their motion for summary judgment in their favor on their qualified immunity defense since that review concerns only issues of law. For claims that are not reviewable as pure law immunity questions, the individual defendants and Nassau County respectfully request that this court exercise its pendent jurisdiction.

--- *The Individual Defendants' Entitlement to Summary Judgment on Immunity is Properly Before this Court*

The denial of summary judgment on a legal question involving a defense of qualified immunity is immediately appealable. *Reyes v. Fischer*, 934 F.3d 97, 102-103 (2d Cir. 2019) (holding that "[t]his 'Court has jurisdiction over interlocutory appeals based on qualified immunity when the defense can be decided based on questions of law' but this Court lacks jurisdiction over 'the resolution of factual

issues'") quoting *Brown v. Halpin*, 885 F.3d 111, 117 (2d Cir. 2018) (per curiam);

see also *Savino v. City of NY*, 331 F.3d 63, 71-72 (2d Cir. 2003) (holding that

"under the collateral order doctrine, 'a district court's denial of a claim of qualified

immunity, to the extent that it turns on an issue of law, is an appealable final

decision notwithstanding the absence of a final judgment'") quoting *Mitchell v.*

*Forsyth*, 472 U.S. 511, 530 (1985).

     Determination of the immunity questions raised below involves only

questions of law.

     ---     *The Exercise of Pendent Jurisdiction is Warranted for*
               *the Remaining Claims*

     Pendent jurisdiction exists to allow this court to examine those issues that

are "inextricably intertwined" with the immunity question. *Plummer v. Quinn*, 326

F.App'x 571, 572 (2d Cir. 2009) (holding that this court would "consider the

district court's denial of qualified immunity as to [an individual defendant], and

exercise pendent jurisdiction over the district court's denial of summary judgment

as to the [employer municipality] because the issues are "inextricably intertwined")

citing *Walczyk v. Rio*, 496 F.3d 139, 153 (2d Cir. 2007) holding that "[this court]

may exercise pendent jurisdiction over . . . issues that are not ordinarily subject to

interlocutory review . . . when . . . they are 'inextricably intertwined' with the

determination of qualified immunity") and *Demoret v. Zegarelli*, 451 F.3d 140,

152 (2d Cir. 2006) (holding that "where a municipality's liability arises solely from

the actions of an employee who is entitled to qualified immunity, we may, in our discretion, reach the liability of the municipality under the doctrine of pendent appellate jurisdiction.")

This appeal invites pendent jurisdiction since so few issues will remain after resolution of the immunity questions and each of those is tightly bound to the undisputed facts on which interlocutory review is already being performed. Under such circumstances this court's exercise of pendent jurisdiction is warranted.

## Issues Presented

*Issue 1:*   Where there is no conflicting proof about facts relevant to a qualified immunity question, is that question properly before this court on an interlocutory appeal?

*Answer:*   Yes.

*Issue 2:*   Where there are issues inextricably intertwined with qualified immunity questions that are properly raised on an interlocutory appeal, can this court exercise jurisdiction over the other issues?

*Answer:*   Yes.

*Issue 3:*   Does the possibility that an officer acted in bad faith while *not* depriving a suspect of any rights, defeat the officer's entitlement to qualified immunity under state or federal law?

*Answer:*   No.

*Issue 4:*   Was it clearly established in 2008 that confirmatory remarks during identifications constituted a violation of the defendant's rights?

*Answer:*   No.

*Issue 5:*     Where the grand jury indicted the defendant without the use of a potentially coerced witness statement, are the officers who obtained the potentially tainted statement entitled to summary judgment?

*Answer:*     Yes.

## Statement of the Facts

---     *The Shooting*

Jorge Anyosa, a cab driver, was shot in the face while he was sitting in his cab at a lot at the Hempstead train station on May 15, 2008. (A. 430, 7395). Twenty minutes earlier, Anyosa and Wilmer Hernandez, another cab driver, had been in a heated argument with the person who ultimately shot Anyosa. (A. 555). The person who shot Anyosa did so after pulling up in his own car next to Anyosa's, aiming his gun at Anyosa through the side windows of the cars – and shooting Anyosa in the face. (A. 562).

Anyosa survived and was hospitalized. (A. 566). Detective Dluginski, of the Nassau County Police Department, was assigned to investigate. (A. 1544). A few days after the shooting, on May 19, 2008, Anyosa collaborated with a police sketch artist to create a composite sketch of his shooter whom he described as being a 25 to 30 year-old Black man, 5-feet-10-inces tall, with short black hair, a medium complexion and an accent. (A. 1646, 1651-1462). The sketch that resulted was circulated to local police departments. (A. 2147).

7

--- *The Robbery*

Nearly two weeks after the shooting, on May 27, 2008, Galloway and a friend of his, Robert Ogletree, robbed Marky Fouse on Fulton Avenue, also in Hempstead. (A. 7432). Fouse reported the robbery to the Village of Hempstead Police Department. Galloway and Ogletree were arrested by Village of Hempstead police officers for the robbery on June 5, 2008. (A. 7441). Darienzo and DeCaro were assigned to the case. (A. 2122).

Galloway is 5-feet-5-inches tall, Black and has no accent. (A. 2573). He was 21 years old and had braids at the time of this arrest for the robbery. (A. 2678). This was not his first arrest; he had been arrested in September 2007 and the mug shot from that arrest was already in the Police Department's system. (A. 5381).

After meeting Galloway, DeCaro realized that he resembled the sketched image of the train station shooter that had been posted in DeCaro's department. (A. 2098).

--- *The Photo Array*

At DeCaro's request, Lipson assembled photo arrays to show to Anyosa, the shooting victim, and Hernandez, the witness who was present when the shooter argued with Anyosa 20 minutes prior to the shooting. (A. 3746). Lipson prepared the photo arrays, by himself, without the other officers' assistance. (A. 3601). He used Galloway's arrest photo from September of 2007 and placed that photo into each of the two arrays (in different positions). (A. 3605, 3746, 5381).

8

---      *Galloway's Identification by Photo Array*

The photo arrays that Lipson created were shown to Anyosa and, separately, to Hernandez. (A. 3557, 3588). DeCaro, Darienzo, Ross, and Dluginski were not present when the photo arrays were viewed by Anyosa or Hernandez. (A. 3557, 3588).

On June 6, 2008, Hernandez identified Galloway from the photo array as the shooter. (A. 650, 3639). There is no dispute that he did not see Galloway in person just before he viewed the array. (A. 3789). Once Hernandez did identify Galloway, Lipson prepared a supporting "deposition" for Hernandez's signature. (A. 3630, 3369). Hernandez signed the attestation. (A. 3791).

Mere hours after Hernandez's identification, Anyosa also identified Galloway from the photos. (A. 3588). There is some dispute about how many sets of photos Anyosa was shown (though none of these disputes implicate any outcome-determinative fact for purposes of this appeal). (A. 634). There is also some dispute about whether Anyosa or Hernandez knew that the police had someone in custody when they made their identification. (A. 655, 3785, 3841, 5326).

Anyosa also testified that he thought (though he did not definitively recall) that he was told before he was shown any arrays that Hernandez had already identified the "right" person from the array. (A. 5337). At Galloway's criminal trial

9

in 2009, Anyosa testified repeatedly that he did not remember how many sheets of paper he was shown when he was asked to identify the person who shot him. (A. 572, 639). He did recall that it was 6 photos to a sheet. (A. 633). He initially testified that he was shown one sheet of paper (A. 572) but by the fourth round of his questioning, during re-cross, he testified that he was shown "three or four sheets" of paper out of which he "signed one [to indicate his identification]." (A. 639). There is no dispute between the parties that Anyosa did identify the plaintiff in the photo array. (A. 639).

During his deposition in this case, Anyosa testified that he thought and guessed that the police officers may have, "probably," told him, though "not to [his] face," that he "did a good job" in picking out the photograph. (A. 5329). He did state unequivocally that "[t]hey never said that, when [he] was picking up [out of the lineup], that's the guy. No. They never say that." (A. 5330).

--- *Ogletree's Statement Implicating Galloway in the Shooting*

Meanwhile, also on June 6, 2008, DeCaro questioned Ogletree, Galloway's accomplice in the robbery. (A. 3353). Ogletree was cooperative and discussed multiple crime incidents with DeCaro. (A. 3358). As is relevant here, he ultimately signed a written statement in which he declared that "[Galloway] said that he [referring to Galloway] had to 'blam', shoot a cab driver over by the chicken place on Jackson [where Anyosa was shot]." (A. 3754).

10

During the plaintiff's criminal trial, Ogletree distanced himself from his statement, claiming then that the detectives had "made up" the claim about the "chicken spot" and that he had been coerced into signing his earlier statement. (A. 447, 483).

--- *Galloway is Charged in the Shooting*

DeCaro relayed the investigative findings to the District Attorney and ultimately signed the resulting criminal complaint as they prepared to charge Galloway with attempted murder, assault and criminal use and possession of a firearm – all in connection with Anyosa's May 15, 2008 shooting. (A. 3881). Galloway was also charged with the robbery and related counts in connection with the May 27, 2008 events. (A. 3876). The Anyosa shooting was presented to the grand jury without any mention of Ogletree's statement. (A. 1451, 3944). Galloway was indicted on four counts. (A. 4030).

--- *Galloway is Identified in the LineUp*

A lineup was ordered and conducted on August 14, 2008, with Galloway's defense counsel present (and without his objection). (A. 4033, 4121). By this time Galloway had changed his hairstyle. (A. 3975). For the lineup, Galloway (and all fillers) were given identical hats to wear so differences in hairstyle did not show. (A. 2528, 4311). Galloway was also seated on two phone books which made him appear to be about the same height as the seated fillers. (A. 2681). Finally, sheets

were draped across Galloway and each of the fillers. (A. 4311). Ultimately, only their faces showed. (A. 4311). All of these efforts relating to the hats, the phone books and the sheets, were undertaken at Ross' direction, who had just gotten involved with the case for the first time, and were discussed with the trial prosecutor prior to conducting the lineup. (A. 4148, 3983).

Anyosa and Hernandez each viewed the lineup, separately, and they each identified Galloway as the shooter. (A. 4379, 4381).

--- *Ross' Fiancée Chimes In*

In November 2020, when Ross was deposed in this matter, he was engaged to be married to Lori Magliaro. (A. 6737). Magliaro, after learning of Ross' testimony about the lineup, claimed for a time that Ross had perjured himself. (A. 6833). After their engagement was called off, she signed an affidavit (prepared by Galloway's prior counsel [A. 7072]) that states that Ross told her that he, Ross, was aware that Galloway did not match the shooter's description and that the lineup had been "contrived" to disguise that mismatch. (A. 6833, 7074).

In time, Magliaro herself conceded that she was the one who committed perjury, however, and in the very affidavit in which she accused Ross of lying. (A. 7045-7047). Magliaro testified during her deposition in this case that her affidavit contains lies. (A. 7045-7056, 7060, 7072). For example, she confessed,

Ross had never described to her any lineup in any detail at all, despite her affirmed claims to the contrary. (A. 7056).

--- *Galloway is Tried and Convicted*

Galloway's criminal trial for Anyosa's shooting resulted in a conviction and a sentence of 25 years in prison and 5 years of post-release supervision. (A. 1441-1443, 4552-4543, 5703).

--- *The Conviction is Vacated*

Nine years into Galloway's prison term, the District Attorney received a call from a Nadine Johnson who claimed that Galloway was not the shooter and, ultimately, disclosed to the DA that she believed Kenton Sherwood (a friend of a friend to Johnson) was the person who shot Anyosa. (A. 7581, 7763, 8012). Anyosa was shown a single photo of Sherwood and identified him as the perpetrator. (A. 6969, 6977, 7587). On September 13, 2018, after the District Attorney completed their re-opened investigation, Galloway's conviction was vacated on the government's application. (A. 5112, 5708).

--- *Galloway Sues*

In the lawsuit that resulted from these events, Galloway brought federal and state claims against the individual officers and Nassau County. (Officers from the Village of Hempstead and the Village itself had been named but all of the Village defendants were granted summary judgment so the claims against them are not detailed here). Similarly, Galloway voluntarily discontinued some defendants and

claims [R. 5305], so those claims are also omitted from the discussion here).

Galloway's allegations were for malicious prosecution, fabrication of evidence and *Brady* violations, false imprisonment, negligent and intentional infliction of emotional distress, conspiracy, unlawful detention, failure to intervene and, as to the municipal entities, supervisor and *Monell* liability.

Galloway's claims were narrowed somewhat in the summary judgment motion that underlies this appeal. Critically, the District Court denied the motions for summary judgment on qualified immunity grounds as to all of the remaining defendants (appellants here).

---    *The Order on Appeal*

After the District Court's initial summary judgment decision, the individual officers as well as Nassau County moved for reconsideration of the summary judgment order. (A. 7874-7910, 7959-7979). The reconsideration motion was denied in full as to the Nassau County defendants. (A. 7980-7997).

The Nassau County defendants appeal. (A. 7998-7999).

## Standard of Review

---    *Standard of Review of Summary Judgment Decisions*

A District Court's summary judgment determination is reviewed by this court de novo. *Ketcham v. City of Mount Vernon*, 992 F.3d 144 (2d Cir. 2021). During such review, this court "construe[s] the evidence in the light most favorable to the nonmoving party" and "draw[s] all reasonable inferences in [the non-moving

14

party]'s favor. *Id* at 148-149 citing *Okin v. Vill. Of Corrnall-on-Hudson Police Dep't*, 557. F.3d 415, 427 (2d Cir. 2009).

"Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Southerland v. City of NY*, 680 F.3d 127, 141 (2d Cir. 2011) quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir.), cert. denied, 524 U.S. 911 (1998), citing Fed. R. Civ. P. 56(a). Conversely, summary judgment "is not appropriate if the evidence is such that a reasonable jury could return a verdict in favor of the party against which summary judgment is contemplated." *NetJets Aviation, Inc. v LHC Communs., LLC*, 537 F.3d 168, 178-179 (2d Cir. 2008), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

--- *Standard of Review for Reconsideration Motions*

A motion for reconsideration is reviewed for "abuse of discretion." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012), as amended (July 13, 2012), citing *Empresa Cubana del Tabaco v. Culbro Corp.*, 541 F.3d 476, 478 (2d Cir.2008) (per curiam).

--- *Standard of Review on Qualified Immunity*

De novo review applies to the interlocutory appeal from the denial of summary judgment on a qualified immunity defense. *Shakir v. Stankye*, 805

15

F.App'x 35 (2d Cir. 2020) (summary order). Additionally, this court "may assess the availability of qualified immunity only 'on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find.'" *Id.* at 37, quoting *Salim v. Proulx*, 93 F.3d 86, 90 (2d Cir. 1996).

"Qualified immunity shields public officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Southerland*, 680 F.3d at 141, quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Officers are entitled to immunity if "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Holcomb v. Lykens*, 337 F.3d 217, 220 (2d Cir. 2003) (internal quotation marks omitted).

A "clearly established" right is present where "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That is, where it is "objectively reasonable" for an officer "at the time of the challenged action to believe his acts were lawful" those acts (and the officer) are protected by qualified immunity. *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010). Thus, in this Circuit, the test ultimately becomes that "if 'officers of reasonable competence could disagree' on the legality of the action

at issue in its particular factual context" then immunity applies. *Manganiello v. City of N.Y.*, 612 F.3d 149, 165 (2d Cir. 2010), quoting *Walczyk v. Rio*, 496 F.3d, 139 at 154 (2007).

## Argument

For the reasons that follow, each of Galloway's claims is subject to summary dismissal either (1) on the interlocutory appeal sought as a matter of right from the denial of summary judgment on a defense of qualified immunity on issues involving pure questions of law; or (2) on this court's exercise of pendent jurisdiction over the remaining claims.

**Point I**      **Detective Ross is Entitled to Summary Judgment on Immunity Grounds, as a Matter of Law**

As Galloway readily concedes (A. 7801, 7888), Ross' involvement in the investigation was limited to the lineup. (A. 7801). Specifically, it was Ross' decision (together with Dluginski's) to use the hats, boost the height of Galloway's seat with phonebooks and cover everyone in sheets for the lineup. (A. 2528-2529, 4000, 4131).

The District Court found that the procedures Ross deployed for the lineup did not render it unduly suggestive – yet it denied Ross' motion for summary judgment, on the ground that there is some possibility he was acting in bad faith. Denying the motion on these grounds was error because neither state nor federal law withholds from a defendant who does the right thing, even for the wrong

reason, the entitlement to qualified immunity or the right to its determination at the summary judgment stage.

---    *The Lineup Procedures did not Violate Galloway's*
      *Clearly Established Constitutional Rights*

In denying Ross' motion for summary judgment, the District Court held (correctly) that "the procedures employed [during the lineup] were not unduly suggestive" (A. 8022) but (in error) that "there are disputes of material fact about whether Detective Ross used otherwise acceptable lineup procedures with the intent to conceal the plaintiff's height and deprive him of a fair trial." (A. 7850).

As to the former determination, as the District Court correctly noted, the "clearly established" law in 2008 allowed for the use of hats, sheets and elevated seats during a lineup. *Ashby v. Senkowski*, 269 F.Supp.2d 109, 117 (E.D.N.Y., Spatt, A., U.S.D.J. July 3, 2003) (holding that it is not unduly suggestive to conduct a lineup using hats, seating and sheets to even out differences between the fillers and the suspect.)

The factual predicate for the District Court's concern over the possibility that Ross was acting in bad faith in organizing the lineup was the statement Ross' former fiancée, Lori Magliano, signed for Galloway's former counsel, after counsel (not Magliano) wrote it for her to sign. (A. 7038-7040, 7061, 7683-7684, 7889-7890). The allegation is made in that written statement that Ross told Magliano that he "contrived" the lineup procedures, in effect, to conceal not the

differences between Galloway and the fillers at the lineup but between Galloway and the description of the suspect. (A. 6833, 7046). The effect of this statement could not be undone through Magliano's subsequent retraction of it in her deposition confession that Ross never told her such things about Galloway's lineup and that, in fact, Ross had never told her anything specific about any lineup. (A. 7045-7046, 7055-7058, 7062, 7889-7890).

Given the jurisdictional limitations of the appellants' procedural predicament, we accept for the purposes of this appeal that the blow Magliaro's statement was calculated to inflict on Ross, did land; on this record, the possibility that Ross acted in bad faith exists. Nevertheless, Ross is entitled to summary judgment on qualified immunity as a matter of law because *even if* it were true that Ross' motives in crafting the procedures for the lineup were in bad faith, under both federal and New York law, he remains entitled to qualified immunity since, as a matter of law, the lineup did not deprive Galloway of any rights.

The District Court's denial of Ross' motion for summary judgment was due to an error of law that stems from a common but erroneous understanding of the "good faith" component of police action, including in the context of qualified immunity, under New York law. The oft-used shorthand for New York's rule of qualified immunity is along the lines that "New York law … does grant government officials qualified immunity on state-law claims except where the

officials' actions are undertaken in bad faith or without a reasonable basis." *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006), citing *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 364 (2d Cir. 2004) and *Arteaga v. State*, 72 N.Y.2d 212 (1988). While this summary is technically correct, it invites error in a case such as this because it fails to account for the particular way in which New York uses the concept of "good faith" in this context.

The particular nuance of New York law in this regard been identified and explained by this very court. In *Jenkins v. City of New York* this court has recognized that

> [w]hile the requirement of "good faith" under New York law might be interpreted to require a factual determination of the officer's subjective intent, this is not the case. Similar to the federal doctrine, if, when the facts are construed in favor of the plaintiff, the officer's [challenged action] was objectively reasonable, the court under New York law should dismiss the plaintiff's [deprivation of rights] claim at the summary judgment stage.

> *Jenkins v. City of New York*,
> 478 F.3d 76, 88 (2d Cir. 2007).

This is an accurate characterization of how New York courts approach these inquiries. For example, in *Baez v. City of Amsterdam*, New York's Appellate Division was called upon to determine whether a police officer was entitled to qualified immunity in the face of allegations of an unreasonable search and seizure as well as a (decidedly state law) claim of assault. 245 A.D.2d 705 (N.Y. 3d Dep't

1997). That the Appellate Division determined the police officer was entitled to immunity is worth noting but the manner in which the Appellate Division arrived at that conclusion is what is critical to observe for the purposes of our analysis.

In determining whether summary judgment would be granted on the qualified immunity defense, the court queried whether the defendant established that "it was objectively reasonable for [the defendant officer] to believe that his conduct was appropriate under the circumstances, or that officers of reasonable competence could disagree as to whether his conduct was proper." 245 A.D.2d 706-707. Critically, this is *all* that the court queried; that is, the Appellate Division did not (unlike the District Court here) conduct a two-part inquiry examining the objective element first and then, on finding that the objective element was satisfied, evaluating whether there was any evidence of bad faith such as would defeat the officer's entitlement to summary judgment on the qualified immunity affirmative defense for the state law claims. No. Instead, once the court concluded that the officer's actions were objectively reasonable, the inquiry ended and the court concluded that the defendant was entitled to summary judgment in his favor on qualified immunity. *Id.* at 707; see also *Pleva v. County of Suffolk*, 222 A.D.3d 795, 797 (N.Y. 2d Dep't 2023) (holding that "[p]olice officers are entitled to qualified immunity on state law claims if their actions are "objectively reasonable" without adding any additional qualifiers relating to subjective state of mind).

21

Summary judgment on the qualified immunity defense without an inquiry going to the possibility of subjective bad faith was entirely consistent with the tenet that, under New York law, "the applicability of the qualified immunity doctrine … shields from liability those official acts performed in good faith or with a reasonable basis." *Baez*, 245 A.D.2d at 707, citing *Stipo v. Town of N. Castle*, 205 A.D.2d 608 (N.Y. 2d Dep't 1994). The reason that there is no tension between this statement of law and the one-item inquiry relating solely to the objective reasonableness of the officer's actions is exactly that which this very court identified in *Jenkins*; under New York law the requirement of "good faith" in the context of police action and qualified immunity involves *only* an inquiry concerning whether the challenged conduct was "objectively reasonable." *Jenkins*, 478 F.3d 88.

Given that this is the manner in which New York applies the "good faith" requirement, this court concluded in *Jenkins* with respect to the false arrest claim at issue, that "under both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." *Jenkins*, 478 F.3d at 88.

The same analysis applies here with respect to the claims against Ross relating to the lineup. There is no disputed fact and no question of law that the

lineup he arranged was "objectively reasonable." Because it was so, he is entitled to qualified immunity under both the federal and New York standards. And this is true even if he was acting in bad faith. *Id.* Consequently, all claims against Ross stemming from his management of the lineup should have been – and must now be – dismissed.

    ---    *All Other Theories Involving Detective Ross must also be Summarily Dismissed*

Though Galloway also articulated "failure to intervene" and other claims against Ross, all of these claims must be dismissed given the undisputed fact that Ross was simply not involved in any aspect of the investigation that pre-dated the lineup. Obviously, Ross could not have intervened, for example, in events he was not involved in. *Demosthene v. City of New York*, 831 Fed.Appx. 530, 535 (2d Cir. 2020) (holding that "[d]ue to … lack of evidence regarding [the defendant officer's] personal involvement in the alleged excessive use of force at the time of the [challenged conduct], the district court … properly dismissed this portion of [the plaintiff's] excessive force and failure to intervene claims.")

Framed in terms of qualified immunity, if one will, it must be determined that it was clearly established at the time of these events that a police officer does not violate a suspect's constitutional rights by merely *not* intervening where the officer is not present. *Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007) (holding that summary judgment was proper "[on the plaintiff's sixth amendment claims] on

the grounds of qualified immunity, because there was no violation of a clearly established right under the Sixth Amendment"), citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

**Point II**      **Detective Lipson is Entitled to Summary Judgment on Immunity Grounds, as a Matter of Law**

By the thinnest of margins, Galloway has created a question of fact concerning the possibility that after Anyosa identified Galloway in the photo array, Lipson made some statement to him that effectively confirmed that he correctly identified the perpetrator of the shooting. Anyosa's testimony in this regard is, equivocal, at best; he stated repeatedly that he could not recall the details of such an exchange and could not remember whether anything was said at all and that if something was said, what the statement might have been. (A. 5324, 5337). At other times though, it is true, he described getting the general impression from what was said to him that he picked the "right" person's photograph. (A. 5324, 5329-5331, 5346-5347).

For purposes of this appeal, given the procedural posture in which the Nassau County defendants find themselves, we accept that Lipson made some kind of statement to Anyosa from which Anyosa could reasonably have concluded that he identified the shooter in the array. That is, the defendants accept Galloway's version of the facts in this regard.

Even if a post-identification confirmatory statement was made, however, Lipson remains entitled to summary judgment on his qualified immunity defense. This is because, in 2008 when the photo array at issue was done, reasonable officers could have differed on whether such comments would violate a suspect's rights.

In fact, there were no cases on the books at the time from which a reasonable officer could have concluded one way or the other whether post-identification confirmatory statements are permissible. There are no cases that involve solely or even center on, a post-identification remark. In the cases where such a statement is part of the fact pattern, the remaining facts of the case tend to swallow whole the comparably insignificant feedback that may have been given to the witness. See, *e.g. Solomon v. Smith*, 645 F.2d at 1179; *Dickerson v. Fogg*, 692 F.2d 238 (2d Cir. 1982); *Thai*, 29 F.3d at 785; *Burress v. Lincoln & Devon Shell Gas Sta.*, 90-CV-2367, 1992 WL 69989, at *3 (N.D.Ill., Rovner, I., U.S.D.J., Mar. 31, 1992); see also *People v. Rodriguez*, 64 N.Y.2d 738 (1984).

A rule prohibiting post-identification confirmatory remarks cannot be extracted from these cases. *Solomon*, for example, involved a long list of questionable acts by the officers involved, including repeatedly showing the suspect's photo to the witness over an extended period of time, after the witness hesitated about the identification the first time. 645 F.2d at 1179. By the time of

the suspect's trial, the witness' hesitancy had vanished – and so had the reliability of the identification. No reasonable officer would deduce from the *Solomon* fact pattern, however, that the problem was a single post-confirmatory remark.

*Dickerson* is the same way; while a post-identification confirmatory remark was made, this was neither the only and certainly not the biggest problem. In fact, this court observed that the identification procedures were "suggestive in several respects" and not merely because of a remark. 692 F.2d 238, 244. Yet, this court also observed that "none of these [suggestive] aspects … alone necessarily would have invalidated the identification" and that instead it was "the combination of them all [that] comprised a highly suggestive identification." *Id.*

Cases on this issue from the New York Court of Appeals are in accord. In *Rodriguez* the witness identified the suspect in a photo array. 64 N.Y.2d at 740-41. The witness was then told that the suspect was in custody and that the person whose photo the witness had chosen from the array would be in the lineup. In response to the suspect-turned-criminal defendant's arguments that the identification must be suppressed, the Court of Appeals held that the identification procedures was not unduly suggestive. This means, of course, that the post-identification remarks did *not* deprive that suspect of their rights. The state of the law, therefore, does not support Galloway's theory that reasonable officers would have been in agreement in 2008 that a post-identification confirmatory remark, or

26

even minor remarks made before or during identification, would suffice to deprive a suspect of their constitutional rights.

In denying the summary judgment motion in this case, the District Court relied on *Thai*, 29 F.3d at 806 and *Burress*, 1992 WL 69989 at *3. Neither case supports the proposition that there was an established rule prohibiting confirmatory statements, however. [2]

In *Burress*, for example, the statement at issue was neither post-identification nor confirmatory. The *Burress* witness' testimony (construed heavily in favor of the plaintiff) was that the officer told him which photo to choose out of the array while he was presenting the array to the witness. There is no comparable allegation in this case (A. 3823) therefore reasonable officers evaluating a post-identification confirmatory statement would deprive a suspect of constitutional rights would not be aided by the import of *Burress*. Conversely, it cannot fairly be said that awareness of the prohibition against outright directing a witness' identification would lead a reasonable officer to conclude that there is a prohibition against allowing a witness to freely make an identification and then commenting on what occurred.

---

[2] The District Court also cited *Rosario*, 18-CV-4023, 2021 WL 199342 (S.D.N.Y., Schofield, L., U.S.D.J., Jan. 20, 2021) on this point (A. 8025), but *Rosario* post-dates the events at issue and also does not involve any post-identification confirmatory statements. For these reasons it will not be detailed here.

Certainly, an unequivocal rule against post-identification confirmatory remarks does not emerge from *Thai*, where this court observed that "misguided postidentification remarks or actions will not render [a confident prior identification] invalid or preclude a subsequent in-court identification." *Thai*, 29 F.3d at 810.

There being no clearly established law on the (im)propriety of post-identification confirmatory remarks in 2008, the conclusion is unavoidable that reasonable officers would differ over whether such remarks are deemed to be a violation of a suspect's rights and outright impermissible (or, for example, merely disfavored). Meanwhile, in the absence of clearly established law in this regard, Lipson is entitled to – and should be granted here – summary judgment.

--- *All Other Theories Involving Detective Lipson must also be Summarily Dismissed*

Galloway also claims that Lipson and others should have informed the DA that Anyosa did not identify Galloway in each of the photo arrays that he had been shown. (A. 5777). Even assuming, as we do for the purposes of this appeal, that Anyosa was shown multiple photo arrays and that he did not identify Galloway in each of them, this argument must be rejected as a matter of law, on immunity grounds.

While there is some indication in the record that more than one photo array had been prepared, if we were to assume after that (and we will so assume for

purposes of this appeal) that Lipson took all of the 2 or 3 arrays to show to Anyosa and that Anyosa did in fact identify Galloway on only one of them, summary judgment would still be appropriate. This is because not informing the DA about instances where, concurrent to a positive identification, a witness did not identify a suspect in some of the materials, does not render the identification or the proceedings that flow from it unconstitutional. *Fappiano v. City of New York*, 01-CV-2476, 2015 WL 94190 at *13 (E.D.N.Y. Townes, S., U.S.D.J., Jan. 7, 2015) (holding that there is no merit to the claim that the officers wrongfully suppressed exculpatory evidence when they did not inform the DA of two attempts at identification via photo array where the witness did not identify the suspect) , *aff'd*, 640 Fed.Appx. 115 (2d Cir. 2016). Instead and to the contrary, the law does not require that the DA be notified about how many identifications a witness may have missed while making at least one positive one. *Id.*

Since there is no established law that would have alerted any of the defendants that a failure to notify the DA of any missed identifications was a constitutional violation, Lipson and each of the individual defendants who did or is alleged to have conveyed information to the DA, is entitled to summary judgment in their favor on their defense of qualified immunity.

29

--- *All Claims Arising from Statements Allegedly made to Hernandez are Also Subject to Immunity*

In addition to objecting to statements that may (or may not) have been made to Anyosa, Galloway has also taken issue with representations that may (or may not) have been made to Hernandez. Specifically, Galloway argues that, read most favorably to him, Hernandez's testimony supports his theory that prior to Hernandez viewing of the photo array, it was made known to him that a suspect was in custody. Although Hernandez' testimony about these communications (A. 655, 3785, 3832) was, if possible, even more equivocal than Anyosa's (A. 5323-5324, 5336-5337), the District Court erred on the side of accepting these allegations as true for purposes of the motion. We do the same.

The analysis with respect to these statements is the same as those alleged to have been made to Anyosa, however; there simply was no established law that would have barred these statements from being made.

Since, even accepting Galloway's facts as true, the conclusion is unavoidable that there was no violation of a clearly established right in connection with these alleged statements, the motion for summary judgment on the immunity defense should have been granted.

**Point III      DeCaro and Darenzio are Entitled to Summary
Judgment for all Claims Stemming from the Ogletree
Statement**

Galloway's allegation that DeCaro and Darienzo deprived him of a fair trial
and manufactured evidence, involves Ogletree's statement and the allegation that
they were obtained through coercion. Assuming for purposes of this appeal that
Ogletree's statement was, as Galloway posits, coerced, DeCaro's and Darienzo's
summary judgment motion must still be granted because the grand jury's
indictment had been secured without reliance on the statement, giving rise to the
presumption of probable cause. That presumption has not been (and cannot be)
overcome here, since there is no evidence of either officer having acted in bad
faith.

The District Court held that summary judgment on this argument would not
be granted because there remained the possibility that there was "bad faith"
conduct by the police, including DeCaro and Darienzo. What the District Court
overlooked, however, is that the only officer against whom a specific claim of bad
faith can even be articulated on this record is Ross.

Galloway has offered no evidence of DeCaro or Darienzo (or anyone else,
save Ross) acting in bad faith. The alleged wrongdoing itself does satisfy the
evidentiary requirement for such a finding. Meanwhile, it is black letter law that
upon a grand jury indictment, there arises a presumption of probable cause.

*Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (holding that an indictment by a grand jury creates a rebuttable presumption of probable cause.) This presumption is rebutted "only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id*. Here, since no such evidence was ever offered and since mere conjecture is insufficient to warrant denial of a motion for summary judgment, DeCaro's and Darienzo's motion should have been granted. *Bermudez v. City of New York*, 790 F.3d 368, 373-74 (2d Cir. 2015).

**Point IV      Dluginski is Entitled to Summary Judgment**

Galloway implicates Dluginski in far more than what he could physically have accomplished. Certainly, those aspects of the claim that are effectively duplicates of the other claims discussed above, the same arguments apply. As to the failure to intervene claim, which relates to the Ogletree statement, dismissal is mandated because Dluginski was not even present during Ogletree's examination.

**Point V      The County is Entitled to Summary Judgment**

The challenges to the individual defendants' actions are inextricably intertwined with the claims brought against the County itself; the same key events and conduct underlie each set of claims. This court is urged to do what it has in the past and to hear and grant the County's summary judgment motion under its pendent jurisdiction. *Escalera v. Lunn*, 361 F.3d 737 (2d Cir. 2004) (holding that where "at the least, arguable probable cause to arrest … existed, entitling the

individual defendants to qualified immunity with respect to [the] false arrest claim" "[i]n the interest of judicial economy and because no additional inquiry or analysis is necessary to dispose of the false arrest claim against the County, we choose to exercise pendent jurisdiction and hold that, because each of the individual defendants had arguable probable cause, the County is likewise entitled to summary judgment in its favor"); *Stansbury v. Wertman*, 721 F.3d 84 (2d Cir. 2013) (same).

With the same reasoning, it is respectfully asked that this court reach all issues not before it as a matter of right on the appeal from the denial of the motion for summary judgment on the qualified immunity defense and that it grant the remaining defendants' motion for summary judgment.

## Conclusion

For the foregoing reasons, it is respectfully requested that the order on appeal be reversed to the extent that it denied the Nassau County defendants' summary judgment motion and that the motion be granted.

Dated:      New York, New York
            November 6, 2024

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
   EDELMAN & DICKER LLP


By:      \s\ Judy C. Selmeci
          Judy C. Selmeci
          John A. Vitagliano
          Attorneys for defendants-appellants
          Nassau County, Detectives
          Charles DeCaro, Thomas Dluginski
          and George Darienzo
          150 East 42nd Street
          New York, New York 10017-5639
          Our File: 12947.00047

## Certificate of Compliance with Frap 32(A)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,502 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated:    New York, New York
          November 6, 2024

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP

By:   \s\ Judy C. Selmeci
        Judy C. Selmeci
        John A. Vitagliano
        Attorneys for defendants-appellants
        Nassau County, Detectives
        Charles DeCaro, Thomas Dluginski
        and George Darienzo
        150 East 42nd Street
        New York, New York 10017-5639
        Our File: 12947.00047

**SPECIAL APPENDIX**

# **Table of Contents**

**Page**

Transcript of Proceedings held before the
Honorable Ann M. Donnelly on March 13, 2024 ...................... SPA1

Memorandum Decision and Order of the
Honorable Ann M. Donnelly, dated March 29, 2024 ............... SPA37

Memorandum Decision and Order of the
Honorable Ann M. Donelly, dated June 11, 2024 .................... SPA83

```
                                                                    1

 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - -      X
 3   JOSIAH GALLOWAY,             :
                                        19-CV-5026(AMD)
 4          Plaintiff,            :

 5       -against-               :
                                        United States Courthouse
 6                                      Brooklyn, New York
     COUNTY OF NASSAU, et al.,    :
 7                                      March 13, 2024
            Defendant.           :      3:00 p.m.
 8   - - - - - - - - - - - -      X

 9               TRANSCRIPT OF ORAL ARGUMENT
              BEFORE THE HONORABLE ANN M. DONNELLY
10               UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:    ELEFTERAKIS ELEFTERAKIS & PANEK
                           80 Pine Street, 38th Floor
13                         New York, NY 10005
                           BY:  GABRIEL HARVIS, ESQ.
14                              BAREE FETT, ESQ.
                                MICHAEL GLUCK, ESQ.
15

16   For the Defendants:   WILSON, ELSER, MOSKOWITZ, EDELMAN &
                           DICKER LLP
17                         1133 Westchester Avenue
                           West Harrison, NY 10604
18                         BY:  JOHN VITAGLIANO, ESQ.
                                JANINE MASTELLONE, ESQ.
19
                           HARRIS BEACH PPLC
20                         333 Earle Ovington Blvd., Ste. 901
                           Uniondale, NY 11553
21                         BY: DANIEL S. HALLAK, ESQ.
                               WILLIAM J. GARRY, ESQ.
22
     Court Reporter:       Andronikh M. Barna
23                         225 Cadman Plaza East
                           Brooklyn, New York
24                         (718) 613-2178

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

**SPA2**

2

1          THE COURTROOM DEPUTY:  This is civil cause for oral

2   argument.  Docket No. 19-CV-5026, *Galloway v. County of*

3   *Nassau, et al.*

4          Counsel, state your appearances, Plaintiff first.

5          MR. HARVIS:  For the Plaintiff, Your Honor, Gabriel

6   Harvis.

7          Good afternoon.

8          THE COURT:  Good afternoon.

9          MS. FETT:  Good afternoon, Your Honor.

10          Baree Fett for the Plaintiff.

11          THE COURT:  Good afternoon.

12          MR. GLUCK:  Good afternoon.

13          Michael Gluck for the Plaintiff.

14          THE COURT:  Good afternoon.

15          Does everybody have their microphones on?

16          MR. HARVIS:  Yes.

17          THE COURT:  Good.  Okay.

18          MR. HARVIS:  I believe so.

19          THE COURT:  Go ahead.

20          MR. VITAGLIANO:  Good afternoon, Your Honor.

21          John Vitagliano on behalf of Nassau County and the

22   Nassau County Defendants.

23          MS. MASTELLONE:  Good afternoon, Your Honor.

24          Janine Mastellone from Wilson Elser, also for the

25   County Defendants.

**SPA3**

3

 1          MR. HALLAK:  Good afternoon, Your Honor.

 2          Daniel Hallak from Harris Beach on behalf of the

 3  Village of Hempstead Defendants.

 4          MR. GARRY:  Good afternoon, Your Honor.

 5          William Garry, also from Harris Beach for the

 6  Village Defendants.

 7          THE COURT:  Okay.  So first thing's first.

 8  Everybody can stay seated, I can hear you better.  I just want

 9  to make sure everybody has access to the microphone.

10          Thing two -- I think I have told you all this

11  before, but bears repeating -- don't talk too fast.  It's very

12  hard on the court reporter and you don't have a good record of

13  your -- well, our court reporter is perfect, so even if you

14  spoke fast she would get it, but don't make her do that.

15          So those are a couple of reminders.

16          This is not a formal oral argument.  It's mostly

17  questions that I have based on your submissions, so that is

18  kind of the way I am going to do it.  If I ask a question,

19  it's really just because I want the answer, don't read

20  anything behind it.  But there are a number of things I just

21  want some clarification on.

22          So in no particular order -- well, you know, let me

23  just start with this *Monell* claim.  I don't understand what

24  the theory is.  As I understand it, it is Nassau County's, the

25  way they did lineups?

4

1          MR. HARVIS:  Right, Your Honor.

2          Detective Ross testified that the reason that he had

3     Plaintiff sit on two phone books and put a hat on his head and

4     covered him in a sheet is because he was following Nassau

5     County's training.

6          THE COURT:  But everybody did that in those days.

7     That's the way all -- so that's the theory, that when lineups

8     were conducted -- I should also say, I am trying to narrow

9     this into what I really think is an issue.  I don't think

10    that's a good argument.  And I think I've talked to -- I don't

11    think it was you who was here before, but about whether this

12    is something that we really need to think about.  Because if

13    we're talking about just the procedure of having a suspect and

14    five fillers in a lineup and minimizing differences by sheets

15    and hats, that I believe is a procedure that has been endorsed

16    certainly by New York State courts on the criminal side, but

17    by federal courts, too.  I really don't see how it could form

18    the basis for a *Monell* claim.

19         MR. HARVIS:  It was me who was here before

20    Your Honor and we have talked about this a little bit, and so

21    let me try to explain where we're coming from.

22         THE COURT:  Okay.

23         MR. HARVIS:  So there's no requirement under a

24    *Monell* claim for the policy that you're challenging to itself

25    be unconstitutional.  We're not saying that they maintained an

**SPA5**

5

1  unconstitutional policy.

2       THE COURT:  Okay.

3       MR. HARVIS:  What we're saying is that in a case

4  like this where the described perpetrator is 5'11" and the

5  suspect is 5'5", as applied to Josiah Galloway, a reasonable

6  jury could conclude that a proximate cause of his

7  misidentification, which we know happened, because he's

8  innocent, was the fact that, according to Ross, he was

9  required to go through this process that had the result of

10 concealing what would have otherwise been distinguishing and

11 exonerating qualities that Mr. Galloway had.  It was both his

12 height, because he was five inches shorter than -- at least

13 five inches shorter than the described perpetrator, and his

14 hair, because he had long hair that they covered with a hat.

15 And so --

16      THE COURT:  I'm sorry to interrupt, but you're

17 talking about the facts of this case and I don't think that

18 translates into a *Monell* claim.

19      I have to say just as a practical matter, I don't

20 really know what it gets you in this case because this is a

21 case about alleged constitutional violations against your

22 client and I'm just not familiar with -- is there another case

23 that you can cite that is like this?

24      MR. HARVIS:  Well, I mean, we've cited some cases in

25 our brief.  I think the *Amnesty International* case is the one

**SPA6**

6

1   that is the most supportive of our position, which basically

2   says that so long as you're challenging an actual policy of

3   municipality, then that automatically establishes the causal

4   link.  And we have Ross saying that this is a policy.  And we

5   believe a reasonable jury could conclude that this policy, in

6   this case, was a contributing factor to what is an

7   acknowledged misidentification.  And for that reason, we think

8   it raises a jury question that should be considered.

9          THE COURT:  Does anybody else say it's a policy

10  besides a detective from the squad?

11         MR. HARVIS:  Well, he's the person who was

12  responsible for deciding how the -- the record supports that

13  he was the person who played the pivotal role in deciding how

14  the lineup should happen, so we view his testimony as being

15  the most vital and controlling on this issue.

16         THE COURT:  Is he a decision-maker, or?

17         MR. HARVIS:  Well, he decided how they would do the

18  lineup that day.  That's what the D.A. says, that's what the

19  defense attorney says, and that's what he says.

20         And so we don't think that that really was the

21  policy because they had to -- for example, they had to go out

22  and get hats that day because they didn't even have hats at

23  the precinct.  So we think that we kind of have an alternative

24  here, which is that if the jury believes Ross that it was a

25  policy, then they might reasonably conclude that it was a

**SPA7**

7

1   contributing factor.  And if they disbelieve him, then it's

2   individual liability against Ross for creating a lineup, like,

3   contrary to policy that, as we said, is a contributing factor

4   to the misidentification.

5          THE COURT:  Maybe it's my own failure of

6   imagination, but this is the way -- and perhaps it's wrong.

7   And I've been out of this business for a while.  But in my

8   experience and reading federal cases and state cases, this is

9   the approved way that lineups are conducted to minimize

10   suggestibility.  And while it may be that you can make an

11   argument that in the particular facts of this case somebody

12   manipulated that policy for their own purposes in this case, I

13   don't see a *Monell* claim here.

14          You know, if you want to go ahead with a *Monell*

15   claim, go ahead.  I feel like you're going to come in second.

16   I could be wrong.  I'm going to continue to read all of, you

17   know, the cases that you submit.  But I don't think that's the

18   key to the case.

19          And just as a practical matter, you're sure this is

20   what you want to go ahead with, that you want Judge Donnelly

21   to spend her energy on?

22          MR. HARVIS:  Well, I don't want Judge Donnelly to

23   spend --

24          THE COURT:  That's why I took the job.  I was just

25   kidding.

**SPA8**

8

1        MR. HARVIS:  No, what I was going to say is, you

2  know, in our view, it was -- Detective Ross was brought into

3  the case by attributing his decisions to the policy.  And once

4  he said "policy" and we -- and in our view and I think in, you

5  know -- you know, in our view and I think in the view of a

6  reasonable jury, when you have someone who is -- you know that

7  he is six inches shorter than the described perpetrator.

8        THE COURT:  Well, let me ask you another question

9  about that.

10        MR. HARVIS:  Yeah.

11        THE COURT:  Is Ross -- I do have some sort of

12  factual questions about his involvement.  And in my -- I'm not

13  going to say anything about the 56.1s, but not exactly helpful

14  in trying to figure out what the facts are, because people are

15  always disputing but not really disputing, and so that's just

16  a side note.  But is Ross the one who is brought in because

17  they're doing double-blind lineups?

18        MR. HARVIS:  It's not double-blind.  He's just

19  brought -- it's true that his involvement is limited to the

20  lineups.

21        THE COURT:  Okay.

22        MR. HARVIS:  So that's accurate.

23        THE COURT:  So is there a dispute about what Ross

24  knew when he put the lineup together in terms of the

25  description of the suspect?

9

1      MR. HARVIS:  Well, we know that he knew that

2 Plaintiff was significantly shorter than the other fillers,

3 which is why he put him on phone books to begin with.

4      THE COURT:  But the critical question is, if he were

5 shorter than the other fillers and he was the only short guy

6 and the description were that the person who shot the victim

7 was a short guy, if they didn't put him on the phone books,

8 that would be a suggestive lineup because it would be like

9 having an arrow on the short guy.

10      MR. HARVIS:  Or they could have gotten fillers that

11 were similar in stature, which is what the policy actually

12 says according to the 30(b)(6) witness.

13      THE COURT:  Well, I think it's an overall -- I mean,

14 if they're all short guys, but -- you know, there's an old

15 Richard Pryor skit about this.  But if one person, you know,

16 is 500 pounds and -- you know, I mean, you can't justify that

17 lineup by saying that everybody is short.

18      But then my question about it is, does the record

19 reflect or is there a dispute of fact about what Ross knew

20 about the description, the victim's description of the

21 shooter?

22      MR. HARVIS:  It's not -- I don't think the record is

23 clear, goes one way or the other about what Ross knew.  I

24 don't think there's anything in the record that says that Ross

25 had a conversation where he is made aware of the discrepancies

**SPA10**

10

1  between the described shooter and Plaintiff.

2          THE COURT:  Okay.

3          MR. HARVIS:  But what we're saying is that if you --

4  well, I guess that's fair.

5          I mean, we have other officers there who were aware

6  of it, like D'Luginski, who was the lead carrying detective.

7  And so, you know, a bit more of a -- I guess like a common,

8  shared knowledge kind of an argument.

9          THE COURT:  And that's another question about -- I'm

10 kind of -- I'm going to give you guys a chance to talk, I

11 promise.

12         But also just with respect to Ross, I mean, it sort

13 of seemed to me, in reading the submissions, is that Ross

14 becomes involved after there is an indictment.

15         MR. HARVIS:  Correct.

16         THE COURT:  There's a court-ordered lineup.

17         MR. HARVIS:  Right.

18         THE COURT:  Ross is not involved in the

19 investigation, it doesn't sound like.

20         MR. HARVIS:  Correct.

21         THE COURT:  And I don't understand the submissions,

22 but correct me if I'm wrong, to say that he's the one that

23 said good job, you got the right person.

24         MR. HARVIS:  Correct.

25         THE COURT:  So he doesn't do that.

# SPA11

11

1        MR. HARVIS:  No.

2        THE COURT:  And then it seems to me that without the

3  fiancé's affidavit, which I'll get to in a minute, you

4  wouldn't have anything against Ross.

5        MR. HARVIS:  Right.

6        We have the fiancé saying that he admitted to her

7  that he specifically set up the lineup for the purposes of

8  obtaining a misidentification.

9        And then we have the prior lineup where he attempted

10  to shave Plaintiff's head.

11        THE COURT:  That's not what -- okay, we can -- was

12  Ross involved in that?

13        MR. HARVIS:  It was Ross.

14        THE COURT:  All the Plaintiff says in his deposition

15  is they said that we are going to have to cut your hair and

16  nothing ever happened.

17        MR. HARVIS:  They threatened to cut his hair,

18  basically, and then aborted the lineup when he refused.

19        THE COURT:  Well, if they threatened to cut his hair

20  -- I mean, they rescheduled the lineup.

21        So I'm just reading what the Plaintiff said.  The

22  Plaintiff said:  Your hair didn't look like that before.

23  We're going to either have to cut it -- I can't remember what

24  the language is.  Cut it or reschedule.

25        MR. HARVIS:  Well, they took out a Wahl trimmer.

**SPA12**

12

1    And he said --

2           THE COURT:  Pointed to it, according to the

3    Plaintiff.

4           MR. HARVIS:  Okay.

5           And then said, you know -- and he said, basically,

6    over my dead body are you going to be shaving my head.  And so

7    then they did reschedule it.

8           But the reason -- I mean, I think it's worth looking

9    underneath that a little bit because --

10          THE COURT:  Okay.

11          MR. HARVIS:  The reason that they weren't

12   comfortable with him proceeding is because the length of his

13   hair was so obviously distinguishing that they were unprepared

14   to have him in a lineup where his characteristics would have

15   distinguished him from the shooter.  And we have the victim

16   specifically saying that he wishes he had been told about the

17   true height of the Plaintiff because he would have immediately

18   said it wasn't him.

19          THE COURT:  Right.

20          But I'm just getting back to -- I am just trying to

21   identify with Ross --

22          MR. HARVIS:  Yes.

23          THE COURT:  -- that his particular role is as the

24   allegation is, that it's that he purposefully, maliciously

25   followed what most lineups are conducted but knowing that

# SPA13

13

1   those policies would affect your client badly.

2          MR. HARVIS:  According to him and his fiancé, yes.

3          THE COURT:  According to the fiancé.

4          But then the fiancé, at her deposition, says, well,

5   not everything I say is true.

6          Now, I'm not deciding credibility.  But just looking

7   down the line, I mean, that's something that you all as trial

8   lawyers can worry about.

9          But I don't know what I'm supposed to do with those

10  two things -- I think probably nothing -- that, you know, it's

11  very weak, that, one, that there's kind of a legalese thing

12  written out about what she says and then she says, well, I

13  didn't write it, not all of those things are true.  That's a

14  credibility issue.  That is not really for me to decide.

15         But I just wanted to make sure I understood exactly

16  what it was that Ross is alleged to have done.  And it's just

17  in this particular lineup, correct?

18         MR. HARVIS:  Just in this lineup.

19         THE COURT:  Okay.

20         MR. HARVIS:  Yes.

21         THE COURT:  All right.

22         My second question, just about people that I'm not

23  100 percent sure what they did.

24         I know one of them is Cunningham.

25         MR. HARVIS:  Yeah.

**SPA14**

14

1        THE COURT:  And who is the other guy?  With an S,

2   wasn't it?  Sortino?

3        I thought it was Cunningham and Sortino.  I'm just

4   having a difficult time figuring out what it was that they

5   did.

6        MR. HARVIS:  Sure.

7        So Cunningham is present when Plaintiff is arrested.

8   He's one of the officers who arrested him on June 6th.

9        THE COURT:  Okay.

10       MR. HARVIS:  He brings him back.  He remains at the

11   armory for, you know, this 15-hour period when they're

12   conducting their investigation.

13       THE COURT:  Right.

14       MR. HARVIS:  And he participates in a decision

15   regarding what charges will be brought against the Plaintiff.

16       That's pretty much what we have in terms of

17   Cunningham's participation.

18       THE COURT:  And what is wrong with that?  Just

19   remind me.

20       Because this is before any of the -- no, this is

21   after the photo array.

22       MR. HARVIS:  This is all happening afterwards.

23       I mean, we contend -- and we have a concession from

24   DeCaro that this is the case -- that the criminal complaint

25   that was filed contains this false statement claiming that

**SPA15**

15

1   Plaintiff had admitted to the crime.

2          THE COURT:  I remember that.  But what does that

3   have to do with Cunningham?

4          MR. HARVIS:  Well, yeah, I mean, I think it's a fair

5   question.

6          I think that to the extent Cunningham is aware of

7   what's going on, which we allege is this sort of -- quite a

8   bit of misconduct in the course of this 15-hour period.

9          THE COURT:  But don't you have to have him

10  specifically doing something?

11         He's not involved in the photo arrays.

12         MR. HARVIS:  That's correct.

13         THE COURT:  He's not involved, as far as I can tell,

14  in the interview of Ogletree.

15         MR. HARVIS:  That's correct.

16         I agree with Your Honor that of the -- we did take

17  some people out already.

18         THE COURT:  No, I know.

19         MR. HARVIS:  And of the people that we left in, I

20  agree that that's the closest question.  So I'm with

21  Your Honor on that.

22         THE COURT:  If you can think about that.

23         It just a) selfishly gives me less to worry about;

24  b) I don't think people should be in lawsuits if they don't

25  belong in lawsuits.

Case 2:19-cv-05026-AMD-JMW   Document 219   Filed 03/22/24   Page 16 of 36 PageID #: 36199

16

1          MR. HARVIS:  I think that's a fair point,

2    Your Honor.  I think we'd be prepared to withdraw against

3    Cunningham.

4          THE COURT:  Okay.  And I will take it tentatively

5    now.

6          MR. HARVIS:  Yeah.

7          THE COURT:  And then the second fellow, I think it

8    was -- was it Sortino.

9          Was it Sortino?

10          Sorry.

11          MR. HARVIS:  That's okay.  Go ahead.

12          THE COURT:  Let me get my boss here.

13          MR. HARVIS:  Please, yes.  Exactly.

14          (Pause in proceedings.)

15          THE COURT:  So I think I saw two other people:

16    Sortino and Dorsi.

17          MR. HARVIS:  Right.

18          So those, those two people are supervisors.

19          THE COURT:  Okay.

20          MR. HARVIS:  Okay?

21          I'm just saying that because we withdrew our

22    supervisory liability claim.

23          THE COURT:  Right.

24          MR. HARVIS:  So our theory is not that because they

25    were supervisors, they're responsible.

# SPA17

17

1          THE COURT:  Okay.

2          MR. HARVIS:  They have direct involvement and that's

3 made out through documents and their own testimony.

4          Sortino testified that this, what happened at the

5 armory was a joint investigation between Hempstead and Nassau.

6          THE COURT:  Right.

7          MR. HARVIS:  Sortino was the supervisor for

8 Hempstead.  He was sitting at the desk.  Dorsi was a

9 supervisor for Nassau County.  And they both testified that --

10 well, we know that both of them signed all the key documents

11 that were basically summarizing what happened that day.  So,

12 the arrest report --

13          THE COURT:  Slow down just a little.

14          MR. HARVIS:  Oh, sorry.

15          THE COURT:  That's okay.

16          MR. HARVIS:  The arrest report, the crime report.

17 There's something called a -- the case report.  All of those

18 documents were reviewed and signed by both Dorsi and Sortino.

19          And then Dorsi is supervising the detectives who are

20 allegedly involved in the misconduct around the

21 identifications, although we can see that that wouldn't have

22 been disclosed to him.

23          THE COURT:  Right.

24          So just as far as I know, Dorsi is not personally

25 involved in running the lineups, correct?

**SPA18**

                                                                    18

1            MR. HARVIS:  The photo arrays in the armory, no.

2            He is supervising that stuff and signing off on the

3    paperwork and looking at whether or not the --

4            THE COURT:  Same with Sortino?

5            MR. HARVIS:  Sortino signs the criminal complaint,

6    which is the initiating document of the Prosecution which

7    contains a false statement, which we think puts him on the

8    hook for --

9            THE COURT:  What?

10           MR. HARVIS:  Malicious prosecution.  He's initiating

11   a prosecution --

12           THE COURT:  But that false statement never goes

13   anywhere.

14           MR. HARVIS:  Well, it goes to the prosecutors.

15           THE COURT:  But I mean...

16           MR. HARVIS:  That's the whole test under *Garnett* and

17   *Ricciuti*, is whether you forward false information to

18   prosecutors.  It really doesn't -- the question isn't whether

19   it's used further in the proceedings or not, because you could

20   say the same things about Ogletree.

21           I'm sorry.

22           THE COURT:  So Sortino signs off on the complaint,

23   and you're saying that that is forwarding false information

24   because of the...

25           MR. HARVIS:  False statement that says that.

# SPA19

19

1          THE COURT:  The false statement.

2          And that's not a statement that refers to -- well,

3    that you would be contending was false too, because it was

4    Ogletree who said it?

5          MR. HARVIS:  Right.  It's actually -- it's

6    attributed to Plaintiff.

7          THE COURT:  Right.

8          MR. HARVIS:  It's saying that Plaintiff made an

9    omission, when it's conceded and it's undisputed that he never

10   made an omission on the Anyosa shooting.

11         THE COURT:  So let's just start with Dorsi though.

12   He didn't do any of those things.  Should he be in this case?

13   Or do you want to think about it?

14         MR. HARVIS:  I'm happy to think about it.  I mean,

15   I'm very happy to be open to thinking about it.

16         I agree he's not in the absolute core of the -- but,

17   you know, he is reviewing and discussing this with his

18   subordinates.  And I mean...

19         THE COURT:  I don't really think that's enough, but

20   I could be wrong.  I just don't think -- you know, if he is

21   not personally aware of the particular violations that you're

22   describing and there's no supervisory liability, I don't think

23   he can be held liable.

24         Sortino, I don't quite know what the answer is to

25   that.  Because, I mean, I suppose as a practical matter he's

**SPA20**

20

1   just going to say he looked at the -- you know, he shouldn't

2   have done it.  But, I mean, it doesn't sound like he was

3   involved in interviewing any witnesses or anything like that.

4          MR. HARVIS:  That's true.

5          THE COURT:  So I would ask you to think about those

6   two people.

7          All right.  Now let me just ask you if you have any

8   response on this question of *Monell*.

9          MR. VITAGLIANO:  Your Honor, for the most part, we

10  rely on our papers.

11         But we do agree with --

12         THE COURT:  Pull up your microphone a bit if you

13  can.

14         MR. VITAGLIANO:  My apologies.

15         THE COURT:  That's okay.

16         MR. VITAGLIANO:  For the most part, we do rely on

17  our papers, which, you know, there's ample case law to show

18  that the way that this lineup was done was conducted pursuant

19  to policy and it's non-duly suggestive.

20         THE COURT:  So what Counsel is saying is that the

21  policy of -- just all of the things?  Is it covering them up?

22  Is it the phone book?  I think what he's saying is that the

23  policy of doing something like concealing somebody's height

24  when it's radically different from the description is a policy

25  that could be the subject of a *Monell* claim.

21

1        MR. VITAGLIANO:  We disagree with that assessment,

2    Your Honor.  Quite frankly, in the record, all of the

3    detectives who were asked about how the lineup was going to

4    proceed stated that the lineup would have proceeded in the

5    exact same way.  The County's 30(b)(6) witness said the lineup

6    proceeded in the exact same way.

7        THE COURT:  Okay.  I think I understand your

8    position on that.

9        Then do you have anything to add about Ross's

10   involvement?  I think you probably are going to rely on your

11   papers there as well.

12       MR. VITAGLIANO:  We are going to rely on our papers,

13   but just one thing to note.

14       In Exhibit 5-A that's annexed to our papers is an

15   affidavit that's completed by Mr. Harvis, who essentially

16   comes out and says, in the court of claims lawsuit that's

17   parallel to this case, that the affidavit that Lori Magliaro

18   signed, Ross's girlfriend, had absolutely no weight.  He

19   called the affidavit dubious.  And now he wants to rely on --

20   he wants to rely on that when trying to keep Detective Ross in

21   the case where he had minimal involvement.

22       THE COURT:  I mean, it is pretty dubious.

23       MR. HARVIS:  I stand by that.  It's a dubious thing,

24   but it can still raise a dispute of fact.

25       THE COURT:  I mean, we're in a slightly different

**SPA22**

22

1   position here.  I mean, I'm not telling you all anything you

2   don't know.  I can't resolve these credibility determinations.

3   You know, would it be probably fun for a lawyer to

4   cross-examine somebody like that?  It probably would.  But

5   those are the determining I can't make on summary judgment.

6   But I understand your position, I think.

7            Now, the next question -- well, I wrote this down,

8   but I don't know why I would even ask it.  It was:  Have you

9   discussed settlement?  Obviously very far apart, I would

10  imagine.

11           MR. HARVIS:  We tried in the beginning before

12  Judge Wicks and it didn't -- it took about ten minutes and it

13  didn't go anywhere.

14           THE COURT:  Okay.

15           Do you feel the same way?

16           MR. VITAGLIANO:  At this point in time, yes.

17           THE COURT:  All right.

18           Okay.  Now, Mr. Ogletree, such a mystery.  I know

19  there's probably a dispute about whether his trial testimony

20  would be admissible.  I think the weight of persuasive

21  authority is that because these defendants didn't have a

22  chance to cross-examine him, that the trial testimony would

23  probably not be admissible.  I think there's some cases that

24  go the other way.  But let's say, just starting with that

25  premise, has any -- do we know where he is?

23

1      MR. HARVIS:  I know he was in jail at one point.

2      THE COURT:  Has anybody tried to depose him or tried

3 to get him?

4      MR. HARVIS:  We've taken some steps to try to track

5 him down.

6      I mean, our view was because the evidence at summary

7 judgment doesn't need to be offered in admissible form, that

8 it was not -- there was no reason -- we have great testimony

9 from him in the trial, so why --

10      THE COURT:  Yes, okay, but what if I say you can't

11 introduce that?  I mean, I'm just thinking practically.  I

12 mean, discovery is closed, he has not been deposed.  I'm just

13 trying to figure out practically what would happen.

14      So let's say that there's a trial and then in walks

15 Mr. Ogletree.  They're probably going to object if they didn't

16 get a chance to depose him.

17      MR. HARVIS:  But he was in our initial disclosures.

18 They had every opportunity to.  Nobody prevented them from

19 deposing him.  It was there.  For whatever reason, didn't

20 depose him.

21      THE COURT:  Okay.

22      MR. HARVIS:  I don't think they'll have any success

23 with that.

24      I mean, I think the question is -- I mean, it's a

25 question to be answered at trial.  But I think for these

**SPA24**

24

1   purposes in deciding whether there's a dispute of fact about

2   whether the allegations -- because if I may --

3          THE COURT:  I agree with you.

4          MR. HARVIS:  Okay.

5          THE COURT:  I mean, there are cases in which, but I

6   think it's when a witness is deceased --

7          MR. HARVIS:  Exactly.

8          THE COURT:  -- that you can decide it on summary

9   judgment.  That's not this.

10          MR. HARVIS:  Exactly.

11          And we cited to Judge Crotty's opinion in the

12   *Hincapie* summary judgment decision, which is almost identical

13   but the facts are better.  Because in that case, the person

14   who had been coerced didn't even testify at the trial.  It was

15   an unsigned affidavit that Judge Crotty provisionally

16   credited.

17          THE COURT:  Right, I'm not talking about in terms of

18   summary judgment.

19          I'm just talking about it -- you know, I don't mean

20   to rain on anybody's parade, but I don't see myself granting

21   every aspect of the summary judgment.  This case is going to

22   be alive after this, this decision.  I hope that doesn't ruin

23   anybody's world.  But I think there are significant questions

24   of fact about some things.  But what I'm just trying to figure

25   out is, you know, what we're going to do with that.  So okay,

**SPA25**

25

1    I think I understand.

2            Do you have anything you want to say about

3    Mr. Ogletree?

4            MR. VITAGLIANO:  Your Honor, Mr. Ogletree is

5    currently incarcerated at the Nassau County Correctional

6    Center.  By the time that these motions for summary judgment

7    were submitted, he was arrested.  And he's recently in there

8    on another pending indictment for Assault 1, so he's currently

9    in there right now.  It's Plaintiff's burden to demonstrate

10   whether or not he's unavailable and Plaintiff's done

11   absolutely nothing to show that he is unavailable.

12           THE COURT:  Just remind me.  Is he unavailable if he

13   takes the Fifth?

14           I don't know that he would have a Fifth Amendment

15   right in --

16           MR. HARVIS:  No.  The whole point of this case is

17   that the statute ran.  That's why they couldn't charge

18   Kenton Sherwood.  It's an attempted murder.

19           THE COURT:  No, but I'm not talking about that.

20           I'm talking about, can he take the Fifth on anything

21   if he's got a pending case?  Probably not.  Probably not.

22           MR. HARVIS:  I'm not sure.  But --

23           THE COURT:  So it doesn't sound like he's

24   unavailable.

25           But I don't think this is something I can decide on

**SPA26**

26

1   summary judgment.  I think that the record is what the record

2   is.  And it's just a practical question that I had.

3          MR. HARVIS:  I just want to make one point,

4   Your Honor, which is that independent of whether Ogletree

5   himself testifies, we think that Plaintiff's innocence alone

6   casts a lot of questions onto the statement that was allegedly

7   provided by Robert Ogletree because it has facts that he

8   couldn't have known because --

9          THE COURT:  Let's wait for the trial.

10          MR. HARVIS:  All right.

11          THE COURT:  Okay.  Now just a couple of little

12   questions.

13          Mr. Hardy was the lawyer who represented the

14   Plaintiff at the lineup, correct?

15          MR. HARVIS:  Yes.

16          THE COURT:  And he was there.  He didn't object to

17   anything.  And in your 56.1 response it said he didn't have an

18   opportunity.  What does that mean?

19          MR. HARVIS:  He testified that he wasn't -- wouldn't

20   be permitted to object.  And the lineup order itself says that

21   the defense attorney shall attend the procedure in the

22   capacity of an observer.  That's the language in the order.

23          THE COURT:  But isn't it the case -- I mean, maybe I

24   guess I am showing how old I am, but I thought that was the

25   whole reason why lawyers went to lineups, so they could

**SPA27**

27

1  register objections about the composition and about the --

2      MR. HARVIS:  Well, Ross said that he wouldn't have

3  permitted him to do that.  He was --

4      THE COURT:  He wouldn't permit him to say "here's my

5  objection"?

6      MR. HARVIS:  That's what Ross's testimony is.  I can

7  find the paragraph.

8      And we also have -- Hardy has done 3,000 criminal

9  defendants and he said he's never objected once at a lineup.

10  So as a practical matter, I don't think he views that as the

11  purpose of it, because it's never come up for him.

12      THE COURT:  Oh, I guess it was different in

13  Manhattan.  People objected all the time.  They would say they

14  objected to the people that were in the lineup.  I mean,

15  that's the whole point of having a lawyer there.

16      MR. HARVIS:  I would have objected if I was there.

17  That's for sure.

18      THE COURT:  Oh, alright.

19      Do you have anything you want to say about that?

20      MR. VITAGLIANO:  I believe in the record it is

21  pretty clear that defense attorneys do have an opportunity to

22  object from lineups that are run in Nassau County.  But other

23  than that, nothing, Your Honor.

24      MR. HARVIS:  Your Honor, I just want to direct the

25  Court.  It's paragraph 541 of our statement of additional

**SPA28**

28

1   facts.

2          THE COURT:  Oh, yes.

3          MR. HARVIS:  I know there are quite of few.

4          THE COURT:  Objection paragraph 541.

5          But go ahead.

6          MR. HARVIS:  When the attorney appears at a lineup,

7   it is strictly as a witness.  That's Ross's testimony, so...

8          I realize there are a lot of paragraphs.

9          THE COURT:  Well, the problem -- I guess this is a

10  plea for -- I really rely on 56.1s and when they're loaded

11  with arguments and multiple statements, they're just no use to

12  me.  And it requires me and, more importantly, my law clerk to

13  go dig in to find out what the basis for it is.  Which I do,

14  but it makes me unhappy.  I mean, I know people, you know,

15  want to make their arguments wherever they can, but the 56.1

16  is not the place to do it.  It just isn't.  And that's why I

17  require them before -- I am sure you feel like I'm a broken

18  record because I think we had this exact conversation.  But

19  it's just that I can't -- it makes it so inefficient for me

20  because I don't know what to do with that.

21          MR. HARVIS:  We really tried to edit it down between

22  when they were done in the letters and then now.

23          THE COURT:  Yes.

24          MR. HARVIS:  But I understand Your Honor's point.

25  It's a lot of facts.

**SPA29**

29

 1          THE COURT:  Okay.

 2          MR. HARVIS:  No doubt.

 3          THE COURT:  Well, it's just a lot of words.

 4          MR. HARVIS:  Exactly.

 5          THE COURT:  And some of it's not really -- some of

 6    it is legal argument.

 7          All right.  Okay, let's see.

 8          Now my next question has to do with qualified

 9    immunity.  What I'm going to ask both sides to do, the -- I

10    think it's a 2018 Supreme Court case which is in the context

11    of the Fourth Amendment, an excessive force, but which

12    requires some factual similarity so that the police officers

13    are alerted to whether or not their conduct violates a

14    constitutional right.  What I would like both sides to do is

15    give me a letter not to exceed three pages with cases on that

16    subject addressing -- I can't read my own handwriting.

17          (Pause in proceedings.)

18          THE COURT:  *City of Tahlequah* 142 S. Ct. 9 (2021).

19    Not 2018, but there is also a 2018 case from the Supreme Court

20    that also talks about that as well.

21          So what I would like are cases that show me that --

22    if there are, that in these particular circumstances, I think

23    coercing the statement will probably be a lot easier than some

24    of the lineup things.

25          Because you've got a couple of things that you claim

30

1 are suggestive.  We have somebody in custody.  I don't know if

2 that standing by itself constitutes something that is

3 unconstitutional.  And I take it your argument is the whole

4 confluence of circumstances.

5 So I would like those by a week from today.  And

6 just really, it's fine to just give me the cases.  If you want

7 to put a little summary in there, you can, but I just want to

8 get a little bit more clarity on that.

9 All right.  Hold on for just a second.

10 So I guess just to be -- as I said, so the cites

11 would be for the fabrication of evidence, which would be

12 Ogletree's statement; the suggestive identification

13 procedures, specifically the statements that were allegedly

14 made before and after the --

15 MR. HARVIS:  Photo array?

16 THE COURT:  -- photo array and then the lineup.

17 And then I think in terms of suppression of

18 evidence, there is an allegation that the victim said that he

19 saw a couple of photo arrays and didn't identify anybody in

20 them, and so I think that would also be the suppression of

21 evidence.

22 So yes, if you can give me a letter on that, that

23 would be helpful.

24 Okay.  Let me just confer here for a minute.

25 (Pause in proceedings.)

**SPA31**

31

 1         THE COURT:  I think I referred to this sort of

 2    obliquely before, but in the malicious prosecution context,

 3    what does it mean, what is involved and which defendants are

 4    involved in initiating or forwarding information.  I know

 5    you're contending that the people who signed the complaint.

 6         MR. HARVIS:  DeCaro.  That would be Defendant

 7    DeCaro.

 8         And then Sortino, who under Your Honor's request

 9    we're considering whether he's going to remain in the case or

10    not.

11         THE COURT:  Right.

12         And what about -- well, who else?

13         MR. HARVIS:  Well, I think that we think that it's

14    all of the folks that -- we think it's -- well, I think that

15    the initiation is the culmination of this investigation, so

16    the only -- only one person is ever going to be signing a

17    criminal complaint.

18         THE COURT:  Right.

19         MR. HARVIS:  So we think that the analysis is

20    slightly broader than the question of whose signature appears.

21    And we think that we're really talking about DeCaro, Lipson,

22    D'Luginski, and Horowitz who are the people that are --

23         THE COURT:  Horowitz was the arresting officer,

24    right?

25         MR. HARVIS:  Right.  But he's also in there with

**SPA32**

                                                                  32

 1  Ogletree.

 2          THE COURT:  Oh, yes.  Okay.

 3          MR. HARVIS:  So our view would be that those are the

 4  officers that -- whose efforts that evening culminated in the

 5  criminal complaint that DeCaro signed.

 6          So it's, I think, strongest and clearest with

 7  respect to DeCaro, but we think the other ones are in there as

 8  well because it's a joint venture that they're engaged in.

 9          THE COURT:  But again, do I need more specificity

10  than they were in the room or that they --

11          MR. HARVIS:  Well, what we have --

12          THE COURT:  Just something I want you to think about

13  in terms of --

14          MR. HARVIS:  Okay.

15          THE COURT:  And maybe when you submit the letter I

16  will give you an extra page to talk about that.

17          MR. HARVIS:  Well, I mean, what I would say on that

18  is, you know, in a way it's sort of academic only -- I mean,

19  as to the 1983 claims, it matters.  But we have state law

20  claims and valid notices of claims.

21          THE COURT:  Right.

22          MR. HARVIS:  So if it was any Nassau County officer,

23  then Nassau County would be on the hook for the malicious

24  prosecution.

25          THE COURT:  Right.

Case 2:19-cv-05026-AMD-JMW   Document 219   Filed 03/22/24   Page 33 of 36 PageID #: 36216

33

1         MR. HARVIS:  But I hear what Your Honor -- so we can

2  look at whether the other officers can satisfy the initiation

3  prong.

4         THE COURT:  Yes.  I think it just makes it cleaner.

5         MR. HARVIS:  Yeah.

6         THE COURT:  Because then if you're at a trial you

7  have to sort the whole thing out again, which is hard.

8         MR. HARVIS:  Yeah.  I mean, it's just occurring to

9  me, you know, the phrase is initiation or continuation, and so

10  the officers who are testifying at the Grand Jury and then

11  testifying at the trial, I mean, is that continuation?  We

12  will look at the case law and give that some thought.

13         THE COURT:  Okay.  Yes, I mean, that could -- I

14  think those are more for your trial.

15         MR. HARVIS:  Well, I mean, so Anyosa testified that

16  he was not confident at the trial, but he identified Plaintiff

17  because he felt pressure.  So if that pressure was a result of

18  continuing conversations that he's having, we think that may

19  fall into the continuation concept.

20         But we will look at it, and I appreciate what

21  Your Honor is saying.

22         THE COURT:  I thought it was slightly more nuanced

23  than that.  I mean, it was a very compelling statement.  It

24  was sort of a compelling statement that he -- you know, that

25  everybody told him that, you know, that he knew that

**SPA34**

34

1  Josiah Galloway did it, or something like that.  But I'm not

2  quite sure that it answers the question.

3          One other question.  I haven't seen the Grand Jury

4  minutes, but just on the probable cause question, I'm assuming

5  that there was some testimony about the identifications in the

6  Grand Jury?

7          MR. HARVIS:  Both Hernandez and Anyosa testified and

8  Lipson described what happened at the photo array.

9          THE COURT:  Okay.  All right.

10         Oh, they testified about the photo array in the

11  Grand Jury.

12         MR. HARVIS:  Yes.

13         THE COURT:  Oh, because they hadn't had the lineup

14  yet.

15         MR. HARVIS:  Yes, that's right.

16         THE COURT:  Okay.

17         This is totally irrelevant, but are photos arrays

18  now admissible at trial?

19         MR. HARVIS:  I'm not sure.

20         THE COURT:  Because they were not back -- I thought

21  there was a new thing that they are now.

22         MR. VITAGLIANO:  If they're done in a double-blind

23  fashion, yes.  I believe the New York State Criminal Procedure

24  Law was changed in 2017 and I believe -- I forget exactly

25  which section it is, but now if they're done in a double-blind

**SPA35**

35

1   fashion and they meet all the certain criteria, they are

2   admissible as evidence.

3          THE COURT:  And what about sketches?  Because

4   they're probably still not admissible on a direct case.

5          MR. VITAGLIANO:  I don't know.  On the top of my

6   head, I don't believe so, but I'm not sure, Your Honor.

7          THE COURT:  Okay.  I was just curious.  All right.

8          Okay.  I appreciate everybody's input.

9          Is there anything that anybody wants to say?

10          I haven't let you guys say very much, but it's not

11   because I'm not thinking about what you said.  I just had

12   particular questions.

13          MS. MASTELLONE:  If you could just clarify,

14   Your Honor, exactly.  I mean, you pointed out a few things

15   that you want us to address in the three-page letter in the

16   context of this Tenth District matter.

17          THE COURT:  The qualified immunity.

18          MS. MASTELLONE:  Okay.

19          THE COURT:  Yes.  Just in terms of what the

20   factual -- I mean, many of them are just intensely factual

21   inquiries.  And my question is whether there are cases that

22   have similar -- the point is, is the officer alerted that the

23   conduct is violative of a constitutional right.  And I don't

24   think it's enough to say -- I mean, I could be wrong about

25   this.  I don't think it's enough to say *Brady* violations or

36

1    suggestive ID procedures.  I think it has to be more specific

2    than that.  But I will let you all do that work for me.  Okay?

3           All right.  Is there anything else anybody wants to

4    say?

5           MR. HARVIS:  Not from the Plaintiff, Your Honor.

6           MR. VITAGLIANO:  No.  Thank you, Your Honor.

7           THE COURT:  Okay.

8           And if you decide you want to settle the case, let

9    me know.

10          MR. HARVIS:  You're okay with that?

11          THE COURT:  Thanks so much.

12          MR. HARVIS:  Thank you, Your Honor.

13          MS. FETT:  Thank you, Your Honor.

14          (Matter concluded.)

15

16                    *      *      *      *      *

17

18   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
19

20       /s/ Andronikh M. Barna              March 15, 2024
     _____         _____
21       ANDRONIKH M. BARNA                  DATE

22

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                           :

**JOSIAH GALLOWAY**,
                                           :

                          Plaintiff,    :

                                         :    **MEMORANDUM DECISION AND ORDER**

              – against –         :    19-CV-5026 (AMD) (JMW)

                                         :

**COUNTY OF NASSAU**, *et al.*,
                                         :

                        Defendant.    :

-------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

      The plaintiff, wrongfully convicted of attempting to murder a taxi driver named Jorge Anyosa, brings this case against Nassau County, the Village of Hempstead, and individual law enforcement officers from each entity, alleging malicious prosecution, fabrication of evidence, *Brady* violations, false imprisonment, conspiracy, unlawful pre-trial detention, failure to intervene, and a *Monell* claim.

      Before the Court are the defendants' motions for summary judgment.  For the reasons explained below, the motions are granted in part and denied in part.

<strong>BACKGROUND</strong>

      The following facts are taken from the parties' Rule 56.1 statements[1] and relevant portions of the record and are undisputed unless otherwise noted.

---

[1] Citations to the defendants' joint Rule 56.1 statement are to ECF No. 200, which contains the plaintiff's responses to each paragraph.  Likewise, citations to the plaintiffs' Rule 56.1 statement are to ECF No. 209, which contains the defendants' joint responses.

I.      **Factual Background**

     **a.**      **Jorge Anyosa Is Shot**

In the early morning hours of May 15, 2008, Jorge Anyosa was in his parked taxi near Hempstead Train Station, talking to Wilmer Hernandez, who was double-parked in his own taxi cab. (Def. 56.1 ¶¶ 13–15.)  At one point, someone drove up behind them and started honking "like crazy."  (*Id.* ¶ 16.)  The driver got out of his car, argued with Anyosa and Hernandez, and drove away after a few minutes.  (*Id.* ¶¶ 17, 22, 24.)  Shortly thereafter, Anyosa and Hernandez were dispatched to pick up clients.  (*Id.* ¶¶ 25–26.)  When Anyosa's passenger did not show up, he returned to the Hempstead Train Station and parked in the lot, about twenty minutes after the argument with the other driver.  (*Id.*  ¶¶ 27–28.)  Anyosa then heard someone say, "What you going to do now, mother fucker?"  (*Id.* ¶¶ 29–31.)  He saw the driver from the earlier argument in his car with the window rolled down.  (*Id.* ¶ 30.)  He pointed a gun at Anyosa, shot him in the face, and fled.  (*Id.* ¶¶ 32–34.)  A bystander heard the gunshot, saw Anyosa bleeding from his face, and called the police.  (*Id.* ¶ 37.)  Anyosa survived the shooting.  (*Id.* ¶ 43.)  He was transported to Winthrop Hospital, where he had surgery, but suffered permanent nerve damage and scarring to his face.  (*Id.* ¶¶ 43–44.)

Nassau County Police Department ("NCPD") Detective Thomas D'Luginski was assigned to investigate the shooting and arrived at the scene just before 2:00 a.m. on May 15, 2008.  (*Id.* ¶¶ 48–50.)  He viewed footage taken by the MTA Bus Terminal in Hempstead of the vicinity of the shooting, which showed both cars but did not show the shooter clearly.  (*Id.* ¶¶ 54–56.)

On May 19, 2008, Detective D'Luginski asked Detective Thomas Bischoff, a sketch artist, to meet Anyosa at Winthrop Hospital and prepare a composite sketch of the shooter.  (*Id.* ¶¶ 64, 67–68.)  Detective Bischoff interviewed Anyosa and completed a composite sketch, which

was circulated to several police agencies and precincts.  (*Id.* ¶¶ 73–74.)  The composite sketch included a description of the shooter: a 25 to 30 year old man, 5'10" tall, with short black hair and a medium complexion who spoke with an accent.  (Pl. 56.1 ¶¶ 196–97.)

**b.      The Plaintiff Is Arrested for an Unrelated Robbery**

On May 27, 2008, Marky Fouse reported to officers of the Village of Hempstead Police Department ("HPD") that "he was a victim of a robbery by [the] plaintiff that took place on Fulton Avenue in the Village of Hempstead."  (Def. 56.1 ¶ 78.)  On June 5, 2008, at approximately 11:00 p.m., HPD Detective Kevin Cunningham and Police Officer Steven Horowitz arrested the plaintiff and his friend, Robert Ogletree.  (*Id.* ¶¶ 76–83.)[2]  They drove the plaintiff and Ogletree to the Hempstead Police Armory and contacted the NCPD to take over the investigation.  (*Id.* ¶¶ 86–87, 89–93).  NCPD Detectives George Darienzo and Charles DeCaro arrived at the Armory shortly after midnight.  (*Id.* ¶ 93.)

Detective DeCaro spoke with the plaintiff, who was 21 years old, 5'5" tall, had braided hair, and no accent.  (*Id.* ¶¶ 98–100; Pl. 56.1 ¶¶ 287, 379, 517, 633, 663.)  Detective DeCaro thought that the plaintiff resembled the Anyosa shooting suspect depicted in the composite sketch, which had been posted near DeCaro's desk for several weeks.  (Def. 56.1 ¶¶ 100–103.)

Detective Darienzo went back to the NCPD Third Squad and got a copy of the composite sketch.  (*Id.* ¶ 107.)  Detective DeCaro asked NCPD Detective Ronald Lipson to put together two photo arrays with the plaintiff's photograph.  (*Id.* ¶ 110.)  Detective Lipson created two arrays at around 2:00 a.m. on June 6, 2008; he used the plaintiff's arrest photograph from

---

[2] The parties' 56.1 statements do not identify where the plaintiff was when he was arrested or who called notifying law enforcement of his location.

September 2007, and photographs of five fillers.  (*Id.* ¶¶ 113–19.)  He then brought the photo arrays to the Armory.  (*Id.* ¶ 125.)

     **c.**     **Robert Ogletree's Written Statement**

At approximately 3:00 a.m., Detective DeCaro interviewed Robert Ogletree "about multiple different incidents."  (*Id.* ¶ 130.)[3]  Ogletree signed a written statement in which he said that the plaintiff told him that the plaintiff "had to . . . shoot a cab driver over by the chicken place on Jackson."  (*Id.* ¶ 133.)[4]

     **d.**     **Photo Arrays and Interview of the Plaintiff**

          *i.*     *Hernandez*

In the "early morning" of June 6, 2008, Wilmer Hernandez, the driver who saw the argument that preceded the shooting, went to the Armory to view a photo array.  (*Id.* ¶ 136.)  He met with Detective Lipson, who created the array, and Officer Horowitz, who arrested the plaintiff the night before.  (*Id.* ¶ 138.)

The defendants assert that Hernandez did not know anyone was in custody when he was at the Armory (*id.* ¶ 137), citing his trial testimony:

> **Q:**  Okay.  Can you tell us, sir, at the time you did come in and that they had you in the precinct, at that time, did you notice anybody in custody? . . .
>
> **A:**  No.

(ECF No. 194-5 at 478.)  The plaintiff disputes this assertion, citing Hernandez's deposition testimony:

---

[3] The parties dispute the extent to which Detective Darienzo was involved in questioning Ogletree.  (*Id.* ¶ 131.)

[4] At that time, "there was a chicken restaurant located . . . [one] block from where [Anyosa] was shot on May 15, 2008."  (*Id.* ¶ 135.)

> **Q:** When you arrived at the . . . armory, what happened?
>
> **A:** They told me they had the person who was the cause of the incident, but they wanted to show me pictures . . . .

(ECF No. 194-29 at 31.)

At approximately 3:20 a.m., Hernandez looked at the photo array, and circled the plaintiff's photograph, in position #2.  (Def. 56.1 ¶¶ 142–44.)  Detective Lipson wrote "a supporting deposition" for the photo array, which Hernandez signed.  (*Id.* ¶ 145.)

The plaintiff asserts, citing Hernandez's deposition testimony, that "[a]t some point in the procedure, Lipson revealed [the] plaintiff's identity to Hernandez."

> **Q:** Were you told that the person that you selected in the photograph was named Josiah Galloway?
>
> **A:** I think so.  Honestly, I'm not sure.  It might have been possible.
>
> **Q:** Do you remember anything about the circumstances in which you were told that the person's name was Josiah Galloway? . . .
>
> **A:** I don't remember, no.
>
> **Q:** Do you know who told you that; [] which of the officers or who it was that told you that? . . .
>
> **A:** No.  I don't remember, no.
>
> . . .
>
> **Q:** And then it says "The police told you the name of the person in number two[.]"  And then the answer was "Yes," did you say that?
>
> **A:** Yes, that's correct. . . .
>
> **Q:** And sitting here today in the year 2020, do you remember when the police told you that?
>
> **A:** I think it was the day that I went to identify the pictures.

(ECF No. 194-29 at 38, 72.)  The defendants do not dispute that Hernandez learned the plaintiff's name; they assert, however, that the plaintiff's name was "provided on the supporting deposition form that was completed *after* Hernandez identified the plaintiff from the photo array."  (Pl. 56.1 ¶ 356 (the defendants' response) (emphasis added).)

     *ii.    Detectives DeCaro and D'Luginski Interview the Plaintiff*

     At around 4:30 a.m. on June 6, 2008, Detectives DeCaro and D'Luginski questioned the

plaintiff, including about the Anyosa shooting.  (Def. 56.1 ¶¶ 149–50.)  The plaintiff said that he

"didn't know anything about" the shooting.  (ECF No. 194-19 at 193.)

     *iii.    Anyosa Views the Photographic Array*[5]

     At around 5:00 a.m. on June 6, 2008, Detective Lipson drove to Anyosa's home to show

him the photograpic array.  (Def. 56.1 ¶ 156.)

     According to the plaintiff, Detective Lipson "told Anyosa that Wilmer Hernandez had

already selected the 'right person,'" before he showed Anyosa the array.  (ECF No. 202 at 12.)

The plaintiff cites Anyosa's deposition testimony.

> **Q:**  Now, you see how it says that "he knew Wilmer had ID'd
> him." . . . How did you know that?
>
> **A:**  I think so went to the police station, they told me Wilmer ID'd
> him before me.
>
> . . .
>
> **Q:**  [B]efore you looked at the photo array, did you know that
> Wilmer had already picked someone? . . .
>
> **A:**  Yes
>
> **Q:**  Okay.  And did you know . . . that Wilmer had picked Josiah
> Galloway?
>
> **A:**  No, I don't think so.  They only told me he—he got it.  I think
> so.  He picked the right person.

(ECF No. 194-67 at 30–31.)  The plaintiff also maintains that Lipson showed Anyosa two or

three arrays that included the plaintiff's photograph, and that Anyosa did not identify the plaintiff

---

[5] In the responses to the defendants' 56.1 statement, the plaintiff disputed whether any defendants visited
Anyosa early in the morning on June 6, 2008.  (*See* Def. 56.1 ¶¶ 158–59 (the plaintiff's responses).)
However, in his opposition, the plaintiff agrees that officers did visit Anyosa early that morning to
conduct the photo array.  (*See* ECF No. 202 at 12.)  Accordingly, the Court concludes that there is no
dispute about this issue.

in one or two of the arrays; the plaintiff cites Anyosa's trial testimony that he was shown "two or three" sheets of paper with "six pictures" at a time, and that he did not identify the plaintiff when he viewed at least one of the arrays.  (ECF No. 202 at 12–13; ECF No. 194-5 at 456.)  The defendants dispute that Lipson showed Anyosa more than one array.  (*See* Pl. 56.1 ¶ 703 (the defendants' response).)

  **e. The Plaintiff Is Charged With Shooting Anyosa**

  At some point on June 6, 2008, Detective DeCaro faxed paperwork to the Early Case Assessment Bureau ("ECAB") of the Nassau County District Attorney's Office ("NCDA").  (Def. 56.1 ¶¶ 170–72; ECF No. 194-68 (ECAB Paperwork).)  Detective DeCaro[6] spoke with a prosecutor on the telephone about "information related to the investigation of the . . . incident with Marky Fouse . . . and the May 15, 2008 shooting of Anyosa."  (Def. 56.1 ¶ 172.)  Detective DeCaro signed the felony complaint charging the plaintiff with attempted murder, assault, and criminal use and possession of a firearm for the May 15, 2008 shooting of Anyosa.  (*Id.* ¶ 174; *see also* ECF No. 194-37 (Felony Complaint.))

  In the felony complaint for the shooting, Detective DeCaro stated that he "secured a statement of admission from [the plaintiff] regarding the Anyosa shooting."  (Pl. 56.1 ¶ 147.)  Detective DeCaro testified at his deposition that the plaintiff made no such admission:

> **Q:**  Did the [plaintiff] make a Statement of Admission in this case with respect to this crime?
>
> **A:**  In this case, no.
>
> **Q:**  Why does it say that [in the Felony Complaint]?
>
> **A:**  I don't know. . . .
>
> **Q:**  Would you agree that the reference to the defendant's Statement of Admission in this document is an error? . . .

---

[6] The parties dispute whether Detective D'Luginski also spoke to the assistant district attorney in ECAB.  (*See* Def. 56.1 ¶ 172.)

     **A:** That is possible.

     **Q:** And did you read this document before you signed it?

     **A:** I should have.

(ECF No. 194-17 at 196–97 (DeCaro Deposition).)

### f.    Grand Jury Proceedings

NCDA Assistant District Attorney ("ADA") Joseph Larocca was assigned to prosecute the plaintiff for shooting Anyosa. (Def. 56.1 ¶ 184.) He presented the case to a Nassau County Grand Jury on June 10, 2008. (*Id.* ¶ 185; Pl. 56.1 ¶ 393.) The grand jury heard testimony from Detectives Horowitz and Lipson, Anyosa, and Hernandez. (Def. 56.1 ¶ 195.) They also heard testimony about the photo array identifications. (*Id.* ¶ 196.)

On June 16, 2008, the grand jury indicted the plaintiff for the following crimes: (1) attempted murder in the second degree; (2) assault in the first degree; (3) criminal use of a firearm in the first degree, and (4) criminal possession of a weapon in the second degree. (*Id.* ¶ 195.)

### g.    Lineup Procedures

On June 30, 2008, Judge Alan Honorof signed an order requiring the plaintiff to appear in a line-up. (*Id.* ¶ 201.) The judge also ordered the plaintiff not to "alter or remove any scalp or facial hair." (*Id.* ¶ 203.)

On August 5, 2008, the NCPD tried but could not run the line-up because of the change in the plaintiff's hairstyle. (*Id.* ¶ 204.) Although the plaintiff's hair was braided tightly and close to his head on June 6, 2008, he wore his hair in an afro style on August 5, 2008. (*See* Pl. 56.1 ¶ 426.) At his deposition, the plaintiff testified that he took the braids out and washed his hair because his "hair was starting to stink." (ECF No. 194-19 at 82.) When he arrived for the line-up, a detective, whom the parties do not identify, pointed to the plaintiff's hair and said, "your

hair isn't the way it was when you were arrested[,] [s]o we either going to have to cut your hair or you're going to have to go and come back and redo the lineup." (*Id.*) Another officer gestured to a pair of hair clippers. (*Id.* at 82–83.) The plaintiff refused to have his hair cut so the line-up was rescheduled. (*Id.*; Def. 56.1 ¶ 204.)

On August 14, 2008, NCPD Detective Matthew Ross conducted the line-up at the NCPD Third Squad with the plaintiff and five fillers. (*Id.* ¶¶ 208, 231.) Before the line-up, the plaintiff was placed inside an area called the "fishbowl." (Pl. 56.1 ¶ 545.) Detectives had the plaintiff and the fillers wear hats "because nobody else in the lineup ha[d] braids." (ECF No. 194-19 at 83; Def. 56.1 ¶ 225.)[7] The participants were covered with a white sheet from their necks down. (Def. 56.1 ¶ 219.) The plaintiff sat on two phone books. (*Id.* ¶ 221.) The plaintiff's lawyer was present at the line-up and made no objections. (*Id.* ¶ 229.)

The plaintiff claimed at his deposition that while he was in the fishbowl a secretary led a "gentleman"[8] whom the plaintiff could not see, past the conference room; she was "trying to block him from looking in the room" but she was "not really doing a good job because he looks anyway." (ECF No. 194-19 at 89.) The plaintiff then put his "head down." (*Id.*)

     *i.*    *Anyosa Views the Line-up*

Anyosa arrived at the precinct that afternoon. (*Id.* ¶ 232.) He viewed the line-up, identified the plaintiff, and signed a statement. (*Id.* ¶¶ 239, 244.) Citing Anyosa's deposition testimony, the plaintiff asserts that detectives, whom he does not name, told Anyosa that he "did a good job" and "got the right person." (ECF No. 194-67 at 23–24.) The defendants dispute

---

[7] Detective Richard Dorsi, Detective D'Luginski, and Detective Ross made this decision jointly. (*Id.* ¶ 225.) The parties dispute whether ADA LaRocca was also involved in this decision. (*Id.*)

[8] The plaintiff did not identify this man as either Anyosa or Hernandez.

this.  Anyosa did not remember whether officers made this statement after the photo array or the lineup.  (*Id.*)

### ii.    *Hernandez Views the Line-up*

Hernandez viewed the line-up separately, and also identified the plaintiff.  (Def. 56.1 ¶¶ 249, 257.)  Hernandez testified that he recognized the plaintiff from the photo array.  (ECF No. 194-29 at 56 (Hernandez Deposition).)

### iii.    *Lori Magliaro's Testimony About the Line-Up*

The plaintiff asserts that Detective Ross later admitted to his then-fiancé, Lori Magliaro, that he "rigged [the] plaintiff's lineup to conceal his height and cause his misidentification."  (Pl. 56.1 ¶ 476.)  The plaintiff relies on Magliaro's affidavit:

> Mr. Ross told me that Josiah Galloway did not match the description given to them by the victim of the assailant.  He told me that his hair was different and they (the police) used clippers on his hair in order to make him look more like the assailant. They contrived a line-up where Josiah wore a baseball cap to conceal the difference in hair and since his height was not the same as the assailants, they made adjustments on that as well to make Josiah look taller.  I was present for Mr. Ross' [deposition] and after it, I told him that he lied under oath, that we could no longer live together and I then moved out.

(ECF No. 208-51 ¶¶ 8–9.)  The defendants cite Magliaro's deposition testimony, in which she admitted that not all of the statements in the affidavit were true, said that the plaintiff's attorney prepared the affidavit, and that Detective Ross did not give her "specifics" about any lineups. (ECF No. 206-26 at 8, 27–29.)

> **Q:**  So did Matthew Ross ever tell you that he participated in a lineup back when he was a detective, in which the suspect had different hair from the fillers in the lineup?  Did he ever tell you that?
>
> **A:**  He told me he's participated in many lineups but nothing specifics about anything.

10

**Q:** So he never told you that he tried to change or did change the hairstyle of a suspect in order to participate in a lineup?

**A:** No.

**Q:** So how did that end up getting into the affidavit that you signed?

**A:** Well, I heard it while he was doing the EBT.

**Q:** Then you went to Mr. Liotti and you told Mr. Liotti that that was a lie?

**A:** I didn't specifically say it was a lie. I just said I wasn't sure that, you know -- I wasn't sure and that's why I wanted to speak to someone. That's all. I didn't really know if I was going to go forward with anything because I was unsure.

**Q:** I understand. I get it. That's fine. I am wondering, what were you unsure about? Were you unsure about whether he had testified truthfully? Is that what you're unsure about?

**A:** Yes.

(*Id.*)

### h.    Pre-Trial Suppression Hearing

Prior to trial, the plaintiff moved to suppress the photo array and lineup identifications. On November 5 and 7, 2008, Judge Philip Grella held a pre-trial suppression hearing at which Detectives Lipson, DeCaro, Cunningham, and Ross testified. (Def. 56.1 ¶ 276.) Judge Grella denied the motion, holding that the pre-trial identification procedures were not unduly suggestive or violative of the plaintiff's rights. (*Id.* ¶¶ 278–89.)

### i.    Trial, Verdict, and Sentencing[9]

The plaintiff went to trial before Judge Alan Honorof and a jury on February 17, 2009. (*Id.* ¶ 302.) The jury heard testimony from Anyosa, Hernandez, Ogletree, detectives, police officers, and the plaintiff. (*Id.* ¶¶ 309–324.)

---

[9] ADA Robert Schalk took over the plaintiff's case from Larocca. (*Id.* ¶ 290.)

11

Ogletree testified that he did not make the statement attributed to him, and that detectives "made [] up" the story about "some chicken spot." (ECF No. 194-5 at 307–08.) He was "coerced" to "sign the [statement]" because he "was weak" after the officers "kept [him] in there for hours," and "threatened [him] with all kind of charges." (*Id.* at 306–07.)

After approximately four days of deliberations, during which the jury told the judge that they were deadlocked, necessitating an *Allen* charge, the jury convicted the plaintiff of all charges on March 9, 2009. (Pl. 56.1 ¶¶ 700–07; Def. 56.1 ¶ 326.)

On November 23, 2009, the plaintiff was sentenced as a second felony offender to a determinate prison term of 25 years, and five years of post-release supervision. (Def. 56.1 ¶ 327; ECF No. 194-52 at 17.)

### j.    The Plaintiff's Conviction Is Vacated in 2018

In early July 2018, nine years into the plaintiff's sentence, Nadine Johnson called the NCDA and told them that the plaintiff did not shoot Anyosa and was wrongly convicted. (*Id.* ¶¶ 351–52.) A prosecutor in the NCDA Conviction Integrity Unit, Sheryl Anania, investigated the circumstances of the plaintiff's conviction. (ECF No. 208-25 at 18 (Anania Deposition).) As part of that investigation, Anania interviewed Johnson, who told her that Kenton Sherwood was "the actual perpetrator." (*Id.* at 27.) Johnson explained that her friend, Natasha Chaney, was Kenton Sherwood's girlfriend, and that Chaney drove a car that matched the description of the vehicle that Anyosa's assailant drove. (*Id.* at 34–35.) Johnson suspected that Chaney was in the car when Sherwood shot Anyosa, and she said that Chaney cleaned blood out of her car after the Anyosa shooting. (*Id.* at 41–42.) Anania could not corroborate everything Johnson told her. (*Id.* at 27, 39, 42.) Anania also interviewed Anyosa, and showed him a photograph of Kenton Sherwood. (*Id.* at 53, 57.) Anyosa identified Sherwood as the shooter; Anania told him that the

person in the photograph was not the plaintiff.  (*Id.* at 58.)  Anyosa replied that "the officers had told him that he had the right person" after he "identified the photograph in the array."  (*Id.* at 59.)  Anyosa thought that the plaintiff "was about 5 foot 10 or 5-11 maybe" because "the person that committed this crime was about his height."  (*Id.*)  Anyosa said that if "police had told him [the plaintiff] was 5 foot 6[,] [h]e would have told them that Josiah didn't do it."  (*Id.* at 59, 61.)

On September 13, 2018, Judge Teresa Corrigan granted the NCDA's application to vacate the plaintiff's convictions and dismiss the indictment with prejudice.  (Def. 56.1 ¶ 355.)  The plaintiff was released from prison.  (*Id.*)

## II.   Procedural History

The plaintiff filed this suit on September 4, 2019.  (ECF No. 1.)  The operative pleading in this case is the fourth amended complaint.  (ECF No. 114.)  The plaintiff brings (1) a 42 U.S.C. § 1983 malicious prosecution claim against Police Officer Horowitz, Detectives DeCaro, Darienzo, Lipson, and D'Luginski (*id.* ¶¶ 85–92); (2) a § 1983 claim alleging fabrication of evidence, denial of a fair trial, and *Brady* violations against all individually named defendants: Police Officer Horowitz, Detectives Ross, DeCaro, Lipson, D'Luginski, and Darienzo (*id.* ¶¶ 93–101); (3) a New York state law claim for false imprisonment and malicious prosecution against Nassau County and the Village of Hempstead (*id.* ¶¶ 106–112); (4) a § 1983 conspiracy claim against all individually named defendants (*id.* ¶¶ 117–122); (5) an unlawful pre-trial detention claim against all individually name defendants (*id.* at ¶¶ 123–125); (6) a § 1983 claim for failure to intervene against all individually named defendants (*id.* ¶¶ 126–128); and (7) a *Monell* claim against Nassau County (*id.* ¶¶ 129–133).[10]

---

[10] The plaintiff voluntarily withdrew claims for § 1983 supervisory liability and intentional or negligent infliction of emotional distress.  (ECF No. 187.)  The plaintiff also voluntarily withdrew claims against

Nassau County, the NCPD, Detectives DeCaro, D'Luginski, Darienzo, Ross, and Lipson (the "County defendants"), and the Village of Hempstead and Police Officer Horowitz (the "Village defendants") move for summary judgment on all claims.  (ECF Nos. 189, 197.)  The plaintiff opposes.[11]

## LEGAL STANDARD

Summary judgment is appropriate if the parties' submissions—including pleadings, deposition transcripts, affidavits and other documents in the record—show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant has the burden of showing that there are no genuine disputes of material fact.  *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party opposing summary judgment must identify specific facts and affirmative evidence showing that there is a genuine issue for trial.  *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The "mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Liberty Lobby*, 477 U.S. at 252.  Moreover, the nonmoving party must do more than

---

defendants Rene Yao, Carl Strange, John and Jane Doe 1-20, Kevin Cunningham, Joseph Sortino, and Richard Dorsi.  (*Id.*; ECF No. 215.)

[11] The Court heard oral argument on March 13, 2024.  (*Minute Order dated Mar. 13, 2024*.)

point to "some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). He must instead identify the "specific facts" that demonstrate a genuine issue for trial, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and "offer some hard evidence showing that its version of events is not wholly fanciful," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). If the nonmoving party's "evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Liberty Lobby*, 477 U.S. at 249–50 (citation omitted).

The Court views "the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citation, internal quotation marks, and alterations omitted).

## DISCUSSION

### I.   Fair Trial

The plaintiff brings a set of claims based on violations of his due process right to a fair trial. He advances three theories: fabrication of evidence, unduly suggestive identification procedures, and suppression of exculpatory evidence. As explained below, genuine issues for trial preclude summary judgment under each theory.[12]

---

[12] The plaintiff brings this claim against the individually named defendants, who argue that not every theory of liability applies to every defendant. The Court denies summary judgment as to this claim under all theories, and thus does not address the theories of liability that apply to each defendant. That will be for the jury to determine.

    a.      **Fabrication of Evidence**

A plaintiff bringing a § 1983 fair trial claim based on fabrication of evidence must establish that "(1) the officer created false information, (2) the officer forwarded the false information to prosecutors, (3) the false information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation of life, liberty, or property as a result of the officer's actions." *Kee v. City of New York*, 12 F.4th 150, 168 (2d Cir. 2021) (citing *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279–80 (2d Cir. 2016)). "Any information fabricated by an officer can serve as the basis of a claim for a denial of the right to a fair trial." *Garnett*, 838 F.3d at 279. "Such falsified information underlying the claim may be conveyed in documents, or orally, to prosecutors." *Kee*, 12 F.4th at 170. The Second Circuit equates "the fraudulent omission of factual information with the affirmative perpetration of a falsehood, and expressly disclaims any plausible legal distinction between misstatements and omissions." *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, at *17 (S.D.N.Y. Sept. 29, 2018) (cleaned up).

The plaintiff's fair trial claim for fabrication of evidence arises out of the alleged coercion of Robert Ogletree, which involves only Detectives DeCaro and Darienzo, two of the County defendants. (ECF No. 202 at 19.) Ogletree signed a statement at 3:00 a.m. on June 6, 2008, to the effect that the plaintiff told Ogletree that he shot "a cab driver over by the chicken place on Jackson." (Def. 56.1 ¶ 133.) Ogletree testified at the plaintiff's trial that the statement was not true, and that DeCaro and Darienzo "coerced" him into signing the statement by keeping him at the precinct "for hours," and threatening him with "all kind of charges." (ECF 203-1 at 303–07.)

The defendants argue that the Court cannot consider Ogletree's trial testimony on summary judgment because it is hearsay, which could be admitted under Federal Rule of

Evidence 804(b)(1) only if Ogletree is unavailable to testify at trial, "the party against whom the testimony is offered is the same as in the prior proceeding," and "that party had the same motive and opportunity to examine" Ogletree. (ECF No. 192 at 28.)

It is not necessary to decide at this stage of the litigation whether Ogletree's trial testimony is admissible at the civil trial in this matter. As long as the plaintiff "can show that admissible evidence would be available at trial, summary judgment is inappropriate at this stage in the litigation." *Kee*, 12 F.4th at 170 (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)). "[A]s with other forms of sworn testimony, a transcript of trial testimony is admissible evidence on a summary judgment motion [] if it can be presented at trial in an admissible form–for example, [if] the declarant may be available to testify at trial . . . ." *Burch v. Blockbuster, Inc.*, No. 03-CV-2990, 2005 WL 8158056, at \*1 (N.D. Ala. July 15, 2005).[13]

There is a possibility that Ogletree will be available to testify at the plaintiff's civil trial. *Monclova v. City of New York*, 726 F. App'x 83, 84–85 (2d Cir. 2018). He is not missing, or deceased; on the contrary, the defendants concede that he is currently in county custody for unrelated crimes. (*See* ECF No. 210 at 25–26.) Because Ogletree may very well be available to testify, the Court can consider his prior testimony—that Detectives DeCaro and Darienzo fabricated and coerced Ogletree's statement implicating the plaintiff in the Anyosa shooting—in deciding whether summary judgment is appropriate. *See Murphy v. Metro. Transp. Auth.*, 548 F. Supp. 2d 29, 43–44 (S.D.N.Y. 2008) (the plaintiff "adduced enough evidence to survive [a] summary judgment motion" where he "appear[ed] able to identify and subpoena all of the

---

[13] The Second Circuit has held that similar evidence is admissible under the residual hearsay exception in Federal Rule of Evidence 807. *See Monclova*, 726 F. App'x at 84–85.

relevant declarants," and those "individuals may be called at trial to testify"); *Watts v. City of Hartford*, No. 00-CV-0681, 2004 WL 717132, at *4 n.10 (D. Conn. Mar. 31, 2004) (considering hearsay evidence at summary judgment stage because the plaintiff "presumably could identify and subpoena police department personnel with personal knowledge of the matters discussed in the [hearsay]"); *see also Kee*, 12 F.4th at 170 (holding the plaintiff could rely on inadmissible hearsay in documents when deposition testimony "seemed to suggest" that the contents of the documents could be rendered admissible at trial).

Thus, construing the evidence most favorably to the plaintiff, there is a triable issue based on Ogletree's testimony as to whether Detectives DeCaro and Darienzo created false information, forwarded it to NCDA prosecutors, and whether the allegedly false statements were likely to influence the jury's decision. *Kee*, 12 F.4th at 168.

The Village defendants argue that Ogletree's statement "had no influence on the jury's verdict" because it "was never admitted into evidence at trial," and the jury "heard Ogletree's testimony" about coercion. (ECF No. 198 at 38.) While Ogletree's signed statement was not admitted as an exhibit, the jury was well aware of the contents of the statement. The prosecutor highlighted the statement in his opening:

> The defendant, in the days and weeks after these crimes, told one of his friends about it. His name is Robert Ogletree. [T]his is a man, a friend of the defendant, who he confided in about these heinous crimes.
>
>  . . .
>
> He . . . told Robert Ogletree that he gotten into an argument not too long ago with a cabby outside a chicken place on Jackson Street and that he had to blam him which means shoot somebody.

(ECF No. 194-5 at 249–50.) The prosecutor also questioned Ogletree about the statement:

**SPA55**

> **Q:** You didn't tell the Nassau County Police about a conversation that you had with Josiah Galloway that involved him shooting a cab driver on Jackson Street?
>
> **A:** No. I was coerced into that, sir. I told you that. You want me to repeat it one more time?
>
> . . .
>
> **Q:** I just want to be sure, but it's your testimony that the portion that states that Josiah told you that he had to shoot a cab driver by the chicken place on Jackson Street, that part was coerced by the police, right?
>
> **A:** That was coerced.

(*Id.* at 271, 304.) Finally, the prosecutor discussed the statement at length in his summation; the prosecutor urged the jury, in four transcript pages of argument on this subject, to accept the contents of the signed statement as true, and to reject Ogletree's trial testimony that the detectives coerced him into signing the statement:

> Consider who Robert Ogletree is. It's the defendant's friend, one of his very good friends . . . . Robert Ogletree and the defendant were arrested together. They were taken into custody together on June 5th, 2008.
>
> Now, it's interesting the defendant attacks the credibility of Mr. Ogletree in one breath, but then he wants you to believe that the statement was coerced. He can't have it both ways, ladies and gentlemen. . . .
>
> Robert Ogletree was brought to you for one reason, to tell you about the statement he gave the police as it pertains to his friend. You saw that when we asked him about speaking and about testifying, there was no problem. But then when he hits the witness stand, he has a decision to make, talk about the sworn statement he signed or backtrack in front of his friend. You saw his testimony. You witnessed it. You heard how he said this statement was coerced, but when he was asked how it was coerced, he really couldn't answer; how when he was asked you never told anyone that this was coerced, he said nobody ever asked. Have his testimony read back. . . .
>
> [T]here are some very important things about Mr. [O]gletree's statement, that the defendant admitted to him he committed these crimes. First, he was given his Miranda warnings. He was told he had the right to remain silent, the right to an attorney. He signed that card and said he wasn't coerced in signing it. . . . [H]e told the

> police that the defendant had shot a cab driver at a chicken spot
> over on Jackson Street. . . .  You heard that he identified that
> statement that he gave to the police, how the defendant admitted to
> him that this happened, that he shot that cab driver near the
> chicken spot.

(ECF No. 194-6 at 517–21.)  This record, viewed in the light most favorable to the plaintiff, as it

must be, establishes that there is a material question of fact about whether Ogletree's written

statement influenced the jury.  The prosecution's case was built largely on Hernandez's and

Anyosa's identification of the plaintiff as the shooter.  The jury deliberated for four days before

coming to a verdict; at one point the jury advised the trial judge that they were "deadlocked,"

prompting the judge to give them an *Allen* charge.  (Def. 56.1 ¶¶ 325–26; Pl. 56.1 ¶¶ 700–07);

*see Dow v. Virga*, 729 F.3d 1041, 1049 (9th Cir. 2013) ("The evidence against Dow was weak

and the prosecutor's arguments undoubtedly had an effect on the jury's decision.")  The Court

cannot conclude as a matter of law that the contents of Ogletree's statement had no influence on

the verdict.  *See McIlwain v. City of New York*, No. 16-CV-3133, 2019 WL 988891, at *4

(S.D.N.Y. Mar. 1, 2019) ("[C]hoices between conflicting versions of the events are matters for

the jury, not for the court on summary judgment." (internal quotation marks omitted)).  Nor does

the fact that the jury also heard Ogletree's testimony that the statement was coerced "turn what

was otherwise a tainted trial into a fair one." *Dow*, 729 F.3d at 1050 (internal quotation marks

omitted).

Accordingly, summary judgment is denied as to the plaintiff's fair trial claim based on

fabrication of evidence.

**b.    Suggestive Identification Procedures**

"The due process right to a fair trial is violated if unduly suggestive identification

techniques are allowed to taint the trial." *Blackmon v. City of Chicago*, 19-CV-767, 2023 WL

7160639, at *13 (N.D. Ill. Oct. 31, 2023). "Suggestive procedures are disapproved because they increase the likelihood of misidentification, and it is the admission of testimony carrying such a likelihood of misidentification which violates a defendant's right to due process." *Rosario v. City of New York*, No. 18-CV-4023, 2021 WL 199342, at *7 (S.D.N.Y. Jan. 20, 2021) (citations omitted). "In other words, the due process focus is principally on the fairness of the trial, rather than on the conduct of the police." *Id.* (internal quotation marks omitted).

Unduly suggestive identification procedures can also render subsequent identifications tainted or unreliable. *Id.* (citing *United States v. Thai*, 29 F.3d 785, 807–08 (2d Cir. 1994)).

### i.    *Photo Array Procedure*

The plaintiff maintains that the photo array was unduly suggestive because Detective Lipson used the plaintiff's arrest photograph from his September 2007 arrest—a year before the photographic array. (Def. 56.1 ¶¶ 113, 115, 119). This argument is not persuasive. The arrest photograph that the detective used was not especially old, and even if it were, it would not, in and of itself, make the array unduly suggestive. "[T]he mere use of an old photograph, . . . standing alone, do[es] not establish that a photo array is unduly suggestive unless these factors raise a 'substantial likelihood' that Plaintiff would be 'singled out for identification.'" *Gallimore v. Feliciano*, No. 14-CV-1519, 2015 WL 3856694, at *6 (S.D.N.Y. June 19, 2015); *see also United States v. Matthias*, No. 2016-CR-0025, 2017 WL 2434458, at *5 (D.V.I. June 5, 2017) ("Defendant notes that a more recent photo of Defendant was available. However, failure to use the most current photo, standing alone, does not render the array suggestive.").

### ii.    *Lineup Procedure*

The plaintiff argues that Detective Ross and Detective D'Luginski conducted a line-up that was unduly suggestive because the plaintiff and the fillers wore hats to cover their hair, were

seated and were covered by sheets so that only their faces were visible. The procedures

employed were not unduly suggestive. *Ashby v. Senkowski*, 269 F. Supp. 2d 109, 117 (E.D.N.Y.

2003) (line-up conducted with men seated, covered in sheets, wearing hats was not unduly

suggestive); *Neree v. Capra*, No. 17-CV-5434, 2020 WL 2098097, at *7–8 (E.D.N.Y. May 1,

2020) (same); *Roldan v. Artuz*, 78 F. Supp. 2d 260, 272–73 & n.9 (S.D.N.Y. 2000) (line-up of

men of different heights conducted in seated position was not unduly suggestive); *Solis v. Artus*,

No. 09-CV-386, 2012 WL 1252722, at *3 (E.D.N.Y. Apr. 12, 2012) (same); *United States v.

Ríos-Orama*, No. 22-CR-174, 2023 WL 7403602, at *4–5 (D.P.R. Nov. 3, 2023) (same).

The plaintiff claims, nevertheless, that Detective Ross and Detective D'Luginski

employed these procedures in bad faith, so that the lineup would be unduly suggestive—

specifically, so that the witnesses who looked at the line-up would not notice that the plaintiff

was far shorter than the description of the shooter, and that his hair was different. The plaintiff

cites statements by Lori Magliaro, Detective Ross's ex-fiance, in an affidavit:

> Mr. Ross told me that Josiah Galloway did not match the
> description given to them by the victim of the assailant. . . . They
> contrived a line-up where Josiah wore a baseball cap to conceal
> the difference in hair and since his height was not the same as the
> assailants, they made adjustments on that as well to make Josiah
> look taller. I was present for Mr. Ross' [deposition] and after it, I
> told him that he lied under oath, that we could no longer live
> together and I then moved out.

(ECF No. 208-51 ¶¶ 8–9.) The defendants point out that at her deposition Magliaro testified that

not all of these statements in the affidavit were true, that it was prepared by the plaintiff's

attorney, and that Detective Ross did not give her "specifics" about any lineups. (ECF No. 206-

26 at 8, 27–29.)

> **Q:** So did Matthew Ross ever tell you that he participated in a
> lineup back when he was a detective, in which the suspect had
> different hair from the fillers in the lineup? Did he ever tell you
> that?

**A:** He told me he's participated in many lineups but nothing specifics about anything.

**Q:** So he never told you that he tried to change or did change the hairstyle of a suspect in order to participate in a lineup? . . .

**A:** No.

**Q:** So how did that end up getting into the affidavit that you signed?

**A:** Well, I heard it while he was doing the EBT.

**Q:** Then you went to Mr. Liotti and you told Mr. Liotti that that was a lie?

**A:** I didn't specifically say it was a lie.  I just said I wasn't sure that, you know—I wasn't sure and that's why I wanted to speak to someone.  That's all.  I didn't really know if I was going to go forward with anything because I was unsure.

**Q:** I understand.  I get it.  That's fine.  I am wondering, what were you unsure about?  Were you unsure about whether he had testified truthfully?  Is that what you're unsure about?

**A:** Yes.

(*Id.*)  The parties' disputes about Magliaro's conflicting statements are rooted in "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence," which are "matters for the jury, not for the court on a motion for summary judgment." *McClellan*, 439 F.3d at 144 (cleaned up).  Thus, there are disputes of material fact about whether Detective Ross used otherwise acceptable line-up procedures with the intent to conceal the plaintiff's height and deprive him of a fair trial.  Accordingly, summary judgment on this aspect of the plaintiff's fair trial claim is denied.

       *iii.*     *Comments to Anyosa and Hernandez*

The plaintiff claims that the photographic array and the line-up were unduly suggestive in other ways.

Comments to Anyosa Before and After the Photo Array.

The plaintiff asserts that Detective Lipson "told Anyosa that Wilmer Hernandez had already selected the 'right person,'" before Detective Lipson showed Anyosa the array (ECF No. 202 at 12.)  The plaintiff relies on Anyosa's deposition testimony:

> **Q:** Now, you see how it says that 'he knew Wilmer had ID'd him.' . . . How did you know that?
>
> **A:** I think so went to the police station, they told me Wilmer ID'd him before me.
>
> . . .
>
> **Q:** [B]efore you looked at the photo array, did you know that Wilmer had already picked someone? . . .
>
> **A:** Yes.
>
> **Q:** Okay.  And did you know . . . that Wilmer had picked Josiah Galloway?
>
> **A:** No, I don't think so.  They only told me he -- he got it.  I think so.  He picked the right person.

(ECF No. 194-67 at 30–31.)

The plaintiff also cites ADA Anania's notes of her interview with Anyosa, in which she wrote: "[a]fter [Anyosa] id'd photo in array, detective told him he id'd right person."  (ECF 209-1 at 25.)  At his deposition, Anyosa testified as follows:

> **Q:** [A]fter you picked out the picture, did they say anything to you afterwards?
>
> **A:** Yeah, afterward, probably, yeah, they did that probably.  They say I got the right person.

(ECF No. 194-67 at 24.)

Drawing all inferences in the plaintiff's favor, the record demonstrates that Detective Lipson told Anyosa before he looked at the photo array that Hernandez had selected the "right person," and then told him after he identified the plaintiff's photograph that he had also selected the "right person."  Suggestive comments like these could affect the reliability of Anyosa's

photographic identification, the line-up identification, and any in-court identification.  Telling

Anyosa that his friend had selected "the right person" signaled to Anyosa that the perpetrator's

photograph was definitely in the array; this could have induced Anyosa to identify someone,

when he might otherwise have said that he did not recognize anyone in the array.  And telling

Anyosa that he identified the right person in the array tainted the subsequent line-up, as well as

the in-court identification.  *Rosario*, 2021 WL 199342, at *7 (unduly suggestive identification

procedures can also render subsequent identifications tainted or unreliable (citing *Thai*, 29 F.3d

at 807–08)); *see also Burress v. Lincoln & Devon Shell Gas Station*, No. 90-CV-2367, 1992 WL

69989, at *2–3 (N.D. Ill. Mar. 31, 1992).

<u>Suggestive Comments to Hernandez Before the Photo Array and After the Line-Up.</u>

The parties also dispute whether Hernandez knew that someone was in custody when he

looked at the photo array.  The defendants assert that Hernandez did not know anyone was in

custody when he was at the Armory, relying on the following trial testimony:

> **Q:**  Okay.  Can you tell us, sir, at the time you did come in and that
> they had you in the precinct, at that time, did you notice anybody
> in custody? . . .
>
> **A:**  No.

(ECF No. 194-5 at 478.)  The plaintiff cites Hernandez's deposition testimony:

> **Q:**  When you arrived at the . . . armory, what happened?
>
> **A:**  They told me they had the person who was the cause of the
> incident, but they wanted to show me pictures . . . .

(ECF No. 194-29 at 31.)  These conflicting versions of the events are for a jury to resolve, not

the Court on summary judgment.  *McClellan*, 439 F.3d at 144.  Of course, if Hernandez knew

that someone was in custody, that fact alone does not make the identification procedure unduly

suggestive.  *See Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) ("[t]his Court . . .

has held that although the police generally should refrain from informing a witness that the

suspect is in the lineup, a lineup is not unduly suggestive merely because they do"); *Sales v. Harris*, 675 F.2d 532, 538 (2d Cir. 1982) ("[a]s to the lineup, the only hint of suggestiveness emanated from the police officer's statement to [the witness] just prior to viewing the lineup that a suspect was in custody[;] [a]lthough this [C]ourt has expressed disapproval of such a statement, . . . the suggestiveness in this case was minimal since the statement preceded an otherwise acceptable lineup").

However, Hernandez also testified in his deposition that unnamed detectives "possibly" told him after he identified the plaintiff in the line-up that he selected the right person, but that he was not sure and could not remember.  (ECF No. 194-29 at 79–80.)  Hernandez's uncertainty about whether any such comment was made is a subject that the defendants can explore at a trial, but for purposes of summary judgment, the Court assumes that some detective said this to Hernandez.  As explained above, telling a witness that he has identified the right person taints future identification procedures.  *See Rosario*, 2021 WL 199342, at *7; *Burress*, 1992 WL 69989, at *2–3.[14]

---

[14] The plaintiff testified that he was in the "fishbowl" before the line-up when a secretary walked a man whom the plaintiff could not see past the conference room; she was "trying to block him from looking in the room" but she was "not really doing a good job because he looks anyway;" the plaintiff then put his "head down."  (ECF No. 194-19 at 89.)  The parties agree that only Hernandez and Anyosa came to view the line-up; the plaintiff concludes that the person had to be either Hernandez or Anyosa, and that the person saw him before the line-up.  Of course, if either Hernandez or Anyosa saw the plaintiff before the line-up, that would have been suggestive.  *See Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir. 1978) (noting that "eyewitnesses had a pre-lineup opportunity to see" the defendant, which, while it "may simply have been the result of police negligence," it was still suggestive).  In the Court's view, however, this evidence is too tenuous to permit the inference that the plaintiff seeks to draw.  Just because Hernandez and Anyosa were at the precinct that day does not mean that the person the plaintiff claimed to have seen had to be one of them rather than a witness in a different case or another officer.  The plaintiff did not describe the person he saw.  Moreover, there is no other evidence that Hernandez or Anyosa saw the plaintiff or knew that he was in custody.  Neither one of them testified that he saw the plaintiff before the line-up.

    **c.**    **Suppression of Evidence**

The plaintiff claims that Decaro and Darienzo withheld material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and denied him a fair trial. *See McCaffrey v. City of New York*, No. 11-CV-1636, 2013 WL 494025, at *11–12 (S.D.N.Y. Feb. 7, 2013). A plaintiff asserting a *Brady* violation claim must show that "(1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State; and (3) prejudice ensued." *Id.* at *11 (cleaned up).

As explained above, there is a genuine dispute about whether Detectives DeCaro and Darienzo fabricated the statement in which Ogletree implicated the plaintiff. In addition, there is a genuine dispute about whether Officer Horowitz, and Detectives Lipson, Ross, and D'Luginski obtained identifications under unduly suggestive circumstances that were not disclosed to the plaintiff. This evidence is "material" for purposes of a § 1983 suit because "[t]he tactics [Ogletree] said Defendants used to induce [him]" to make his statement and the tactics uses to induce the identifications "would themselves have been useful for impeachment." *Blackmon*, 2023 WL 7160639, at *13.

At the plaintiff's trial, Anyosa testified that Lipson showed him "two or three" sheets of paper with "six pictures" at a time, and that Anyosa identified the plaintiff's photograph in only one array; he did not identify anyone from the one or two other arrays that Lipson showed him. (ECF No. 194-5 at 456.) Lipson's trial testimony was that he put together two different photo arrays, at DeCaro's request, both of which included the plaintiff's photograph. (Def. 56.1 ¶¶ 113–19.) The plaintiff claims that Detective Lipson suppressed evidence that Anyosa looked at more than one array and did not identify the plaintiff in at least one of the photo arrays. (ECF No. 202 at 20.) The defendants deny that Lipson showed Anyosa more than one array and cite

Anyosa's trial testimony that he did not remember if Lipson showed him more than one array. (*See* Pl. 56.1 ¶ 703 (the defendants' response).)

If Anyosa looked at a photographic array that included the plaintiff's photograph, and did not identify him, that is "favorable" and "exculpatory" evidence that should have been provided to the defense in the plaintiff's criminal case. *McCaffrey*, 2013 WL 494025, at *11. There is a material dispute of fact about whether this happened. Accordingly, summary judgment is denied on the suppression of evidence claim.

### d.    Intervening Causes

The defendants argue that even if they did any of the things that the plaintiff claims, "intervening causes" make it appropriate to grant summary judgment on the plaintiff's fair trial claims. They say that their actions did not proximately cause the violations of the plaintiff's rights because (1) the NCDA prosecutors exercised independent judgment in prosecuting the plaintiff, and (2) the plaintiff's defense attorney's decision to offer the photographic arrays into evidence was the superseding cause of the fair trial violation. As explained below, these arguments are unpersuasive.

#### i.    ADA's Decision to Prosecute

ADAs LaRocca and Schalk's decisions in connection with the case against the plaintiff are not superseding causes of the alleged violations. The defendants "can be held liable for violating [the plaintiff's] due process rights if they 'misled or coerced the intervening decision-maker such that the decision-maker's conduct was tainted.'" *Bermudez v. City of New York*, 790 F.3d 368, 374–75 (2d Cir. 2015) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)). "Moreover, if the ADA was simply not informed of the alleged problems with the evidence, then he could not be a superseding cause of the deprivation of [the plaintiff's] due

process rights." *Id.* at 375 (citing *Myers v. County of Orange*, 157 F.3d 66, 73–74 (2d Cir.1998)). "As a result, even if it is undisputed that [the] ADA [] independently decided to present the [tainted] evidence at trial, [the plaintiff] can still pursue a claim against the investigating officers for depriving him of due process rights if the ADA was not informed of constitutional errors in how the [tainted] evidence was obtained." *Id.*

As explained above, the plaintiff claims that the identification proceedings were suggestive and that detectives withheld exculpatory material; the Court has held that there are material disputes of fact about these claims. Assuming that the plaintiff's allegations are true, as the Court must, there are similarly genuine issues about what the ADAs knew: whether they knew that detectives made suggestive comments to Hernandez and Anyosa, that Anyosa did not identify the plaintiff in one or two photographic arrays, or that detectives coerced Ogletree's statement that the plaintiff admitted shooting someone.[15]

Moreover, the ADAs could have been "misled about this evidence in another way that was not cured by [their] own subsequent interrogation of the witnesses;" "[o]nce the witnesses had adopted a story [] because of a suggestive presentation of photographs [or line-ups]. . . they might very well have decided to stick with that story (or become convinced that it was true), and for that reason have misinformed the ADA[s] [upon] subsequent[] question[ing]." *Bermudez*, 790 F.3d at 375–76. Once Hernandez or Anyosa became convinced that they had identified the right person, because of the unduly suggestive identification procedures, they would have

---

[15] In his deposition, ADA LaRocca testified that Lipson did not tell him that he informed Anyosa that he picked the right guy or that Hernandez had selected the plaintiff from the photo array. (ECF No. 194-39 at 36–38.) He also testified that Detective DeCaro did not tell him that he or "other detective had coached" Ogletree into making "the inculpatory statements" against the plaintiff. (*Id.* at 40.) ADA Schalk also stated in his affidavit that no one told him anything about these alleged violations. (*See* ECF No. 194-76 at 4.)

conveyed that certainty to ADAs, who would never have known about the suggestive procedures.  Anyosa's deposition testimony makes the point:

> **Q:**  Did you tell the DA that you felt pressure [to identify the plaintiff]?
>
> **A:**  I don't told them pressure.  I said I don't—I never say that about—you know.  They brought me the whole papers—I mean, the whole documents.  Josiah Galloway was the person who shot me, and they already had witness, everything, right?  So and I already—I mean, I already picked in the picture the right person. So in my conscious, I guess I was sure he was the one, you know, but I don't know whether it can be the pressure or not, but I mean—I don't know what to say, sir.

(ECF No. 194-67 at 28–29.)  Assuming a jury found that the violations occurred—the unduly suggestive identification procedures, the suppression of exculpatory evidence and the coercive interview of Ogletree—the jury could also find the prosecutors could not make informed decisions about the reliability of the evidence because the defendants did not provide them with the necessary information.  In short, the jury could find that the defendants proximately caused the deprivation of the plaintiff's rights.

> ii.    *Defense Counsel's Conduct*

Nor were defense counsel's strategic trial decisions an intervening cause.  In his opening statement, counsel told the jurors that the line-up identifications were unreliable, because of the photographic arrays:

> Maybe that's because what they did was took a photograph of Mr. Galloway without his hair in cornrows and without his hair in a big 5-inch Afro and showed it to the witness to make it fit.

(ECF No. 194-5 at 259–60.)  ADA Schalk subsequently moved to introduce the photographic identifications, because defense counsel "opened the door" to their admission.  (Def. 56.1 ¶ 307.)[16]  Judge Honorof granted the application.  (*Id.* ¶ 308.)

The defendants argue that the "defense counsel's conduct and decision to open the door[] was the catalyst and sole reason behind the trial court's decision to admit the photo arrays into evidence at trial," and that "[t]his intervening cause cuts off plaintiff's claim for recovery." (ECF No. 192 at 37–38; *see also* ECF No. 198 at 41–42.)  This argument is also unconvincing.

Courts in this Circuit have routinely rejected similar arguments, including Judge Carol Amon.  "This Court is not aware of any decision in this Circuit, nor have Defendants cited any, in which an independent decision by a defendant or defense counsel—rather than by a judge, grand jury, or a prosecutor—was held to be a superseding cause of a defendant's conviction, shielding an officer from an otherwise viable fabrication of evidence claim." *Hamilton v. City of New York*, No. 15-CV-4574, 2019 WL 1452013, at *17 (E.D.N.Y. Mar. 19, 2019); *see also Rosario*, 2021 WL 199342, at *7 ("Whether and by whom the photo identifications were offered into evidence at trial does not foreclose Plaintiff's claims based on false evidence in this case.").

Judge Lorna Schofield also rejected this argument.  "Regardless of whether [the witnesses] testified regarding the [tainted] photo identification," witnesses "still testified as to their line-up identification and made in-court identifications of Plaintiff at trial"; "[a]ccordingly, the photo identifications cannot be described as having no impact on the conduct of a criminal trial." *Rosario*, 2021 WL 199342, at *7 (internal citation omitted).

That sound logic applies in this case.  Counsel's decision to "open the door" to the photographic identification evidence is not an intervening cause that absolves the defendants of

---

[16] At the time of the plaintiff's trial, photographic identifications were inadmissible on a prosecutor's direct case.  *People v. Caserta*, 19 N.Y.2d 18 (1966); *People v. Cioffi*, 1 N.Y.2d 70 (1956).

liability because the unduly suggestive identification procedure still affects the reliability of subsequent identifications, regardless of whether the jury knows about the first suggestive procedure.  (ECF No. 192 at 37); *Rosario*, 2021 WL 199342, at *7.  In this case, Anyosa and Hernandez testified that they identified the plaintiff at separate line-ups, identifications which may also have been the product of unduly suggestive procedures.  They also identified the plaintiff in court.  Thus, if the photographic array procedures were suggestive, they tainted the line-ups and the in-court identifications, regardless of counsel's strategic choices.  Accordingly, summary judgment is denied on this claim.

## II.  Federal and State Law Claims for Malicious Prosecution

The plaintiff brings two malicious prosecution claims: one under § 1983 against Police Officer Horowitz, Detectives DeCaro, Darienzo, Lipson, and D'Luginski; and one under New York law against the same defendants, and Nassau County and the Village of Hempstead.[17] "Claims for malicious prosecution under § 1983 are substantially the same as claims for malicious prosecution under state law."  *Porter v. Port Auth. of N.Y. & N.J.*, No. 15-CV-3558, 2022 WL 991978, at *11 (E.D.N.Y. Mar. 31, 2022) (cleaned up).  The elements of a malicious prosecution claim under New York law are "(1) the initiation or continuation of a criminal

---

[17] The plaintiff brings New York state law malicious prosecution claims against Nassau County and the Village of Hempstead in addition to individually named defendants.  "New York courts have held municipalities liable under a theory of *respondeat superior* for malicious prosecution."  *Bailey v. City of New York*, 79 F. Supp. 3d 424, 451 (E.D.N.Y. 2015); *Sankar v. City of New York*, 867 F. Supp. 2d 297, 313 (E.D.N.Y. 2012) ("Unlike claims brought pursuant to [s]ection 1983, under New York state law, municipalities may be held vicariously liable for . . . malicious prosecution under a theory of *respondeat superior.*  This applies even to discretionary actions by police officers where . . . genuine issues of material fact exist as to whether there was probable cause for arrest." (citations omitted)).

Because the Court denies summary judgment on some of the plaintiff's federal law claims and the plaintiff's state law malicious prosecution claims "are so related to claims in the action within the Court's federal question jurisdiction that they form part of the same case or controversy under Article III," the Court retains supplemental jurisdiction over plaintiff's state law claims for . . . malicious prosecution."  *Sankar*, 867 F. Supp. 2d at 313.

proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations and internal quotation marks omitted); *Broughton v. State*, 335 N.E.2d 310 (N.Y. 1975) (same). Similarly, the elements of malicious prosecution under § 1983 are "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor." *Porter*, 2022 WL 991978, at *11 (internal quotation marks omitted). In addition, the Second Circuit requires that in order "to sustain a § 1983 malicious prosecution claim, there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (internal quotation marks omitted); *see also Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) ("In order to allege a cause of action for malicious prosecution under § 1983, [the plaintiff] must assert, in addition to the elements of malicious prosecution under state law, that there was . . . a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." (emphasis omitted)).

The parties agree that the plaintiff was deprived of his liberty and that the case terminated in his favor. They dispute whether the defendants initiated the prosecution against the plaintiff, whether there was probable cause to commence the proceeding, and whether the defendants acted with malice.

a.      **Initiation or Continuation of a Criminal Proceeding**

The defendants argue that that they did not play sufficiently active roles in initiating or prosecuting the charges against the plaintiff.

An officer initiated or continued a criminal proceeding if he "distorted the process by which plaintiff was brought to trial, such as by creating false information and forwarding it to prosecutors or by withholding relevant and material information from prosecutors." *McGrier v. City of New York*, 2019 U.S. Dist. LEXIS 38688, at *11 (S.D.N.Y. Mar. 11, 2019) (cleaned up); *see Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999) ("Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable" for initiating or continuing a criminal proceeding.); *Ragland v. City of New York*, 45 Misc. 3d 1218(A), at *4 (N.Y. Sup. Ct. 2014) ("New York law has long equated the civil defendant's failure to make a full and complete statement of the facts to the District Attorney or the court, or holding back information that might have affected the results, with that defendant's initiation of a malicious prosecution." (quoting *Ramos v. City of New York*, 285 A.D.2d 284, 299 (1st Dep't 2001))).  Courts have found the initiation element satisfied where a defendant officer was involved in creating false evidence "likely to be sent to prosecutors," even if that officer did not himself sign the criminal complaint or forward the information to prosecutors.  *Herrera-Amador v. N.Y.C. Police Dep't*, No. 16-CV-5915, 2021 WL 3012583, at *16–17 (E.D.N.Y. July 16, 2021); *see Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003).

As explained above in connection with the plaintiff's fair trial claims, there is a material factual dispute about whether Detectives Darienzo and DeCaro coerced Ogletree's false statement and whether DeCaro, who spoke to ECAB prosecutors and signed the felony complaint, forwarded it to the prosecutors without alerting them to the coercive circumstances

34

surrounding the statement. *Herrera-Amador*, 2021 WL 3012583, at \*17 ("Defendant Officer

Lee initiated a criminal proceeding against Plaintiff with his sworn criminal complaint.");

*Tavernier*, 316 F.3d at 138.  Moreover, there are material disputes about whether Detective

Lipson and Officer Horowitz employed suggestive tactics in connection with the photographic

arrays, and whether Detective Lipson did not notify prosecutors that Anyosa failed to identify the

plaintiff in at least one photo array.  *Herrera-Amador*, 2021 WL 3012583, at \*17.  Finally, there

are material issues of fact about whether Detectives Ross and D'Luginski conducted line-ups

under unduly suggestive circumstances.  *See id.*

>        Accordingly, summary judgment is denied on this claim.

>    **b.       Probable Cause and Malice**

>        The defendants next argue that a reasonable jury could not find a lack of probable cause

or actual malice.  Under New York law, probable cause "is the knowledge of facts, actual or

apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for

prosecuting the defendant in the manner complained of."  *Rosario*, 2021 WL 199342, at \*11

(citing *Cardoza v. City of New York*, 29 N.Y.S.3d 330, 340 (1st Dep't 2016) (citation omitted)).

"Indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted

by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or

other police conduct undertaken in bad faith."  *Id.* (cleaned up) (citing *Dufort v. City of New

York*, 874 F.3d 338, 352 (2d Cir. 2017)).  "The presumption may be overcome only by evidence

establishing that the police witnesses have not made a complete and full statement of facts either

to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence,

that they have withheld evidence or otherwise acted in bad faith."  *Id.* (quoting *Rothstein v.

Carriere*, 373 F.3d 275, 283 (2d Cir. 2004)).  Actual malice requires only "that the defendant

must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Id.* (quoting *Dufort*, 874 F.3d at 353). "Actual malice can be inferred when a plaintiff is prosecuted without probable cause." *Id.* (cleaned up).

"Probable cause is a mixed question of law and fact." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 243 (2d Cir. 2020). "An identification cannot be used to support probable cause if it was 'so defective that probable cause could not reasonably be based upon it.'" *Rosario*, 2021 WL 199342, at *11 (quoting *Dufort*, 874 F.3d at 348).

As discussed, there are key questions of material fact about the reliability of the witnesses' identifications of the plaintiff, and about the extent to which the identifications procedures were unduly suggestive. The witnesses testified about their photographic identifications in the grand jury. Accordingly, the Court cannot make a probable cause determination. A reasonable juror could find that the indictment of the plaintiff was procured through police misconduct. These issues of fact are to be resolved at trial. *See id.*[18]

### III.    False Imprisonment, Unlawful Detention, and Conspiracy Claims

The defendants are entitled to summary judgment on the plaintiff's unlawful detention, conspiracy, and state law false imprisonment claims, because the plaintiff did not address or oppose them, and has thus abandoned them. *See Taylor v. City of New York*, 269 F. Supp. 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way"); *Prevost v. City of New York*, 2015 U.S. Dist. LEXIS 171218, at *9

---

[18] Because there are questions of fact to be resolved at trial as to the liability of the individual defendants, there are also questions of fact to be resolved at trial as to the liability of Nassau County and the Village of Hempstead for the state law malicious prosecution claim on a *respondeat superior* theory.

(S.D.N.Y. Dec. 22, 2015) (dismissing § 1983 claim as abandoned where plaintiff does not respond to defendants' summary judgment arguments).

### IV.   Failure to Intervene

The defendants also seek summary judgment on the plaintiff's failure-to-intervene claim against all the defendants.  The defendants say that the plaintiff has not adduced evidence that the defendants violated his constitutional rights, and that even if they did, there is no evidence that the defendants had a realistic opportunity to intervene, or that a reasonable person would know that the plaintiff's constitutional rights were being violated.

"A police officer is liable when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene."  *Rosario*, 2021 WL 199342, at *12.

As discussed above, a reasonable jury could find from the evidence that the defendants participated in violating the plaintiff's constitutional rights, either in the production of false evidence or its dissemination.  Whether an officer had "a realistic opportunity to intervene is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise."  *Sloley v. VanBramer*, 945 F.3d 30, 47 (2d Cir. 2019) (internal quotation marks omitted).

The record demonstrates that there are triable issues of fact as to whether each of the individual defendants reasonably could have intervened in each other's alleged acts.  *See Rosario*, 2021 WL 199342, at *12.

**V.     Qualified Immunity**

The defendants argue that they are entitled to qualified immunity as a matter of law on the fair trial and malicious prosecution claims.

Under federal law, the affirmative defense of qualified immunity is established by demonstrating that "(1) the right was not clearly established or (2) even if the right was clearly established, it was objectively reasonable for the officer to believe the conduct at issue was lawful." *Elder v. McCarthy*, 967 F.3d 113, 131 (2d Cir. 2020) (quotation marks omitted). "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).

"[T]he substantive law of [the State] governs the applicability of qualified immunity to [the plaintiff's] state law claims[.]" *Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir. 1991) (citation omitted); *accord Ismael v. Charles*, No. 18-CV-3597, 2020 WL 4003291, at *9 n.6 (S.D.N.Y. July 15, 2020).  New York law provides government officials qualified immunity on state law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis. *See Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006); *accord Rothman v. City of New York*, No. 19-CV-0225, 2020 WL 2139328, at *4 (S.D.N.Y. May 5, 2020).

For the reasons explained below, deciding whether the defendants are entitled to qualified immunity arguments must await resolution of the factual disputes in this case.

**a.     Fair Trial Claims**

At this stage, the Court must draw all reasonable inferences in the plaintiff's favor.  The defendants argue that "[n]one of the actions (or failures to act), by the [] defendants violated plaintiff's constitutional rights, it was not clearly established that said actions (or failures to act)

in 2008 were unlawful, and it was objectively reasonable for the defendants to proceed as they did."  (ECF No. 192 at 51; *see also* ECF No. 198 at 45.)  In making these arguments, the defendants "rely on their version of events as to the investigation, including what occurred during the identification procedures, and that version of events is disputed."  *Rosario*, 2021 WL 199342, at \*13.  As discussed above, a reasonable jury could credit the plaintiff's version of events: that DeCaro and Darienzo coerced Ogletree's statement, that Horowitz, Lipson, Ross, and D'Luginski employed suggestive procedures at the photographic arrays and at the line-up, that Anyosa did not identify the plaintiff in at least one photographic array, and that the defendants withheld this information from the prosecutors.

Accordingly, there are issues of fact that must be resolved before the Court can determine whether it was objectively reasonable for the defendants to believe their actions were lawful.  *See id.*

The defendants also argue that the plaintiff cannot show the rights he asserts were violated were clearly established in 2008.  Drawing all inferences in the plaintiff 's favor, it was clearly established at the time of this investigation and trial that a reasonable official would have understood that fabricating an inculpatory statement and forwarding that information to prosecutors violated the plaintiff's constitutional right to a fair trial.  *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."); *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (holding that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors," there, a false confession, "he violates the accused's constitutional right to a fair trial"); *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015) ("[As of 2006,] . . .

*Ricciuti* and its progeny, including *Zahrey,* clearly establish[ed] that qualified immunity is unavailable on a claim for denial of the right to a fair trial where that claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find.") (internal quotations omitted).

Moreover, it was clearly established at the time of this investigation and trial that a reasonable official would have understood that making suggestive comments to witnesses in the process of a photo array or line-up violated the plaintiff's constitutional right to a fair trial. *Thai*, 29 F.3d at 807, 810 (holding that "[a] defendant has a due process right not to be the object of suggestive police identification procedures that create a very substantial likelihood of irreparable misidentification," and that "[a]n otherwise fair pretrial identification procedure may be rendered impermissibly suggestive through subsequent actions or remarks by government agents."); *id.* at 810 ("Conduct such as . . . endorsing the correctness of the selection, 'may tend to reinforce an otherwise weak or tentative identification and therefore lend a later in-court identification greater conviction than it deserves.'"); *see also Solomon v. Smith*, 645 F.2d 1179, 1185 (2d Cir. 1981) (holding that "while a witness is always entitled to become surer of an identification, due process precludes the generation of that increased certainty through" suggestive police behavior (citing *Simmons v. United States*, 390 U.S. 377, 383 (1968))).

Finally, suppressing potentially exculpatory information "including impeaching evidence as to the reliability of the testifying witnesses' identifications and other unreported identification procedures" would have clearly violated constitutional rights at the time of the investigation at issue here. *Rosario*, 2021 WL 199342, at *13 (finding the right clearly established since at least the 1990s); *Nnodimele v. Derienzo*, 13-CV-3461, 2016 WL 337751, at *19 (E.D.N.Y. Jan. 27,

2016) (finding a clearly established *Brady* violation as of 2007 for failing to turn over exculpatory information related to identification procedures).

### b.    Malicious Prosecution Claims

The defendants maintain that they had "arguable probable cause," and are thus entitled to qualified immunity on the malicious prosecution claims.  "Arguable probable cause" exists if "it [is] objectively reasonable for the officer to believe that probable cause exist[s]" or "officers of reasonable competence could disagree on whether the probable cause test was met." *Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2d Cir. 2012).  Since there are material questions of fact about the identifications, the Ogletree statement, and the suppression of evidence, the Court cannot determine at this time whether the defendants had probable cause or arguable probable cause.  *See Rosario*, 2021 WL 199342, at *11; *see also* (*Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) (finding qualified immunity premature because, assuming in favor of the plaintiff that the officer had "fabricated" evidence against him, "it would be objectively unreasonable for [the defendant] to believe he had probable cause to arrest [the plaintiff] if [the defendant] himself fabricated the grounds for arrest," and "[n]o reasonably competent [ ] officers could disagree").

## VI.    *Monell* Claim

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  For a plaintiff "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the

constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *accord Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 636 (S.D.N.Y. 2015).

The plaintiff challenges the County's "identification procedures and practices"—using an "old" photograph in a photo array and minimizing the differences among line-up participants by having them sit (and in the plaintiff's case, sit on telephone books), by covering them with sheets so that only their faces were visible, and using hats to disguise differences in hairstyles. The plaintiff concedes that these procedures and practices are not themselves unconstitutional, but claims that as employed in his case, the procedures deprived him of his constitutional rights. (ECF No. 202 at 26–27; ECF No. 219 at 4–5.) "Where a policy is facially unconstitutional— where it *compels* municipal agents to violate rights—the plaintiff establishes culpability simply by showing that the municipality's application of the policy caused her injury." *Becker v. City of Evansville*, No. 12-CV-182, 2015 WL 328895, at *28 (S.D. Ind. Jan. 26, 2015). But "[w]here the plaintiff alleges that a facially constitutional policy nevertheless *allowed* or *authorized* an agent to violate her rights," as the plaintiff does here, he can only prevail "by proving that the municipality enacted the policy 'with "deliberate indifference" as to its known or obvious consequences.'" *Id.* (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 406–407 (1997)). In other words, the plaintiff must show that Nassau County, by employing its identification practices and procedures, "continu[ally] adhere[d] to an approach that they kn[e]w or should [have] know[n] ha[d] failed to prevent tortious conduct by employees.'" *Id.*; *see also Jones v. City of Chicago*, 787 F.2d 200, 205 (7th Cir. 1986) ("Where the custom itself does not establish wrongdoing, there must be evidence of a course of events or circumstances that permit an inference of deliberate indifference or tacit authorization of the offensive acts.").

42

The plaintiff has not made the necessary showing.  Rather, he alleges only a single incident—this case.  *Compare Newton v. City of New York*, 681 F. Supp. 2d 473, 494 & n.144 (S.D.N.Y. 2010) (denying summary judgment where, "[a]lthough [the] alleged policy, custom, or practice [was] not [itself] unconstitutional," the plaintiff produced evidence of "a persistent or widespread" application of the policy resulting in rights violations).  By citing only the circumstances of his case, the plaintiff has not shown that Nassau County's deliberate indifference led to the violation of his constitutional rights.  *See Becker*, 2015 WL 328895, at *28 ("A plaintiff who can point to only a single unconstitutional application of a facially constitutional policy faces a steep climb.  This is because such a plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action—enacting the policy." (internal quotation marks omitted)); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.").  For these reasons, Nassau County is entitled to summary judgment on the plaintiff's *Monell* claim.

## VII.   The Village Defendants' Cross-Claims Against the County Defendants

The County defendants seek summary judgment on the Village defendants' cross-claims for contribution and indemnity.  The Village defendants have withdrawn these claims.  (ECF No. 194-77 (Stipulation of Voluntary Dismissal).)  In any event, they are also abandoned.  Accordingly, summary judgment is granted.

**VIII.  The Plaintiff's Motion to Strike Exhibits**

The plaintiff moves to strike the County's policies and procedures, and ADA Schalk's affidavit.

"A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1). "When considering whether to exclude evidence pursuant to Rule 37, courts in this Circuit must consider (1) a party's explanation for the failure to comply with the Federal Rules, (2) the importance of the evidence, (3) the prejudice suffered by the opposing party of having to prepare to meet the new evidence, and (4) the possibility of a continuance." *Miss Jones LLC v. Shahid*, No. 17-CV-716, 2022 WL 4642716, at *6 (E.D.N.Y. Sept. 30, 2022) (quoting *Richmond v. Gen. Nutrition Ctrs. Inc.*, No. 08-CV-3577, 2012 WL 762307, at *6 (S.D.N.Y. Mar. 9, 2012)). "The purpose of the rule is to prevent 'sandbagging' an opposing party with new evidence." *Id.* (quoting *Ventra v. United States*, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000)). "Courts in this Circuit recognize that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with caution." *Id.*

The plaintiff's motion is denied.  The defendant turned over most of the County's policies and procedures information before discovery closed, and the plaintiff did not object or request to reopen discovery when he received the rest of the material shortly after the discovery deadline passed.  Moreover, the plaintiff does not explain how he has been prejudiced, except to say that "he deposed a different official, Lyndon John, as the County's 30(b)(6) designee on identification policies without the benefit of the records."  (ECF No. 202 at 29.)  This is not sufficient to warrant the "drastic" remedy of striking the exhibit.  *Miss Jones LLC*, 2022 WL 4642716, at *6.

On July 31, 2023, the defendants submitted an affidavit from ADA Shalk in which he says that he "was not aware that, and not informed by any detective involved with the investigation that, Mr. Galloway made any admission or confession to shooting Jorge Anyosa," that "Jorge Anyosa [and] Wilmer Hernandez never indicated that they were pressured or coerced into identifying Josiah Galloway from the photo arrays or the line-up, both confirmed their identifications of Mr. Galloway, and both never[wavered] in their identifications of Mr. Galloway," that he "became aware of differences between several physical descriptions of Mr. Galloway and the perpetrator as described by both Jorge Anyosa and Wilmer Hernandez, include difference in height, hair style, age, and the lack of an accent" and he "did not believe that these differences were discrepancies or distinguishing characteristics," and that the "first time that [he] learned that Ogletree claimed his written statement was coerced was when he testified at Mr. Galloway's criminal trial." (ECF No. 194-76 at 3–5.) The plaintiff claims that the affidavit "seeks to retroactively immunize the defendants from liability" and includes "matters that plaintiff would have explored with Mr. Schalk at his deposition three years ago." (ECF No. 202 at 29.) But there is no reason why the plaintiff could not have asked ADA Shalk about these topics during his deposition. *See Blake v. City of New York*, No. 05-CV-6652, 2007 WL 1975570, at *5 (S.D.N.Y. July 6, 2007) (denying motion to strike filed with summary judgment motion where plaintiffs were on notice that affiant was a potential witness when his name was produced on documentary evidence during discovery and the plaintiffs failed to depose him).

Accordingly, the motion to strike is denied.

# SPA82

**CONCLUSION**

For these reasons, the defendants' motions for summary judgment are granted in part and denied in part.  The following claims may proceed:

1.  a 42 U.S.C. § 1983 malicious prosecution claim against Police Officer Horowitz, Detectives DeCaro, Darienzo, Lipson, and D'Luginski;

2.  a § 1983 claim alleging fabrication of evidence, denial of a fair trial, and *Brady* violations against all individually named defendants: Police Officer Horowitz, Detectives Ross, DeCaro, Lipson, D'Luginski, and Darienzo;

3.  a New York state law claim for malicious prosecution against Nassau County and the Village of Hempstead; and

4.  a § 1983 claim for failure to intervene against all individually named defendants.

The parties are to file a joint pre-trial order that complies with the Court's Individual Rules within thirty days from the date of this Memorandum and Order.

**SO ORDERED.**

s/Ann M. Donnelly

_____

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
      March 29, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                               :
**JOSIAH GALLOWAY**,                                           :
                                                               :
                              Plaintiff,                       :
                                                               :   **MEMORANDUM DECISION AND**
                                                               :   **ORDER**
               – against –                                     :
                                                               :   19-CV-5026 (AMD) (JMW)
**COUNTY OF NASSAU**, *et al.*,                                :
                                                               :
                              Defendants.                      :
------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

Before the Court are the County defendants'[1] and the Village defendants'[2] motions under

Federal Rule of Civil Procedure 60(b) and Local Rule 6.3 for reconsideration of and relief from

the Court's March 29, 2024 memorandum decision and order denying in part and granting in part

the defendants' motions for summary judgment.  For the reasons explained below, the Village

defendants' motion is granted and the County defendants' motion is denied.

## BACKGROUND

The Court assumes familiarity with the underlying facts and procedural history of this

case, which are discussed in detail in the Court's March 29, 2024 memorandum decision and

order denying in part and granting in part the defendants' motions for summary judgment.  (*See*

ECF No. 220 at 2–14.)  The Court granted summary judgment to the County and Village

defendants as to the plaintiff's false imprisonment, unlawful detention, conspiracy, and *Monell*

claims.  The Court denied summary judgment as to the fair trial claims (which the plaintiff

---

[1] The "County defendants" are Nassau County, the NCPD, and Detectives Charles DeCaro, Thomas
  D'Luginski, George Darienzo, Matthew Ross, and Ronald Lipson.

[2] The "Village defendants" are the Village of Hempstead and Police Officer Steven Horowitz.

advanced under three theories — fabrication of evidence, unduly suggestive identification procedures, and suppression of exculpatory evidence), state and federal malicious prosecution claims, and failure-to-intervene claims.  The Court also deferred ruling on qualified immunity pending resolution of the factual disputes in this case.

The following claims remain in this lawsuit: (1) a 42 U.S.C. § 1983 malicious prosecution claim against Police Officer Horowitz and Detectives DeCaro, Darienzo, Lipson, and D'Luginski; (2) a § 1983 fair trial claim alleging fabrication of evidence, unduly suggestive identification procedures, and *Brady* violations against all individually named defendants: Police Officer Horowitz and Detectives Ross, DeCaro, Lipson, D'Luginski, and Darienzo; (3) a New York state law claim for malicious prosecution against Nassau County and the Village of Hempstead; and (4) a § 1983 claim for failure to intervene against all individually named defendants.

Both the County defendants and the Village defendants filed motions for reconsideration. (*See* ECF Nos. 221, 222.)

## LEGAL STANDARD

Rule 60(b) allows the Court to relieve a party from an order in the following circumstances: "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . . ; (3) fraud . . . , misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  "A motion for reconsideration should be granted only where the moving party demonstrates that the Court has overlooked factual matters or controlling precedent that were presented to it on the underlying motion and that would have changed its decision."  *McAnaney v. Astoria Fin. Corp.*, 233 F.R.D.

285, 287 (E.D.N.Y. 2005) (citation omitted). "Reconsideration may also be granted to 'correct a clear error or prevent manifest injustice.'" *Suarez v. Big Apple Car, Inc.*, No. 15-CV-5330, 2017 WL 9400686, at *1 (E.D.N.Y. Dec. 1, 2017) (quoting *Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)). "However, a party cannot 'rel[y] on different facts and alternative arguments to seek reconsideration.'" *Id*. (quoting *Nimkoff Rosenfeld & Schechter, LLP v. RKO Props., Ltd.*, No. 07-CV-7983, 2017 WL 4129644, at *8 (S.D.N.Y. Sept. 18, 2017)). Thus, "[a] Rule 60(b) motion is properly denied where it seeks only to relitigate issues already decided." *Maldonado v. Local 803 I.B. of Tr. Health & Welfare Fund*, 490 F. App'x 405, 406 (2d Cir. 2013) (citing *Zerman v. Jacobs*, 751 F.2d 82, 85 (2d Cir. 1984)).

## DISCUSSION

### I. The Village Defendants' Motion for Reconsideration

The Village defendants argue that the Court should have granted summary judgment as to Horowitz — the only individually named Village defendant remaining in the lawsuit other than the municipality. (ECF No. 222-1.) After careful consideration of the submissions, the Court concludes that the Village defendants are correct.

It is undisputed that Horowitz's participation was limited. He responded to the scene of the Anyosa shooting, was present when the plaintiff was arrested, was present with Lipson when Hernandez looked at the photo array, and testified in the grand jury only about responding to the scene of the Anyosa shooting. (ECF No. 220 at 4, 8; ECF No. 194-7 at 28–30; Pl. 56.1 ¶ 367.) For purposes of this lawsuit, only the circumstances of the Hernandez photo array are relevant in determining whether there are factual disputes about Horowitz's participation in the alleged constitutional violation. Specifically, the only question is whether Horowitz or Lipson told Hernandez that "they had the person who was the cause of the incident" before they showed Hernandez the photo array. (*See* ECF No. 220 at 25 (quoting ECF No. 194-29 at 31).) Drawing

all inferences in favor of the plaintiff, the non-moving party, the Court explained in the summary judgment order that commenting that someone was in custody, standing alone, did not render the photo array identification procedure unduly suggestive.  (ECF No. 220 at 26 (collecting cases).)

Accordingly, even if the plaintiff could show at trial that it was Horowitz who told Hernandez that a suspect was in custody before they showed him the photo array, that would not be enough to support fair trial or malicious prosecution claims against Horowitz.  Additionally, given Horowitz's limited involvement, the Court finds that Horowitz did not have "a realistic opportunity to intervene and prevent" violations of the plaintiff's constitutional rights that may have occurred at other points during the investigation and prosecution.  *Demosthene v. City of New York*, 831 F. App'x 530, 535 (2d Cir. 2020) (affirming dismissal of excessive force and failure-to-intervene claims against a detective who was not present when alleged constitutional violations occurred).

Summary judgment is therefore granted as to all claims against Horowitz — the § 1983 malicious prosecution claim, the § 1983 fair trial claim, and the § 1983 claim for failure to intervene — and Horowitz is dismissed as a defendant in this lawsuit.  Because the malicious prosecution claim against Horowitz is dismissed, summary judgment is also proper as to the New York state law claim for malicious prosecution brought against the Village of Hempstead, because no relevant conduct can be attributed to the municipality under a *respondeat superior* theory or otherwise.  *See Bailey v. City of New York*, 79 F. Supp. 3d 424, 451 (E.D.N.Y. 2015). The Village of Hempstead is thus also dismissed as a defendant in this lawsuit.

**II.     The County Defendants' Motion for Reconsideration[3]**

    **a.     General Challenge to Fair Trial, Malicious Prosecution, and Failure-to-Intervene Claims**

One of the themes the County presses in seeking reconsideration is that the defendants cannot be held liable if they were not physically present for certain conduct.  The County argues that:

- Ross cannot be held liable for any alleged constitutional violations that occurred before the line-up.  (ECF No. 221-1 at 13.)
- Lipson, DeCaro, and Darienzo cannot be held liable for any alleged constitutional violation associated with the line-up.  (*Id.* at 13–14.)
- D'Luginski cannot be held liable for any alleged constitutional violation associated with Ogletree's statement.  (*Id.* at 17.)
- Darienzo, D'Luginski, and DeCaro cannot be held liable for any alleged constitutional violation associated with the photo array.  (*Id.* at 20.)

These arguments do not address an error in the Court's summary judgment order.  As the plaintiff points out, the Court accounted for these unremarkable propositions in its order.  (*See* ECF No. 226 at 7.)

The plaintiff claims that each defendant violated his right to a fair trial and posits three theories of liability: fabrication of evidence, unduly suggestive identification procedures, and suppression of exculpatory evidence.  But not every theory of liability applies to each defendant, because not every defendant was present for each relevant act underlying certain theories of liability.  However, at least one theory of liability applies to each fair trial claim against each County defendant, which is sufficient to survive summary judgment.  There is no reason to dismiss an otherwise valid claim even if it was also brought pursuant to an irrelevant theory of liability.  *See Johnston v. Cnty. of Sonoma*, No. 10-CV-03592, 2011 WL 855934, at *4 (N.D.

---

[3] The County defendants divide and repeat arguments in different sections of their briefing.  For purposes of efficiency and clarity, the Court has reordered and consolidated the arguments.

Cal. Mar. 9, 2011) (rejecting similar argument where "each cause of action" had "a legal basis" even though the plaintiff had also "pleaded certain legal bases for those claims that are not applicable"). Accordingly, there are no fair trial claims that should have been entirely dismissed for the County defendants, and thus no error to correct.[4]

Similarly, the County defendants argue that the defendants cannot be held liable for failing to intervene in acts in which they were not involved or for which they were not present. This point, too, is as obvious as it is correct. Drawing all inferences in the plaintiff's favor, because each defendant was present for at least one alleged violation and *could* have intervened, there are no failure-to-intervene claims to dismiss.

      **b.**    **Specific Challenges to the Court's Denial of Summary Judgment on the Fair Trial Claims**

          *i.*   *Magliaro Affidavit*

The County defendants repeat their argument that Lori Magliaro's affidavit is "unreliable," and that "[a]dditional evidence" of the affidavit's unreliability "surfaced on March 13, 2024, . . . as Thomas Liotti, the (former) attorney who drafted and prepared this affidavit, was suspended from the practice of law due [to] his misconduct while acting in his capacity as an attorney." (ECF No. 221-1 at 14–15 (citing *Matter of Liotti*, 2024 N.Y. App. Div. LEXIS 1286, 2024 NY Slip Op. 01310 (2d Dep't Mar. 13, 2024).) Liotti was suspended for making insulting remarks about opposing counsel and a judge in another matter, which has nothing to do with this case or Magliaro's affidavit. *Matter of Liotti*, 2024 N.Y. App. Div. LEXIS 1286. Liotti's suspension is therefore not material and does not warrant granting the defendant's motion. *See Hanover Ins. Co. v. Weirfield Coal, Inc.*, No. 19-CV-04456, 2022 WL 21296023, at *1

---

[4] For these same reasons, there are no malicious prosecution claims to dismiss. Obviously, the defendants cannot be liable for conduct in which they had no involvement, but there are no claims to dismiss entirely.

(E.D.N.Y. May 26, 2022) (when a party seeks reconsideration based on new evidence "the new evidence must be of such importance that it probably would have changed the outcome of the prior ruling" (cleaned up)).

The County defendants argue that Magliaro's affidavit contains inadmissible hearsay and that "she is not competent to testify as to the matters asserted in the affidavit." (ECF No. 221-1 at 15.) This argument is without merit. According to Magliaro, Ross made admissions to her, which are not hearsay. (ECF No. 220 at 10–11); *see* Fed. R. Evid. 801(d)(2)(A) (admission of an opposing party is not hearsay).[5]

Accordingly, the Court declines to dismiss the claims related to Magliaro's affidavit.

> ii.   *Fair Trial Claim Based on the Line-Up Procedure*

The County defendants argue that the Court was wrong to conclude that "there are disputes of material fact about whether Detective Ross used otherwise acceptable line-up procedures with the intent to conceal the plaintiff's height and deprive him of a fair trial," because the Court also "found that the line-up procedures employed were not unduly suggestive." (ECF No. 221-1 at 15–16 (citing ECF No. 220 at 23).) Thus, they say, "Ross should be dismissed as a named defendant in this lawsuit." (*Id.*)

This argument is unpersuasive. The Court found the measures employed in the line-up — having the participants seated, wearing hats, and covered by a sheet, as well as having the plaintiff seated on telephone books to minimize any height differences — were not, by themselves, unduly suggestive. But the plaintiff did not argue that the line-up procedure was designed to single him out. *Compare Roldan v. Artuz*, 78 F. Supp. 2d 260, 272 (S.D.N.Y. 2000)

---

[5] In addition, the County defendants did not make this argument in their summary judgment briefing, and it is therefore not a proper ground for reconsideration. *See Suarez*, 2017 WL 9400686, at *1 (quoting *Nimkoff*, 2017 WL 4129644, at *8).

**SPA90**

(finding a similar line-up procedure was not unduly suggestive where the plaintiff argued he "appeared drastically different from all of the fillers, he was either taller, and or lighter in complexion, heavier in weight, younger than fillers and [his] hair style was totally different"). Rather, the plaintiff maintains that Ross utilized these measures to conceal the features that demonstrated that he was not the person who shot the victim, thereby ensuring a misidentification.  This is a fair trial claim, whether it is categorized under the unduly suggestive identification standard or the fabrication of evidence standard, and there are disputes of material fact that preclude summary judgment.  *See Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001) ("Suggestive identification procedures increase the likelihood of misidentification, and it is the likelihood of misidentification which violates a defendant's right to due process." (cleaned up)); *West v. Greiner*, No. 01-CV-1267, 2004 WL 315247, at *5 (E.D.N.Y. Feb. 12, 2004) ("The focus of the [unduly suggestive identification procedure] inquiry is not whether the suspect has a distinctive feature not shared by the other participants, but whether that feature matches the description provided by the witness."); *see also Kee v. City of New York*, 12 F.4th 150, 168 (2d Cir. 2021) (a plaintiff bringing a fabrication of evidence claim must show that "(1) the officer created false information, (2) the officer forwarded the false information to prosecutors, (3) the false information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation of life, liberty, or property as a result of the officer's actions"); *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) ("[A]ny information fabricated by an officer can serve as the basis of a claim for a denial of the right to a fair trial." (emphasis omitted)).

Moreover, there are factual disputes about Ross's ability to intervene and the extent to which he made suggestive comments during the line-up procedure.  (*See* ECF No. 220 at 26.)

Accordingly, the Court declines to dismiss the fair trial claim against Ross or to dismiss Ross from this action.

### iii. *Ogletree Statement*

The County defendants renew their argument that Ogletree's testimony at the plaintiff's criminal trial would be inadmissible at a trial in this matter, and thus cannot be the basis for denying summary judgment. (ECF No. 221-1 at 18–19; *see* ECF No. 192 at 27–28 (County defendants' summary judgment motion).) The Court has considered this argument and rejected it. (ECF No. 220 at 16–20); *see Maldonado*, 490 F. App'x at 406 ("A Rule 60(b) motion is properly denied where it seeks only to relitigate issues already decided." (citation omitted)).

### iv. *Comment to Hernandez Before Photo Array*

The County defendants argue that "[n]o defendant can be held liable for the alleged statement to Hernandez regarding a suspect in custody prior to viewing the photo array." (ECF No. 221-1 at 21.) As explained earlier, the Court did not find that any defendant could be liable for that statement alone (ECF No. 220 at 25–26); accordingly, there was no error.

The County defendants also argue that the Court erroneously "merge[d] the photo array (taking place on June 6, 2008) and line-up (taking place on August 14, 2008) together" in determining that "there are issues of fact for all identification procedures administered to Hernandez." (ECF No. 221-1 at 21.) The Court did not "merge" these identification procedures; rather, in a separate paragraph, the Court found that, drawing all inferences in favor of the plaintiff, a jury could find that a detective present for the line-up — including Ross or D'Luginski — told Hernandez he selected the "right person," a statement which could have tainted future identification procedures. (ECF No. 220 at 26.) Accordingly, summary judgment is not appropriate.

> v.   *Other Comments to Hernandez and Anyosa During the Identification Procedures*

Next, the County defendants reiterate their arguments, which the Court also considered and rejected, that the Court should dismiss allegations of suggestive comments to Anyosa and Hernandez during the photo array and the line-up as "mere speculation." (ECF No. 221-1 at 22; *see also* ECF No. 210 at 22 (County defendants' summary judgment reply brief).) They maintain that the Court should reject as speculative Hernandez's deposition testimony that a detective told him that he identified the right person at the line-up. (ECF No. 221-1 at 23.) In addition, the defendants say that the Court "cherrypicked Anyosa's deposition testimony inferring that Lipson allegedly told Anyosa that Hernandez had selected the right person." (*Id.*) In fact, it is not "cherrypicking" to draw all inferences in the nonmovant's favor; that is what the Court must do on summary judgment. *See Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). In any case, the Court already considered these arguments and found them unpersuasive. *See Maldonado*, 490 F. App'x at 406.

The County defendants also argue that "[w]ith respect to the allegation that Lipson told Anyosa that he selected the right guy after Anyosa selected plaintiff from the photo array, ADA Anania's notes, as previously relayed to this Court are inadmissible hearsay that lack[] all guarantees of trustworthiness." (ECF No. 221-1 at 23 (citing ECF No. 210 at 10–11, and ECF No. 192 at 18 n.7).) As the County defendants acknowledge, they already made this argument and were not successful. *See Maldonado*, 490 F. App'x at 406. In any event, the argument is meritless because the Court can consider ADA Anania's notes on summary judgment. *See Murphy v. Metro. Transp. Auth.*, 548 F. Supp. 2d 29, 43–44 (S.D.N.Y. 2008) (the plaintiff "adduced enough evidence to survive [a] summary judgment motion" where he "appear[ed] able

to identify and subpoena all of the relevant declarants," and those "individuals may be called at trial to testify").

vi.     *Whether Lipson Showed Anyosa Multiple Arrays*

In another effort to relitigate an issue the Court decided, the defendants repeat their argument that Anyosa's testimony was "too speculative" to determine whether he saw more than one photo array and did not identify the plaintiff in one of them.  (ECF No. 221-1 at 24; *see* Pl. 56.1 ¶ 703 (the defendants' response)); *Maldonado*, 490 F. App'x at 406.  The testimony is not speculative.  Anyosa testified at the plaintiff's criminal trial that Lipson showed him "two or three" sheets of paper with "six pictures" at a time — in other words, more than one array — and that he identified the plaintiff's photograph in only one array; he made no identifications in the one or two other arrays that Lipson showed him.  (ECF No. 194-5 at 456.)  His testimony was supported by Lipson's testimony that he put together two different arrays at DeCaro's request, both of which included the plaintiff's photograph.  (Def. 56.1 ¶¶ 113–19.)  Drawing all inferences in the plaintiff's favor, a jury could find that Anyosa viewed at least two arrays, which included the plaintiff's photograph, and that he did not identify the plaintiff in at least one of them.

The County defendants also argue that Anyosa's failure to identify the plaintiff in a photo array was not material evidence that the prosecution was required to disclose pursuant to *Brady v. Maryland*, 373 U.S. 83, 85 (1963).  On the contrary, identification was a critical issue in this case.  Evidence that an eyewitness did not identify the plaintiff was at the very least material impeachment evidence.  *See Simmons v. Beard*, 590 F.3d 223, 237–38 (3d Cir. 2009) (noting that not disclosing a witness's failure to identify the petitioner in a photo array is a *Brady* violation); *see also Romero v. Beard*, No. 08-CV-0528, 2024 WL 1975475, at *45 (E.D. Pa. May 2, 2024) ("[A] witness's failure to identify a defendant in a photo array is impeachment evidence under

11

*Brady* . . . ." (citing *Simmons*, 590 F.3d at 237–38 (3d Cir. 2009))).  Accordingly, the Court will not revisit its decision.

>        vii.      *Assessing Reliability of the Identifications*

The Court found that there were material factual disputes about whether various identification procedures — the photographic arrays and the line-ups — were unduly suggestive. The County defendants argue that the Court must also determine whether the witnesses' identifications were nonetheless independently reliable.  The short answer is that the identifications were obviously not reliable because the plaintiff was not the shooter, a fact which is undisputed.  In any event, analysis of the factors in *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972) confirms that the Court cannot find the identifications independently reliable.

A court determining whether an identification is independently reliable despite suggestive identification procedures considers these factors:  (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness' degree of attention," (3) "the accuracy of the witness' prior description of the criminal," (4) "the level of certainty demonstrated by the witness at the confrontation," and (5) "the length of time between the crime and the confrontation."  *United States v. Haskins*, No. 21-CR-269, 2022 WL 1460277, at *12 (E.D.N.Y. May 9, 2022) (cleaned up).  "None of these factors standing alone is dispositive of the existence of independent reliability; instead, reliability is assessed in light of the totality of the circumstances."  *Id.* (citation omitted).

Anyosa and Hernandez had an "opportunity . . . to view the criminal at the time of the crime" or at least shortly before the shooting when, during the first encounter, the shooter drove up behind Anyosa and Hernandez, started honking, argued with them for a few minutes, and

drove away.  *Id.*; (*see also* Def. 56.1 ¶¶ 17, 22, 24.)[6]  But that argument lasted only a few minutes, between midnight and 2:00 a.m.  *Compare Neil v. Biggers*, 409 U.S. 188, 194 (1972) (unduly suggestive identification was independently reliable where the victim was with her assailant for almost half an hour, with ample opportunity to face him directly in adequate light).

Anyosa also saw the shooter at 2:00 a.m., when he shot Anyosa in the face.  That encounter lasted for a few minutes at most, and the circumstances — getting shot in the face at night — were not conducive to a reliable identification.  *See Haskins*, 2022 WL 1460277, at *9, 13 (identification was not independently reliable where the witness's opportunity to view the criminal and degree of attention "were hindered by the presence of the gun" as "eyewitnesses held at gunpoint focus on weapons being pointed at them and thus their recollection of other details becomes less clear" (citing National Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* 93 (2014))).

Lipson showed Anyosa and Hernandez a photo array[7] 22 days after the shooting, on June 6, 2008 — at 3:20 a.m. for Hernandez, and 5:00 a.m. for Anyosa, whose jaw was wired shut as he recovered from surgery.  (Def. 56.1 ¶¶ 142–44; Pl. 56.1 ¶¶ 230, 433.)  *Compare United States v. Flores*, 855 F. Supp. 638, 639 (S.D.N.Y. 1994) (identifications were independently reliable where "all the identifications occurred within two days of the alleged crime").

As for "the accuracy of the witness' prior description of the criminal," the defendants, as noted above, agree that the plaintiff did not shoot Anyosa, so the identifications were obviously inaccurate.  *Haskins*, 2022 WL 1460277, at *12.  Anyosa told investigators that the shooter was a 5'10" man between 25 and 30 years old who spoke with an accent and had short black hair.  (Pl.

---

[6] The parties do not dispute that the person in this first encounter was the person who shot Anyosa.

[7] As explained above, Anyosa testified at the plaintiff's criminal trial that he looked at more than one photo array.

56.1 ¶¶ 196–97.)  The plaintiff did not fit that description:  He was 21 years old, 5'5" tall, did not

speak with an accent and wore his hair in braids.  (Pl. 56.1 ¶¶ 287, 379, 517, 633, 663); *see*

*Bolden v. Pesavento*, 623 F. Supp. 3d 897, 917 (N.D. Ill. 2022) (finding a witness's prior

identification unreliable where it did not match the description of the suspect).

      Although this is sufficient to end the inquiry, there is additional evidence of unreliability,

as the parties dispute whether Anyosa looked at more than one array with the plaintiff's picture

and failed to identify him.  *See Bolden*, 623 F. Supp. 3d at 917–18 (finding witness's prior

identification unreliable where under "[t]he fourth factor [regarding] certainty in his

identification," the witness "could not identify Bolden in a photo array"); *Raheem*, 257 F.3d at

138–40 (finding witness's prior identification unreliable where the witness "at first identified no

one").

      In short, drawing all inferences in the plaintiff's favor, the Court cannot conclude that the

identifications were independently reliable.

    **c.**    **Specific Challenges to the Court's Denial of Summary Judgment on the Malicious Prosecution Claims**

      *i.*    *DeCaro and Darienzo*

      The County Defendants argue that DeCaro and Darienzo are not liable for malicious

prosecution because "it was objectively reasonable for them to rely on the representations of

their fellow officer" and that probable cause independent of fabricated evidence is a defense to

the plaintiff's malicious prosecution claim.  (ECF No. 221-1 at 33 & n.19.)  This, too, is an

attempt to relitigate matters that the Court considered and rejected because material factual

disputes preclude finding probable cause independent of fabricated evidence.  (ECF No. 220 at

36); *see Maldonado*, 490 F. App'x at 406.

ii.     *False Statements Contained in the Felony Complaints*

The County defendants argue that the Court "incorrectly found a material factual dispute related to the information — alleged false statement — contained in the felony complaints, but correctly stated at the March 13, 2024 oral argument that this alleged 'false statement never goes anywhere.'" (ECF No. 221-1 at 34 (citations omitted).)  This is not accurate.  The allegedly false statement at issue is Ogletree's signed statement implicating the plaintiff.  (*See* ECF No. 220 at 18–20, 34–35.)  The discussion at oral argument was about a different false statement in the felony complaint — that the plaintiff admitted to DeCaro that he shot Anyosa.  (*See* ECF No. 221-1 at 53; ECF No. 220 at 7–8.)  The Court did not consider this statement in deciding the summary judgment motion because, as the Court observed at oral argument, it did not "go anywhere."  Accordingly, this is not a reason to grant summary judgment.

iii.     *Probable Cause*

The County defendants reiterate their argument that there was probable cause even if the identification procedures in this case were suggestive.  (ECF No. 221-1 at 34.)  The Court already considered this argument and found it unconvincing.  (ECF No. 220 at 36); *see Maldonado*, 490 F. App'x at 406.

**d.     Specific Challenge to the Court's Denial of Summary Judgment on the Failure-to-Intervene Claims**

The County defendants argue that Darienzo's "involvement in the line-up was limited and confined to keeping Hernandez separate from everyone," and that he "would never had known that the plaintiff's rights were allegedly violated, and thus, could not possibly have had a realistic opportunity to intervene."  (ECF No. 221-1 at 14.)  As the Court already addressed in the summary judgment order, Hernandez testified in his deposition that unnamed detectives may have told him after he identified the plaintiff in the line-up that he selected the right person, but

that he was not completely sure.  (*See* ECF No. 220 at 26 (quoting ECF No. 194-29 at 79–80).)
It is for the jury to determine whether Darienzo participated in or failed to intervene in this
alleged violation.

> **e.    Qualified Immunity**

The County defendants argue at various points throughout their briefing that the Court
should reconsider its decision to defer ruling on qualified immunity until resolution of the factual
disputes in this case.

The County defendants argue, without citing the summary judgment order, that "Ross
and all the defendants are entitled to qualified immunity for any conduct associated with, or
practices utilized during, the line-up." (ECF No. 221-1 at 16–17.)  The Court already considered
and rejected this argument.  (ECF No. 220 at 39–40); *see Maldonado*, 490 F. App'x at 406.

The County defendants also argue, without citing any case law, that "Lipson and all other
defendants" are entitled to qualified immunity because "in 2008, there was no clearly established
right that a post-identification confirmatory remark by an officer to a witness would violate a
person's constitutional rights." (ECF No. 221-1 at 28.)  The County defendants state that
"[n]either plaintiff nor this Court can cite to any case, with specific similar facts, that
demonstrates that this conduct was clearly established in 2008." (*Id.*)  The Court held that it was
clearly established at the time of this investigation and trial that a reasonable official would have
understood that making suggestive comments to witnesses in the process of a photo array or line-
up violated the plaintiff's constitutional right to a fair trial.  (*See* ECF No. 220 at 40 (citing *Thai*,
29 F.3d at 807, 810, and *Solomon v. Smith*, 645 F.2d 1179, 1185 (2d Cir. 1981)).)

The County defendants also argue that D'Luginski is entitled to qualified immunity for
malicious prosecution because he was "entitled to rely on the allegations of fellow police officers
that Hernandez and Anyosa positively identified plaintiff from the photo arrays," which would

**SPA99**

have established probable cause.  (ECF No. 221-1 at 32.)  As discussed above, the Court cannot determine as a matter of law on this record that a reasonable jury would have to find that probable cause existed.  (ECF No. 220 at 35.)

The County defendants also argue that DeCaro and Darienzo "cannot be held liable for malicious prosecution, and at the very least, are entitled to qualified immunity" because the "plaintiff was indicted with no evidence regarding Ogletree or his statement presented to the grand jury."  (ECF No. 221-1 at 33.)  As the Court already held in denying summary judgment, there is a material factual dispute about whether Darienzo and DeCaro coerced Ogletree's false statement and whether DeCaro, who spoke to prosecutors in ECAB and signed the felony complaint, forwarded it to the prosecutors without alerting them to the coercive circumstances surrounding the statement.  And the Court found that a reasonable jury could find that the indictment was procured by police conduct undertaken in bad faith.  Accordingly, the Court will not reconsider the deferral of the qualified immunity ruling pending resolution of factual disputes.

17

**SPA100**

**CONCLUSION**

For these reasons, the County's motion for reconsideration is denied, and the Village defendants' motion for reconsideration is granted.  Horowitz and the Village of Hempstead are dismissed as defendants in this case.

In light of the Court's decision to dismiss parties from this case, the deadline for the parties to file a joint pretrial order is extended to July 15, 2024.

**SO ORDERED.**

s/Ann M. Donnelly

_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       June 11, 2024