# 24-1785

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

JOSIAH GALLOWAY,

Plaintiff–Appellee,

v.

COUNTY OF NASSAU, DETECTIVE MATTHEW ROSS (SHIELD #834), DETECTIVE CHARLES DECARO (SHIELD #1047), DETECTIVE RONALD LIPSON (SHIELD #1296), DETECTIVE THOMAS D'LUGINSKI (SHIELD #7900), DETECTIVE GEORGE DARIENZO (SHIELD #1038),

Defendants–Appellants.

On Appeal from a non-final order of the
United States District Court for the Eastern District of New York
Case No. 19-cv-5026, Hon. Ann M. Donnelly

**BRIEF FOR APPELLEE**

Gabriel P. Harvis
Baree N. Fett
ELEFTERAKIS, ELEFTERAKIS & PANEK
80 Pine Street
38th Floor
New York, NY 10005
(212) 532-1116
gharvis@eeplaw.com

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Eliana Machefsky
NATIONAL POLICE ACCOUNTABILITY
  PROJECT
P.O. Box 2981
Berkeley, CA 94702
(314) 440-3505
eliana.npap@nlg.org

Counsel for Appellee

January 17, 2025

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ............................................................................. iv

Introduction ......................................................................................... 1

Jurisdictional Statement ...................................................................... 2

Issues Presented .................................................................................. 3

Standard of Review ............................................................................. 3

Statement of the Case .......................................................................... 4

    A.   Factual Background ................................................................... 4

         1.   Jorge Anyosa gets shot by a man who does not resemble
             Josiah Galloway. ............................................................. 4

         2.   Nassau County officers zero in on Mr. Galloway despite—and
             by covering up—mounting discrepancies. ........................... 4

         3.   An initially deadlocked jury convicts Mr. Galloway. ......... 7

         4.   Mr. Galloway is exonerated after serving more than nine
             years. ............................................................................... 8

    B.   Procedural History ................................................................... 8

         1.   Fair trial claims ............................................................... 9

         2.   Malicious prosecution claims and failure to intervene ....... 11

         3.   Qualified immunity ......................................................... 12

Summary of Argument ........................................................................ 13

Argument ............................................................................................ 14

I.    This Court does not have appellate jurisdiction because Appellants
    primarily dispute facts in the record ................................................ 14

    A.   This Court has appellate jurisdiction to hear interlocutory
        appeals of qualified immunity denials that present only questions
        of law, not such appeals that dispute the facts. ........................... 15

    B.   This appeal primarily disputes the District Court's description of
        the facts in the summary judgment record. ................................. 18

    C.   This Court should reject out of hand the County's request that the
        Court exercise pendent appellate jurisdiction over a denial of
        summary judgment of a state law claim ...................................... 21

II.   To the extent that Appellants do appeal only pure issues of law, based
    upon the facts in the record a reasonable jury could find that
    Appellants violated Mr. Galloway's clearly established rights. ........ 25

# TABLE OF CONTENTS—continued

A.   Appellants violated Mr. Galloway's clearly established right not to be identified via unduly suggestive procedures. ........................................ 25

  1.   The Photo Array ......................................................... 25
  2.   The Lineups ................................................................ 34

B.   Appellants violated Mr. Galloway's clearly established right not to be charged and prosecuted with fabricated or coerced evidence, and without access to exculpatory evidence. .............................................. 40

  1.   Coerced witness statements. ................................................. 40
  2.   Suppression of exculpatory evidence. .................................... 43

III.  Appellants have waived or forfeited all argument relating to the failure-to-intervene and malicious prosecution claims. .................................... 48

Conclusion.............................................................................. 50

Certificates........................................................................... 1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdur Raheem v. Kelly,*
    257 F.3d 122 (2d Cir. 2001) ................................................................ 26, 35, 38

*Ashby v. Senkowski,*
    269 F.Supp.2d 109 (E.D.N.Y. 2003) ........................................................ 27, 36

*Barnes v. City of New York,*
    68 F.4th 123 (2d Cir. 2023) .................................................................... 43

*Bellamy v. City of New York,*
    914 F.3d 727 (2d Cir. 2019) .................................................................... 44

*Bermudez v. City of New York,*
    790 F.3d 368 (2d Cir. 2015 ..................................................................... 37

*Bernard v. Cnty. of Suffolk,*
    356 F.3d 495 (2d Cir. 2004) .................................................................... 22

*Biosafe-One, Inc. v. Hawks,*
    379 F.App'x 4 (2d Cir. 2010) ............................................................... 49, 50

*Bolmer v. Oliveira,*
    594 F.3d 134 (2d Cir. 2010) .................................................................. 16, 21

*Boyette v. Lefevre,*
    246 F.3d 76, 91 (2d Cir. 2001) ................................................................ 47

*Brady v. Maryland,*
    373 U.S. 83 (1963) ................................................................................ 44

*Brown v. Halpin,*
    885 F.3d 111 (2d Cir. 2018) .................................................................... 17

*Coollick v. Hughes,*
    699 F.3d 211 (2d Cir. 2012) .................................................................. 3, 15

*Cowan ex rel. Est. of Cooper v. Breen,*
    352 F.3d 756 (2d Cir. 2003) .................................................................... 18

*Demoret v. Zegarelli,*
    451 F.3d 140 (2d Cir. 2006) .................................................................... 24

*Dickerson v. Fogg,*
    692 F.2d 238 (2d Cir. 1982) .................................................................... 28

*DiStiso v. Cook,*
    691 F.3d 226 (2d Cir. 2012) .................................................................... 18

*Doninger v. Niehoff,*
    642 F.3d 334 (2d Cir. 2011) .................................................................. 3, 16

*Fappiano v. City of New York,*
    No. 07-CV-2476 (SLT) (SMG), 2014 U.S. Dist. LEXIS 179584 (E.D.N.Y. Dec. 31,
    2014) ........................................................................................... 45, 46

*Franco v. Gunsalus,*
    972 F.3d 170 (2d Cir. 2020) .................................................................... 18

iv

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Frost v. New York City Police Dep't.*,
  980 F.3d 231 (2d Cir. 2020) ................................................................. 41

*Garnett v. Undercover Officer C0039*,
  838 F.3d 265 (2d Cir. 2016) ................................................. 41, 42, 43

*Garnett v. Undercover Officer C0039*,
  No. 1:13-cv-7083-GHW, 2015 U.S. Dist. LEXIS 45232 (S.D.N.Y. Apr. 6, 2015),
  *aff'd Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016) .............. 43

*Giglio v. United States*,
  405 U.S. 150 (1972) ............................................................................. 47

*Good v. Curtis*,
  601 F.3d 393 (5th Cir. 2010) .............................................................. 40

*Harewood v. Braithwaite*,
  64 F.Supp.3d 384 (E.D.N.Y. 2014) .............................................. 34, 39

*Harewood v. City of New York*,
  508 F.App'x 60 (2d Cir. 2013) .......................................... 17, 33, 39, 40

*Harewood v. City of New York*,
  No. 09-cv-2874(FB)(RML), 2012 U.S. Dist. LEXIS 194186 (E.D.N.Y. Feb. 10, 2012) ................................................................................................. 33

*Holeman v. City of New London*,
  425 F.3d 184 (2d Cir. 2005) ................................................................ 18

*In re State Police Litig.*,
  88 F.3d 111 (2d Cir. 1996) ............................................................. 3, 17

*Jarrett v. Headley*,
  802 F.2d 34 (2d Cir. 1986) .................................................................. 26

*Jenkins v. City of New York*,
  478 F.3d 76 (2d Cir. 2007) ..................................................... 29, 30, 31

*Johnson v. Jones*,
  515 U.S. 304 (1995) ....................................................................... 2, 15, 16

*Johnson v. Newburgh Enlarged Sch. Dist.*,
  239 F.3d 246 (2d Cir. 2001) ................................................................ 22

*Jok v. City of Burlington*,
  96 F.4th 291 (2d Cir. 2024) .......................................... 15, 16, 17, 18

*Kaluczky v. City of White Plains*,
  57 F.3d 202 (2d Cir. 1995) ................................................................. 22

*Kee v. City of New York*,
  12 F.4th 150 (2d Cir. 2021) .......................................................... 41, 42

*Kyles v. Whitley*,
  514 U.S. 419 (1995) ............................................................................. 44

*Leka v. Portuondo*,
  257 F.3d 89 (2d Cir. 2001) ............................................................ 44, 45

v

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Lennox v. Miller,*
968 F.3d 150 (2d Cir. 2020)...................................................... 16, 18

*Mancuso v. N.Y. State Thruway Auth.,*
86 F.3d 289 (2d Cir. 1996)........................................................ 21

*Mara v. Rilling,*
921 F.3d 48 (2d Cir. 2019)........................................................ 30

*Mitchell v. Forsyth,*
472 U.S. 511 (1989) ............................................................ 15, 17

*Morris-Hayes v. Bd. of Educ. Of Chester Union Free Sch. Dist.,*
423 F.3d 153 (2d Cir. 2005)...................................................... 22

*Myers v. Hertz Corp.,*
624 F.3d 537 (2d Cir. 2010)...................................................... 22

*Napue v. Illinois,*
360 U.S. 264 (1959) .............................................................. 48

*Natale v. Town of Ridgefield,*
927 F.2d 101 (2d Cir. 1991)...................................................... 22

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.,*
673 F.3d 84 (2d Cir. 2012)................................................... 49, 50

*Norton v. Sam's Club,*
145 F.3d 114 (2d Cir. 1998)...................................................... 48

*O'Bert ex rel. Estate of O'Bert v. Vargo,*
331 F.3d 29 (2d Cir. 2003)....................................................... 18

*Papineau v. Parmley,*
465 F.3d 46 (2d Cir. 2006)....................................................... 22

*People v. Bermudez,*
906 N.Y.S.2d 774 (N.Y. Sup. Ct. 2009)........................................... 37

*Plummer v. Quinn,*
326 F.App'x 571 (2d Cir. 2009) .................................................. 23

*Ricciuti v. New York City Transit Auth.,*
124 F.3d 123 (2d Cir. 1997).................................................. 41, 43

*Roldan v. Artuz,*
78 F.Supp.2d 260 (S.D.N.Y. 2000) ............................................... 36

*Sales v. Harris,*
675 F.2d 532 (2d Cir. 1982)...................................................... 30

*Salim v. Proulx,*
93 F.3d 86 (2d Cir. 1996)........................................................ 16

*Simmons v. United States,*
390 U.S. 377 (1968) ..................................................... 26, 27, 29, 32

*Snowden v. Solomon,*
847 F.App'x 54 (2d Cir. 2021) ................................................... 22

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Soto v. Gaudett,*
862 F.3d 148 (2d Cir. 2017)......................................................... 15

*Spicer v. Roxbury Correctional Inst.,*
194 F.3d 547 (4th Cir. 1999) ....................................................... 44

*Stolt-Nielsen SA v. Celanese AG,*
430 F.3d 567 (2d Cir. 2005)......................................................... 24

*Swint v. Chambers Cnty. Comm'n,*
514 U.S. 35 (1995) ....................................................................... 23

*Terebesi v. Torreso,*
764 F.3d 217 (2d Cir. 2014)............................................. 2, 15, 18

*Tolbert v. Queens Coll.,*
242 F.3d 58 (2d Cir. 2000)..................................................... 48, 50

*Triolo v. Nassau County,*
24 F.4th 98 (2d Cir. 2022) .......................................................... 24

*United States v. Agurs,*
427 U.S. 97 (1976) ....................................................................... 48

*United States v. Al-Farekh,*
956 F.3d 99, 112 (2d Cir. 2020)................................................... 31

*United States v. Avellino,*
136 F.3d 249 (2d Cir. 1998)......................................................... 47

*United States v. Concepcion,*
983 F.2d 369 (2d Cir. 1992)......................................................... 26

*United States v. Jarvis,*
560 F.2d 494 (2d Cir. 1997)......................................................... 27

*United States v. Leonardi,*
623 F.2d 746 (2d Cir. 1980)......................................................... 32

*United States v. Maldonado-Rivera,*
922 F.2d 934 (2d Cir. 1990)................................................... 26, 27

*United States v. Moskowitz,*
581 F.2d 1 (2d Cir. 1978).............................................................. 32

*United States v. Rattler,*
475 F.3d 408 (D.C. Cir. 2007) ..................................................... 31

*United States v. Restrepo,*
986 F.2d 1462 (2d Cir. 1993)........................................................ 49

*United States v. Ruiz,*
116 F.4th 1246 (10th Cir. 2024)................................................... 31

*United States v. Saunders,*
501 F.3d 384 (4th Cir. 2007) ................................................. 29, 30

*United States v. Thai,*
29 F.3d 785 (2d Cir. 1994)............................................ 25, 26, 27, 29

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Walczyk v. Rio,*
496 F.3d 139 (2d Cir. 2007).................................................. 23

*Walker v. Horn,*
286 F.3d 705 (3d Cir. 2002).................................................. 17

*Washington v. Napolitano,*
29 F.4th 93 (2d Cir. 2022).................................................... 17

*Washington v. Rogozinski,*
2023 WL 7014137 (2d Cir. 2023) ......................................... 17

*Young v. Conway,*
698 F.3d 69 (2d Cir. 2012)............................................... 37, 38

**Statutes**

28 U.S.C. § 1331 .................................................................... 2

42 U.S.C. § 1983 .................................................................... 2

# INTRODUCTION

Appellee Josiah Galloway served more than nine years for an attempted murder to which he had no connection. Nor did he resemble the person who did: two witnesses described the assailant as 25-to-30 years old, 5'10" or 5'11", with short hair, and a noticeable accent. Mr. Galloway was 21 years old, 5'5", with braids, and without any accent. He faced charges, and, ultimately, was convicted, because the individual Appellant officers repeatedly obscured those discrepancies through constitutionally infirm photo arrays, a tainted lineup, a fabricated witness statement implicating him, and withholding exculpatory evidence that would likely have altered the result of a trial where the jury deliberated for four days and announced a deadlock before eventually voting to convict. One Appellant's former fiancée has even shared that Appellants did this knowingly, to ensure a conviction.

The District Court properly denied qualified immunity and summary judgment to the Appellants. Mr. Galloway, like all criminal defendants, had longstanding clearly established rights not to face charges because of unduly suggestive photo arrays and lineups, and longstanding clearly established rights not to face prosecution through fabricated or coerced evidence and without access to material exculpatory information. And as the District Court explained in a thorough initial opinion and a follow-up opinion denying reconsideration, a version of the facts exists by which a reasonable jury could conclude that Appellants violated those rights.

Against this backdrop, the individual Appellant officers take an interlocutory appeal, and Nassau County purports to join. But this Court lacks jurisdiction to hear qualified immunity appeals, like Appellants' here, that refuse to accept the version of

the facts identified by the District Court—much less pendent appellate jurisdiction to hear the County's appeal of a state law claim with different elements. And to whatever extent Appellants accept the facts and present only allowable legal questions about whether the facts identified by the District Court could prove a violation of clearly established law, that law has been clearly established by this Court for decades. This Court should dismiss for lack of jurisdiction, or simply affirm, so that a jury can resolve the numerous fact disputes identified by the District Court that preclude both summary judgment and qualified immunity in this case.

## JURISDICTIONAL STATEMENT

This Court does not have appellate jurisdiction. *See* Argument Section I, *infra* at 14-25. The District Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Mr. Galloway alleged claims pursuant to 42 U.S.C. § 1983. This Court makes only limited allowances for interlocutory appeals of otherwise non-final orders denying qualified immunity. *E.g. Terebesi v. Torreso*, 764 F.3d 217, 229 (2d Cir. 2014). That allowance permits appellants with non-final orders to seek review only of "abstract issues of law." *Johnson v. Jones*, 515 U.S. 304, 217 (1995). It requires such appellants to accept the facts "as given" by the District Court. *Id.* at 319. Because Appellants here repeatedly dispute the District Court's description of the facts and otherwise refuse to accept the facts appropriately construed in Mr. Galloway's favor, their appeal does not fall into the "limited exception" that would allow appellate jurisdiction here. *Terebesi*, 764 F.3d at 229. This Court should dismiss for lack of appellate jurisdiction.

2

## ISSUES PRESENTED

Should this Court dismiss for lack of jurisdiction when Appellants refuse to accept the version of the facts identified by the District Court under which a reasonable jury could find violations of clearly established law?

Proposed answer: Yes

To whatever extent Appellants accept those facts, did the District Court correctly hold that officers setting up unduly suggestive photo arrays and lineups, fabricating witness statements, withholding exculpatory evidence, and failing to intervene to stop fellow officers from taking those steps, violated longstanding clearly established rights?

Proposed answer: Yes

## STANDARD OF REVIEW

On interlocutory review of a denial of qualified immunity, this Court undertakes *de novo* review of only the purely legal question of whether a right is clearly established. *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012). This Court does not have jurisdiction to review disputes of fact, and must accept the facts identified by the district court. *Doninger v. Niehoff*, 642 F.3d 334, 352 (2d Cir. 2011). In that *de novo* review of the purely legal questions, this Court applies the same summary judgment standard as the district court, and only reverses a denial of qualified immunity if "the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right." *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996).

## STATEMENT OF THE CASE

### A.    Factual Background

1.    Jorge Anyosa gets shot by a man who does not resemble Josiah Galloway.

In 2008, taxi driver Jorge Anyosa was shot in the face in the parking lot of Hempstead Train Station by a driver he had previously argued with after the driver honked at and threatened him. SPA38. Defendant-Appellant Thomas D'Luginski, assigned to investigate the shooting, took advantage of the fact that Anyosa had survived by asking Detective Thomas Bischoff[1] to make a sketch of the shooter with Anyosa's assistance. SPA38. Bischoff's sketch and the accompanying description explained that the shooter was a 25- to 30-year-old man, 5'10" tall, with short black hair, a medium complexion, and a discernible accent. SPA38-39. At the time, Appellee Galloway was 21 years old, 5'5" tall, wore his hair in braids, and had no accent. SPA39.

2.    Nassau County officers zero in on Mr. Galloway despite—and by covering up—mounting discrepancies.

When Mr. Galloway was arrested on an unrelated matter about three weeks later, officers from a nearby town brought Appellee Galloway and his friend, Robert Ogletree, to the Nassau County Police Department. SPA39. There, despite the substantial discrepancies between Mr. Galloway's appearance and the sketch and associated description, Defendant-Appellant Charles DeCaro—who had had the composite sketch posted near his desk—and Defendant-Appellant George Darienzo

---

[1] Bischoff was a defendant in the district court but is not an appellant at this court.

decided that Mr. Galloway made a good suspect for the Anyosa shooting. SPA39. DeCaro got Defendant-Appellant Ronald Lipson to put together two different photo arrays with a year-old arrest photo of Mr. Galloway and five fillers. SPA39-40. Concurrently, Appellant DeCaro and Appellant Darienzo interviewed Mr. Ogletree and coerced him into signing a written statement claiming that Mr. Galloway had confessed to "shoot[ing] a cab driver over by the chicken place on Jackson." SPA40.

Plowing ahead as discrepancies mounted, Appellant Lipson and Officer Steven Horowitz[2] met with another cab driver, Wilmer Hernandez, who had seen the argument preceding the shooting. SPA40. They explained to him that they "had the person who was the cause of the incident" in custody, but that "they wanted to show [him] pictures" as part of an identification process. SPA40-41. When Hernandez identified the photo of Appellee Galloway, Lipson affirmed that he had selected the intended person and shared Mr. Galloway's identity with Mr. Hernandez. SPA41, 62. Appellant Lipson then tried to get Mr. Anyosa to confirm the identification, prepping him by telling him that Hernandez had already picked the "right person" out of the array, SPA42, and then taking two or three tries with different photo arrays—all of which contained Mr. Galloway's picture—when Mr. Anyosa did not initially identify Mr. Galloway. SPA42-43. When Mr. Anyosa finally did identify Mr. Galloway, Lipson told him he had selected the right person. SPA60.

With that, Appellant DeCaro signed a complaint charging Mr. Galloway with attempted murder, assault, and criminal use and possession of a firearm in

---

[2] Horowitz was a defendant in the District Court but is not an appellant at this Court.

connection with the Anyosa shooting. SPA43. Beyond the aforementioned problems, DeCaro falsely swore that he had "secured a statement of admission" from Mr. Galloway, SPA43, whom Appellant DeCaro later acknowledged had told him and Appellant D'Luginski that he "didn't know anything about" the Anyosa shooting. SPA42. Assistant District Attorney Joseph Larocca[3] used that complaint to obtain an indictment from a grand jury of Mr. Galloway for attempted murder in the first degree, assault in the first degree, criminal use of a firearm in the first degree, and criminal possession of a weapon in the first degree. SPA44.

Subsequently, the court required Appellee Galloway to participate in a lineup, with the hair on both his head and his face unaltered from how he had worn it when he had been arrested. SPA44. Although the order specified that Appellee Galloway "stand" in the lineup, Appellants Matthew Ross, D'Luginski, and Detective Richard Dorsi[4] conducted a seated lineup. A5739, A5740, SPA45. Appellants had both Mr. Galloway and the five fillers wear hats, "because nobody else in the lineup had braids." SPA44-45. Appellants also sat Mr. Galloway on two phone books to make him appear taller, an adjustment Appellants hid by covering Mr. Galloway and the five fillers with white sheets from the neck down. SPA45. When Mr. Anyosa subsequently identified Mr. Galloway at the lineup, detectives told him that he had done "a good job" and "got the right person." SPA45. Mr. Hernandez, who recognized Mr. Galloway from the photo array, also selected Mr. Galloway from the lineup. SPA45.

---

[3] Larocca was a defendant in the district court but is not an appellant at this court.

[4] Dorsi was a defendant in the district court but is not an appellant at this court.

Mr. Galloway's fears about the lineup proved well-founded. Appellant Ross later admitted to his then-fiancée, Lori Magliaro, that he had "rigged [Mr. Galloway's] lineup to conceal his height and cause his misidentification." SPA46. Lori Magliaro swore in an affidavit that Ross told her he had "contrived a lineup where Josiah wore a baseball cap to conceal the difference in hair" and "made adjustments" "to make Josiah look taller" because "his height was not the same as the assailant[']s." SPA46." While Ms. Magliaro later attempted to walk some of that back, she only did so after she and Appellant Ross had temporarily reconciled and after Ross learned of the affidavit and threatened to blackmail her or release revenge porn. A5744, A5750, A5751. Even then, she explained that she remained worried that Appellant Ross had not testified truthfully in disclaiming responsibility. SPA46-47. And Appellants have never explained how she might have known key, specific details about Mr. Galloway's lineup if not having learned them from Ross.

      3.     An initially deadlocked jury convicts Mr. Galloway.

In subsequent proceedings, Mr. Galloway lost a motion to suppress the photo array and lineup as unduly suggestive, and went to trial. SPA47. At the trial, numerous officers testified. SPA47. Anyosa and Hernandez both testified, identifying Mr. Galloway as Anyosa's assailant. SPA47. Mr. Ogletree, whom the police said had implicated Mr. Galloway, testified that he had not done so and that the police had fabricated the statement. SPA48. After four days of deliberations, after the jury initially deadlocked, and after the judge delivered an *Allen* charge, the jury convicted Mr. Galloway on all counts. SPA48. In November 2009, he received a sentence of 25 years, with five years of supervised release on the back end. SPA48.

    4.    Mr. Galloway is exonerated after serving more than nine years.

Years into Mr. Galloway's sentence, the Nassau County DA's office received a tip about the man who actually shot Mr. Anyosa. The DA's Conviction Integrity Unit investigated the tip, and learned that a man named Kenton Sherwood was "the actual perpetrator." SPA48. Unlike Mr. Galloway, Mr. Sherwood fit the facts of the shooting: his girlfriend at the time drove a car that matched the vehicle Mr. Anyosa's assailant had driven, his girlfriend had had to clean blood out of her car after the shooting, and, even years after the fact and knowing that a different person—Mr. Galloway—had already been convicted, Mr. Anyosa immediately identified Mr. Sherwood as the shooter upon seeing his photograph. SPA48-49. In grappling with the prior mistaken identification of Mr. Galloway, Mr. Anyosa explained that if Appellants had not hidden Mr. Galloway's short stature, he "would have told them that Josiah didn't do it" because he knew the person who had shot him was roughly his own height. SPA49. Mr. Anyosa added that "in court, he didn't feel 100 percent sure [about his identification of Mr. Galloway], but he felt pressure because he knew Wilmer [Hernandez] had identified [Mr. Galloway] and detectives said it was the right guy." A5718. Ultimately, Mr. Galloway's convictions were vacated, the indictment was dismissed, and he was released from prison. SPA49.

    **B.    Procedural History**

In 2019, Mr. Galloway brought several claims under 42 U.S.C. § 1983 against numerous defendants, including, as relevant to this appeal, Defendant-Appellants Ross, DeCaro, Lipson, D'Luginski, and Darienzo. Mr. Galloways' claims against these individual Appellants that remain after summary judgment are:

8

- A malicious prosecution claim against Appellants DeCaro, Darienzo, Lipson, and D'Luginski;

- A denial of a fair trial claim—pressing theories of fabrication of evidence, use of unduly suggestive identification procedures, and suppression of *Brady* evidence—against Ross, DeCaro, Lipson, D'Luginski, and Darienzo; and

- A failure to intervene claim against Ross, DeCaro, Lipson, D'Luginski, and Darienzo.[5]

Mr. Galloway also brought a *Monell* claim against Nassau County, and New York state law false imprisonment and malicious prosecution claims against, as relevant to this appeal, Nassau County.

After substantial discovery, Appellants moved for summary judgment on all claims, seeking qualified immunity. The District Court denied that motion. In a lengthy opinion the District Court identified numerous fact disputes, properly construed all the facts in Mr. Galloway's favor, and then carefully went through the claims and defendants and explained how a reasonable jury could find that on a version of the facts in the record Appellants violated Mr. Galloway's clearly established rights. Those conclusions precluded both summary judgment and qualified immunity.

### 1. Fair trial claims

On the fair trial claims, the District Court identified numerous "genuine issues" of material fact that a jury would need to resolve. SPA51. For fabrication of evidence,

---

[5] Mr. Galloway did not dispute summary judgment on false imprisonment, unlawful detention, or conspiracy claims, which are not at issue on this appeal.

the District Court pointed to Appellants DeCaro and Darienzo's coercion of Mr. Ogletree, noting that Ogletree's trial testimony that Appellants had coerced him into signing a false statement created a material dispute of fact for trial. Op. at SPA52-53. The Court also described a sharp fact dispute over whether Ogletree's inculpatory statement affected the jury and the verdict of conviction, based upon the prosecutor's lengthy discussion of the statement in opening and closing arguments, the long jury deliberations, and the temporary deadlock. SPA54-56. Construing Ogletree's testimony, the prosecutor's trial presentation, and the long jury deliberations, the District Court correctly observed that a reasonable jury in this civil case could find both that Appellants coerced or fabricated the statement and that it had made a key difference at trial. SPA56.

For the suggestive identification procedures, the District Court similarly discussed substantial disputes of material facts precluding summary judgment. The Court specifically pointed to the parties' substantial dispute over Ms. Magliaro's testimony that Appellant Ross had told her that they specifically fixed the lineup to implicate Mr. Galloway, and the conflicts between Ms. Magliaro's affidavit and deposition testimony. SPA58-59. Observing that the "disputes about Magliaro's conflicting statements are rooted in 'credibility assessments, choices between conflicting versions of events, and the weighing of evidence,'" the District Court described a dispute of material fact that, if construed in Mr. Galloway's favor, would amount to a violation of clearly established law based on Appellants' bad faith during the lineups. SPA59 (cleaned up). The Court bolstered this analysis by pointing to other disputes. For one, the parties disputed Appellant Lipson's suggestive comments

10

to Mr. Anyosa—but construed in Mr. Galloway's favor, a reasonable jury could find that they tainted both the photo array and the subsequent lineup and in-court identifications. SPA60-61. For another, the parties disputed the nature of suggestive comments to Mr. Hernandez—and "conflicting versions of the events are for a jury to resolve, not the Court on summary judgment." SPA61.

For suppression of potentially exculpatory evidence in violation of *Brady v. Maryland*, the District Court pointed, again, to numerous genuine disputes of fact. The Court specifically discussed disputes about Appellants DeCaro and Darienzo's fabricated witness statement, Appellants Lipson, Ross, and D'Luginski's failure to disclose the suggestive lineups, and Appellant Lipson's failure to disclose that he showed Mr. Anyosa multiple photo arrays including Mr. Galloway before obtaining his desired outcome, all of which precluded summary judgment. SPA63-64.

### 2. Malicious prosecution claims and failure to intervene

On the malicious prosecution claims, the District Court, again, noted Appellants' reliance on a disputed version of the facts. Those disputes included "whether the defendants initiated the prosecution against the plaintiff, whether there was probable cause to commence the proceeding, and whether the defendants acted with malice." SPA69. As to whether they had initiated or continued a criminal proceeding, the Court observed that the same disputes concerning Mr. Galloway's fair trial claims applied here, and pointed to DeCaro's signing of a felony complaint that falsely said Mr. Galloway had implicated himself. SPA70-71.

For probable cause and malice, the District Court not only noted the numerous fact disputes at issue, but recognized the fact-intensive nature of those issues in the

first place. The opinion's analysis incorporated "key questions of material fact" already discussed at length "about the reliability of the witnesses' identifications of the plaintiff, and about the extent to which the identification procedures were unduly suggestive," SPA72, and ultimately rejected Appellants' request to make a probable cause determination as a matter of law. At bottom, "[a] reasonable juror could find that the indictment of the plaintiff was procured through police misconduct." SPA72.

As to the failure to intervene claim against all defendants, the Court concluded that because Appellants' defense turned on an absence of any violation, the same numerous disputes of fact that precluded summary judgment on the underlying claims precluded summary judgment on intervention, too. SPA73. The Court further observed that the other part of the claim—Appellants' opportunity to intervene—is generally a question for the jury. SPA73.

### 3. Qualified immunity

In denying qualified immunity, the District Court specifically pointed to the numerous disputes of fact, explaining that "deciding whether the defendants are entitled to qualified immunity [] must await resolution of the factual disputes in this case." SPA74. The Court explained that Appellants' qualified immunity arguments "rely on their version of events" and that because "a reasonable jury could credit plaintiff's version of" DeCaro, Darienzo, Lipson, Ross, and D'Luginksi's individual actions, Appellants could not rely on their own facts to seek summary judgment. SPA75.

Construing all the disputes in favor of Mr. Galloway, the Court cited longstanding precedents under which that version of the facts would make out violations of clearly

established law. For the fair trial claims, the Court pointed to cases from 2000, 1997, and 2006 clearly establishing that officers could not fabricate inculpatory statements, SPA75, cases from 1981 and 1994 clearly establishing that officers could not use suggestive identification procedures in photo arrays or lineups, including the exact actions Appellants took here, SPA76, and a clearly established right dating to the 1990s against officers suppressing potentially exculpatory information, SPA76. For the malicious prosecution claims, the Court noted that Appellants relied upon a dispute as to the presence of probable cause, SPA77, reiterated the disputes about identifications, fabrications, and suppression of evidence, SPA77, and consequently noted longstanding clearly established law that officers could not use fabricated probable cause as grounds for arrest. SPA77.

## SUMMARY OF ARGUMENT

This Court should dismiss this appeal for lack of jurisdiction. This Court's jurisdiction over interlocutory appeals of orders denying qualified immunity extends only to such appeals that accept the facts identified by the District Court and present solely legal questions about whether that version of the facts violates clearly established law. The individual Appellants here dispute some facts, ignore or minimize others, and do not limit their appeal to purely legal questions that allow for jurisdiction. Nassau County's claim to this Court's jurisdiction is even less justified. The County seeks pendent appellate jurisdiction over a state law claim with different elements than the claims against individual Appellants, a claim which does not depend on the resolution of the individual claims at all. This Court should reject that and dismiss for lack of jurisdiction.

To the extent the individual Appellants present questions of law appropriate for interlocutory review, this Court should affirm. Mr. Galloway had a longstanding clearly established right not to be identified via unduly suggestive photo array and lineup procedures of the sort Appellants used here. He had a similarly longstanding clearly established right against being prosecuted based on evidence fabricated or coerced by Appellants, and without material exculpatory evidence withheld by Appellants. And in any event, Appellants have waived or forfeited arguments on several issues. This Court should dismiss or affirm, and remand for a jury to resolve the numerous fact disputes precluding qualified immunity.

## ARGUMENT

### I. This Court does not have appellate jurisdiction because Appellants primarily dispute facts in the record.

Interlocutory appeals by law enforcement officers to whom a district court has denied qualified immunity may only address issues of law, rather than attack the district court's description of the facts in the record. In considering such appeals, this Court accepts the district court's description of the facts unless the record blatantly contradicts that description, and considers whether the district court has appropriately defined the right at issue and correctly determined whether that right was clearly established. Although Appellants style their appeal as a dispute of law, their brief makes quite clear that they disagree with the District Court's description of the facts. This Court regularly dismisses such qualified immunity appeals for lack of jurisdiction, and it should do so here.

A.     **This Court has appellate jurisdiction to hear interlocutory appeals of qualified immunity denials that present only questions of law, not such appeals that dispute the facts.**

Government defendants to whom a district court denies qualified immunity may appeal that denial on an interlocutory basis only in limited circumstances. This Court has appellate jurisdiction to hear interlocutory appeals of denials of qualified immunity "only where the order turns on a question of law, and the appellant does not dispute the material facts." *Jok v. City of Burlington*, 96 F.4th 291, 294 (2d Cir. 2024); *see also Coollick*, 699 F.3d at 217 (describing jurisdiction over an interlocutory appeal of qualified immunity denial as only "to the extent that it turns on an issue of law"). As this Court has repeatedly emphasized, the exception is "narrow." *Jok*, 96 F.4th at 295; *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017). Denials turn on issues of law only insofar as they determine whether the conduct of the government defendant violated a right that was clearly established at the time. *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1989). When, instead, a District Court denies qualified immunity because there is a version of the facts supported by the record from which a reasonable jury could find a violation of a clearly established right, this Court lacks jurisdiction to hear an interlocutory appeal that attacks that version of the facts. *Johnson*, 515 U.S. at 319-20 (1995); *see also Terebesi*, 764 F.3d at 229.

*Johnson* specified that courts of appeals may not entertain interlocutory appeals from denials of qualified immunity based upon questions of fact. Such orders are not appealable. *Johnson*, 515 U.S. at 313. *Johnson* characterized *Mitchell*'s allowance as "limited . . . to appeals challenging, not a district court's determination about what factual issues are 'genuine,' but the purely legal issue [of] what law was 'clearly

15

established.'" *Johnson*, 515 U.S. at 313; *see also Bolmer v. Oliveira*, 594 F.3d 134, 140-41 (2d Cir. 2010) (discussing genuine fact disputes). This rule reflects several practical considerations, including appellate courts' comparative expertise in considering questions of law and trial courts' comparative expertise in assessing issues of fact, *Johnson*, 515 U.S. at 313-14, 316; the distinction between the qualified immunity question and the factual issues likely to predominate at trial, *id.* at 314-15; and the need to consider many key factual questions in civil rights suits upon a full airing at trial, rather than earlier, *id.* at 316. These factors, as well as the judiciary's interests in efficiency and finality to which interlocutory appeals run counter, "are too strong" to allow interlocutory appeals of denials of qualified immunity except as to pure questions of law. *Id.* at 317-18.

As a result, during interlocutory appeals of qualified immunity denials this Court considers only whether "on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find, the immunity defense is established as a matter of law." *Jok*, 96 F.4th at 295 (citing *Salim v. Proulx*, 93 F.3d 86, 90 (2d Cir. 1996)); *Lennox v. Miller*, 968 F.3d 150, 154 (2d Cir. 2020). Indeed, the limited allowance of interlocutory appellate jurisdiction does not extend to appeals explicitly or implicitly attacking "evidence sufficiency at summary judgment," *Jok*, 96 F.4th at 295 (quoting *Salim*, 93 F.3d at 89), because "a district court's finding that there is enough evidence in the record to create a genuine issue as to factual questions that are, in fact, material to the resolution of the qualified immunity claim" is not reviewable on this posture, *Doninger*, 642 F.3d at 352; *see also Jok*, 96 F.4th at 295; *Washington v. Napolitano*,

29 F.4th 93, 103 (2d Cir. 2022). Ultimately, "where the district court has ruled that adjudication of the immunity defense requires the resolution of genuinely disputed questions of fact, the denial of summary judgment is not immediately appealable." *In re State Police Litig.*, 88 F.3d at 124 (2d Cir. 1996).

Allowing defendants to appeal fact issues on an interlocutory basis serves none of the interests of the qualified immunity doctrine. Qualified immunity exists to shield government actors from unfairly facing the burdens of litigation when they exercise judgment in areas governed by arguably unclear law—and to ensure that people do not eschew government service out of fear of liability for their good-faith mistakes. *See*, *e.g*, *Mitchell*, 472 U.S. at 511. Cases in which an evidence-supported version of the facts falls entirely outside of any such gray area do not implicate this interest at all. When there is a construction of the facts that suggests a violation of a clearly established right, this Court "must accept the District Court's version of the facts" and has "no jurisdiction over [an] appeal and must dismiss it." *Walker v. Horn*, 286 F.3d 705, 711 (3d Cir. 2002).

Since *Johnson*, this Court has "stringent[ly] enforce[d]" the limits it applied to interlocutory appellate jurisdiction. *Jok*, 96 F.4th at 296 (internal quotation omitted). The Court regularly dismisses appeals of district courts' denials of qualified immunity for lack of jurisdiction when those appeals turn on disputed issues of material fact or attack the District Court's descriptions of the facts as lacking support. *See, e.g.*, *Jok*, 96 F.4th at 297-98; *Brown v. Halpin*, 885 F.3d 111, 117-18 (2d Cir. 2018) (per curiam); *Washington v. Rogozinski*, 2023 WL 7014137 (2d Cir. 2023); *Harewood v. City of New York*, 508 F.App'x 60, 63 (2d Cir. 2013). When it does not dismiss on that basis, it

17

adopts the district court's description of the disputed facts, so as not to exceed its jurisdiction. *E.g. Lennox*, 968 F.3d at 154 n.2; *Terebesi*, 764 F.3d at 229; *Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 762-63 (2d Cir. 2003). It does this even where it might view the district court's description of the facts as incorrect. For example, even where "no such evidence jump[ed] out" of the record to support a district court denial of qualified immunity, this Court still affirmed because that factual conclusion does not fall within interlocutory appellate jurisdiction. *Holeman v. City of New London*, 425 F.3d 184, 192 (2d Cir. 2005). "If the District Court says the evidence was sufficient to create a jury issue, then that is the end" of the matter. *Franco v. Gunsalus*, 972 F.3d 170, 175 (2d Cir. 2020) (citation omitted); *see also DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012).

### B. This appeal primarily disputes the District Court's description of the facts in the summary judgment record.

Government defendants denied qualified immunity in district courts regularly attempt to evade this limit on appellate jurisdiction by claiming that they "do[] not substitute [their] own rendition of the facts," when, "[i]n actuality, [they] refuse[] to accept [the plaintiff's] facts." *Jok*, 96 F.4th at 297. Appellants here, like many qualified immunity appellants, "purport[] to accept plaintiff's version of the facts," but filed a brief "replete with [their] own version of events" instead of accepting the District's Court's recitation. *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 40 (2d Cir. 2003).

Although Appellants claim that "there is no conflicting proof about facts relevant to a qualified immunity question," Opening Br. at 6, Appellants thread their own

version of disputed facts throughout. *See, e.g.*, "DeCaro realized that [Mr. Galloway] resembled the sketched image of the train station shooter," despite a 5+ inch height difference, Opening Br. at 8; "Lipson prepared the photo arrays by himself, without the other officers' assistance," *id*. Appellants similarly insist that Mr. Ogletree implicated Mr. Galloway, Opening Br. at 10, despite Ogletree's testimony about Appellants' coercion and that hotly disputed fact going to the very heart of Mr. Galloway's fabrication claim. And Appellants have their own version of Ms. Magliaro's damning affidavit, insisting that "she was the one who committed perjury," Opening Br. at 12, despite the vigorous dispute over which version of her testimony is correct and the need to test her credibility at trial to resolve that dispute.[6]

Appellants dispute facts identified by the District Court in other ways, too. Some disputes they briefly acknowledge but dismiss as not "outcome-determinative," *see, e.g.*, Opening Br. at 9 (dismissing multiple attempts made to get Mr. Anyosa to identify Mr. Galloway); *id*. (dismissing suggestion to Mr. Hernandez that they already had a person in custody). Other key fact disputes that the District Court identified they simply ignore, such as Appellant DeCaro signing a criminal complaint

---

[6] In pushing their own facts, Appellants make much of Ms. Magliaro's affidavit having been obtained by prior counsel for Mr. Galloway. *E.g.* Opening Br. at 18. They ignore, however, that Appellant Ross's personnel file contains multiple sustained charges of deception and dishonesty. A5751-52. More importantly, they do not acknowledge that Ms. Magliaro's conflicting deposition testimony came after Appellant Ross and Ms. Magliaro had temporarily reconciled, *see* A5744, and after Appellant Ross had repeatedly threatened to blackmail Ms. Magliaro or release revenge porn when he learned of the affidavit, *see* A5744, 5751.

that fabricated a confession. *See* Opening Br. at 11 (omitting that in discussing complaint).

If anything, the District Court could have done more to construe facts in favor of Appellee at the summary judgment stage. For example, the District Court discussed the difference in height between Mr. Galloway, 5'5", and the assailant Mr. Anyosa described as 5'10" or 5'11". But the District Court did not mention that Mr. Hernandez also described the assailant as 5'10", A5757, or that Mr. Anyosa was absolutely certain about the assailant's height because the two had argued while standing, face-to-face, A5718, 5757, 5762. Nor did the Court mention that Appellant D'Luginski entered Mr. Galloway's height in the booking system as 5'8", A5760, which a reasonable jury might construe as an attempt to make the charge look more legitimate. A reasonable jury might further suspect such fabrication given D'Luginski's simultaneous knowledge that the assailant drove a Toyota Corolla, A5724, and written notes that Mr. Galloway drove a Honda Civic. A5732. As another example, the District Court described Mr. Galloway as having braids, although an officer testified at his criminal trial that he "had messy cornrows when he was arrested," A5757, underscoring not only that Mr. Galloway did not have short hair "cut to the head" at the time of his arrest, but that it had been so for several weeks, including at the time of Mr. Anyosa's shooting, A5757. The Court similarly did not mention Mr. Galloway's "pretty obvious" missing front tooth, A5746, in contrast to Mr. Anyosa's failure to notice anything unusual about his assailant's teeth. A5758.

Of course, Appellants disagree with the version of the facts identified by the District Court. But their recourse is to present their version of the facts at trial, not

20

to attack the District Court's description of them on interlocutory appeal. This Court lacks jurisdiction to consider Appellants' interlocutory appeal because it relies upon their version of disputed facts.

### C. This Court should reject out of hand the County's request that the Court exercise pendent appellate jurisdiction over a denial of summary judgment of a state law claim.

Even if it decides to reach the merits of the individual Appellants' qualified immunity interlocutory appeal, this Court should reject the County's attempt to bootstrap its way to interlocutory appellate jurisdiction out of hand. As it is, this Court and other appellate courts generally decline to extend the already-limited interlocutory appellate jurisdiction for individual officials' qualified immunity appeals to a government entity's appeal from a denial of summary judgment on a related *Monell*—that is, federal—claim. But the County's request here is not even that; the County attempts to appeal the denial of summary judgment as to an underlying New York state law claim. The County offers no precedent authorizing such bootstrapping, and what little precedent it does offer belies the substantial weight of authority cautioning against such jurisdiction—including undiscussed Supreme Court precedent that should foreclose it here.

As this Court has explained, "pendent appellate jurisdiction should be exercised sparingly, if ever." *Bolmer*, 594 F.3d at 141 (citing *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 292 (2d Cir. 1996)). "[T]he pendent appellate jurisdiction standard is not satisfied" even for "similar" issues if the proposed issue is "distinct from and broader than" a question appropriately on interlocutory appeal. *Myers v. Hertz Corp.*,

624 F.3d 537, 553-54 (2d Cir. 2010). That rule applies with even more force in qualified immunity cases, because "on an interlocutory appeal from an order rejecting a claim of qualified immunity, a claim involving a 'pendent party' is an 'unrelated question' that cannot be resolved under pendent jurisdiction." *Kaluczky v. City of White Plains*, 57 F.3d 202, 207 (2d Cir. 1995). Indeed, this Court regularly rejects municipal and county defendants' requests for it to exercise pendent appellate jurisdiction even when it accepts their individual employees' allowed interlocutory appeals from denials of qualified immunity. *See, e.g.*, *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 255-56 (2d Cir. 2001) (rejecting a school district's request for pendent appellate jurisdiction in a § 1983 appeal); *Snowden v. Solomon*, 847 F.App'x 54 (2d Cir. 2021); *Morris-Hayes v. Bd. of Educ. Of Chester Union Free Sch. Dist.*, 423 F.3d 153, 164 (2d Cir. 2005); *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004). In qualified immunity cases, this Court exercises pendent appellate jurisdiction "only in exceptional circumstances" "because of the danger of abuse." *Papineau v. Parmley*, 465 F.3d 46, 65 (2d Cir. 2006) (quoting *Natale v. Town of Ridgefield*, 927 F.2d 101, 104 (2d Cir. 1991)).

Against this weight of authority, Nassau County offers one possible basis for this Court to exercise pendent appellate jurisdiction. It says that "[p]endent jurisdiction exists to allow this court to examine those issues that are 'inextricably intertwined' with the immunity question," Opening Br. at 13, and cites a summary of this Court exercising such jurisdiction in one case. *Id.* (citing *Plummer v. Quinn*, 326 F.App'x 571 (2d Cir. 2009)). Both the County and *Plummer* rely on *Walczyk v. Rio*, 496 F.3d 139, 153 (2d Cir. 2007), where this Court exercised pendent appellate jurisdiction

over a *plaintiff*'s otherwise-disallowed cross-appeal. Whatever weight *Plummer* has, it runs headlong into Supreme Court authority holding to the contrary.

In *Swint v. Chambers Cnty. Comm'n*, the Supreme Court rejected the Eleventh Circuit's exercise of pendent appellate jurisdiction over claims against a county in an interlocutory qualified immunity appeal by individual officers. Even though the Court "unquestionably had jurisdiction to review the denial of the individual police officer defendants' motions for summary judgment based on their alleged qualified immunity from suit," the Circuit "did not thereby gain authority to review the denial of the Chambers County Commission's motion for summary judgment." 514 U.S. 35, 38 (1995). Such 'pendent party' appellate jurisdiction did not exist despite reasonable views about "judicial economy," *id.* at 40, 44, despite the possibility that accelerated review "put an end to the entire case against the County," *id*. at 44, and despite the litigation having "already been interrupted by an authorized pretrial appeal," *id.* at 45. The Court emphasized that the request was for "not merely pendent appellate jurisdiction, but pendent *party* appellate jurisdiction" over the County. *Id*. at 49 n.6 (emphasis in original). It rejected a rule that "would encourage parties to parlay" limited allowable interlocutory appeals "into multi-issue interlocutory appeal tickets." *Id*. at 50. Simply put, an appellate court's "authority immediately to review the District Court's denial of the individual police officer defendants' summary judgment motions did not include authority to review at once the unrelated question of the county commission's liability." *Id*. at 51.

Nassau County's attempt to bootstrap also fails on its own terms. Even to the extent that heavily circumscribed pendent appellate jurisdiction might cover

23

genuinely "inextricably intertwined" issues, Opening Br. at 13, this case would not present such a situation. Here, the claim that the District Court allowed to go forward against the County is one of New York state law. The one other case the County cites, *Demoret v. Zegarelli*, explains that "inextricably intertwined" means one "[w]here the standards for finding a violation under other statutes are the same as those for finding a constitutional violation under § 1983," and where "a municipality's liability arises solely from the actions of an employee who is entitled to qualified immunity." 451 F.3d 140, 152 (2d Cir. 2006). But the standards for malicious prosecution under § 1983 and New York state law are not the same. As the District Court observed, "Unlike claims brought pursuant to section 1983, under New York state law, municipalities may be held vicariously liable for malicious prosecution under a theory of *respondeat superior*." SPA68 n.17. The elements have many similarities, SPA69, which accounts for the District Court's reliance on the same set of facts to deny summary judgment on that claim, SPA71-72. But as the County should well know, a plaintiff like Mr. Galloway may maintain a state law malicious prosecution claim "even when the employee is individually immune, so long as the wrong was committed within the scope of employment." *Triolo v. Nassau County*, 24 F.4th 98, 110 (2d Cir. 2022). Put another way, "resolution of the non-appealable order" is not "subsidiary to resolution of the appealable order," even were the Appellants to get qualified immunity. *Stolt-Nielsen SA v. Celanese AG*, 430 F.3d 567, 576 (2d Cir. 2005). Accordingly, the § 1983 claims against individual Appellants are not so "inextricably intertwined" with the state law malicious prosecution claim to justify an

extraordinary departure from this Court's sharply circumscribed limits on pendent appellate jurisdiction.

## II. To the extent that Appellants do appeal only pure issues of law, based upon the facts in the record a reasonable jury could find that Appellants violated Mr. Galloway's clearly established rights.

If the Appellants really do appeal the purely legal questions, this Court should simply affirm. Based upon the District Court's well-supported description of the facts in the record and citation to longstanding binding precedent of this Court, each of the individual Appellants violated constitutional rights that date back decades. People like Mr. Galloway have clearly established rights not to be identified as criminal perpetrators through unduly suggestive procedures, and clearly established rights not to have officers fabricate or coerce evidence used to wrongfully convict them at trial. All of Mr. Galloway's claims ultimately rest on those rights. To the extent this Court exercises jurisdiction to reach the merits, it should affirm the District Court's denial of qualified immunity and summary judgment.

### A. Appellants violated Mr. Galloway's clearly established right not to be identified via unduly suggestive procedures.

#### 1. The Photo Array

Long predating his prosecution, Mr. Galloway enjoyed the clearly established "due process right not to be the object of suggestive police identification procedures that create 'a very substantial likelihood of irreparable misidentification.'" *United States v. Thai*, 29 F.3d 785, 807 (2d Cir. 1994) (quoting *United States v. Concepcion,* 983 F.2d 369, 377 (2d Cir. 1992)). This right "encompasse[d] not only the right to avoid

methods that suggest the initial identification, but as well the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain." *Abdur Raheem v. Kelly*, 257 F.3d 122, 135 (2d Cir. 2001). The District Court identified well-supported facts from which a reasonable jury could find that Appellant Lipson violated Mr. Galloway's fair trial rights by conducting unduly suggestive photo arrays that misidentified Mr. Galloway throughout the prosecution and trial process. And because that version of the facts shows that in conducting those arrays Lipson employed practices long established as unduly suggestive by this Court, he is not entitled to qualified immunity.

This Court has long recognized that a photographic identification procedure is "inherently prejudicial" if it "use[s] . . . a very small number of photographs" or if the investigating officer "utter[s] . . . suggestive comments before an identification is made." *Thai*, 29 F.3d at 808; *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990). A photo identification procedure may also be unduly suggestive if "the picture of the accused . . . so st[ands] out from all the other photographs," whether because it is the only one in the array that resembles the description of the suspect, because it is notably different than all the others, or because the officer conducting the photo array emphasizes the accused's photograph through his conduct or remarks. *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986); *see also Simmons v. United States*, 390 U.S. 377, 383 (1968) ("Th[e] danger [of misidentification] will be increased if the police display to the witness . . . the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized."). And "[a]n otherwise fair pretrial identification

procedure may be rendered impermissibly suggestive through subsequent actions or remarks by government agents," such as statements informing the witness that they correctly identified the suspect. *Thai*, 29 F.3d at 810; *see also United States v. Jarvis*, 560 F.2d 494, 500 (2d Cir. 1997) ("We do not approve the practice . . . of informing potential witnesses of the 'correctness' or 'incorrectness' of their pretrial identifications. Such practices might well so taint an identification as to require reversal.").

This Court has also emphasized the fact-intensive nature of a suggestiveness analysis, which makes it ill-suited for summary judgment and, often, qualified immunity. "The fairness of a photographic array depends on a number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents." *Maldonado-Rivera*, 922 F.2d at 974; *see also Thai*, 29 F.3d at 808 ("In reviewing challenges to pretrial identification procedures, a court must examine the procedures employed in light of the particular facts of the case and the totality of the surrounding circumstances."). Each fact influences the inquiry; the smaller the size of the array, for example, the greater the likelihood that slight irregularities in the accused's photo or suggestive comments from the investigating officer will unduly influence the witness's identification. *See Thai*, 29 F.3d at 810 (explaining that "repeatedly asking a witness who has selected a certain photo to look again at the array might be troubling . . . if there were a small number of photos and only one perpetrator"); *Ashby v. Senkowski*, 269 F.Supp.2d 109, 117 (E.D.N.Y. 2003) (citing *Simmons*, 390 U.S. at 386, for the proposition that "the more photographs of persons resembling a defendant the complainant views, the less danger of misidentification").

27

Even if "none of the[] aspects of the procedure confrontation alone necessarily would have invalidated the identification, the combination of them all [can] comprise[] a highly suggestive identification procedure." *Dickerson v. Fogg*, 692 F.2d 238, 245 (2d Cir. 1982).

Appellants' refusal to accept the facts as identified by the District Court not only undermines their request for interlocutory appellate jurisdiction but reveals the fatal flaws of their argument on the merits. They attempt to reduce Mr. Galloway's photo array claim to a single suggestiveness factor—the presence of the investigating officer's post-identification confirmatory remarks. *See* Opening Br. at 24 (acknowledging only "some kind of statement" by Appellant Lipson). Instead of addressing all the facts identified by the District Court and the full context of Mr. Galloway's claim, Appellants ignore the Hernandez photo identification procedure in its entirety and treat only Lipson's post-identification confirmatory remarks to Mr. Anyosa as relevant to Mr. Galloway's claims. *See* Opening Br. at 24-28. That fundamentally ignores why the District Court correctly denied summary judgment and qualified immunity. As the District Court and summary judgment record reflect, Mr. Galloway relies upon both the Hernandez and Anyosa photo identification procedures, and the District Court pointed to several problems with both procedures that would let a reasonable jury find Appellants violated clearly established law.

First, Appellant Lipson informed Mr. Hernandez before initiating the photo identification procedure that the police had already arrested Mr. Anyosa's shooter. SPA61 (quoting Mr. Hernandez's testimony that when he arrived at the Armory to view the photo array, "[Lipson] told me they had the person who was the cause of the

28

incident, but they wanted to show me pictures . . .").[7] This pre-identification comment alone was enough to render the procedure inherently prejudicial. *See Thai*, 29 F.3d at 808 (listing suggestive pre-identification comments as an "inherently prejudicial" practice); *Simmons*, 390 U.S. at 383 ("The chance of misidentification is . . . heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."). When a witness knows that a suspect is already in custody, he can assume that the police have a strong case against a particular person, whose photo he should expect to see in the array, thereby increasing the danger that he choose the person from the array who most closely resembles his mental image of the suspect rather than make no identification at all. *See Jenkins v. City of New York*, 478 F.3d 76, 92 (2d Cir. 2007); *United States v. Saunders*, 501 F.3d 384, 390-91 (4th Cir. 2007).

Although the witness to a lineup necessarily knows the police have a person in custody by the mere fact of an in-person identification procedure, *see Jenkins*, 478 F.3d at 93, a witness asked to view a photo array does not.[8] Without knowing that a

---

[7] This fact is not even seriously disputed. Appellants dispute whether they ensured that Mr. Hernandez saw Mr. Galloway in custody when he arrived at the precinct for the photo array. *See* SPA61 (quoting Hernandez's testimony from Mr. Galloway's criminal trial that he did not "notice anybody in custody" when he arrived). But whether Mr. Hernandez saw Mr. Galloway in custody is distinct from whether Appellant Lipson told Mr. Hernandez that the shooting suspect was in custody prior to the identification.

[8] If anything, the District Court could have gone further here. In reasoning that a pre-identification comment to a photo array witness is not necessarily unduly suggestive, the Court relied on cases analyzing such comments in the context of a

particular suspect is in custody, a photo array witness might assume the police want help narrowing down possible leads—which might not be strong, and may not yet have resulted in an arrest. But when the police tell the witness they "ha[ve] the person who was the cause of the incident," as Mr. Hernandez testified he was told, SPA41, 61, the witness "can feel pressure to make an identification, even if he is not fully confident, for fear of jeopardizing the case against the arrested suspect," *Saunders*, 501 F.3d at 391. A reasonable jury could find that Appellant Lipson's remarks amounted to "telling [Mr. Hernandez] he 'had to pick someone' from [the] photo array," which "would make [Hernandez's] ensuing identification both inadmissible at trial and too defective to support probable cause." *Mara v. Rilling*, 921 F.3d 48, 75 (2d Cir. 2019) (citing *Jenkins*, 478 F.3d at 93).

Appellants, as noted, ignore other evidence that bolstered the District Court's conclusion. Appellant Lipson began the Anyosa photo array procedure with a similarly corrupting remark. *See* SPA42, 60 (quoting Mr. Anyosa's deposition testimony that before he was shown the photo array, Lipson told him that Mr. Hernandez had already seen the array and had "picked the right person"). The jury could readily find that this statement was so suggestive as to "t[ake] the option not to pick anyone off the table," *Jenkins*, 478 F.3d at 93, as it signaled to Anyosa that the police knew the correct suspect and needed Anyosa's confirmation to proceed with prosecution. Other evidence underscores this problem; Lipson made Mr. Anyosa view

---

*lineup* identification procedure. *See* SPA61-62 (citing *Jenkins*, 478 F.3d at 93 and *Sales v. Harris*, 675 F.2d 532, 538 (2d Cir. 1982) for the proposition that "although the police generally should refrain from informing a witness that the suspect is in the lineup, a lineup is not unduly suggestive merely because they do").

three or four photo arrays until he made an identification. *See* SPA43 (quoting Anyosa's testimony from Galloway's criminal trial that "he was shown 'two or three' sheets of paper" and that each sheet contained six photos before he selected Mr. Galloway's photo). Officers prolonging lineup procedures until a witness identifies a suspect "would render the lineup . . . defective" under clearly established law. *Jenkins*, 478 F.3d at 93.

The small size of the array exacerbated Appellant Lipson's comments. Although an array with as few as six photos may not be inherently prejudicial, an array of such few photos is suspect. *See United States v. Ruiz*, 116 F.4th 1246, 1257 (10th Cir. 2024) ("To begin, we must give significant weight to any irregularities in the photo array shown to [the witness] because it included only six photographs.") (internal quotation marks omitted); *United States v. Rattler*, 475 F.3d 408, 413 (D.C. Cir. 2007) ("A relatively small number of photographs in an array heightens the need to examine the suggestivity of irregularities between the subjects in the array."). And while "an array of . . . as few as six photographs" might not be inherently suggestive, such a small array can contribute to suggestiveness in light of other facts. *See United States v. Al-Farekh*, 956 F.3d 99, 112 (2d Cir. 2020). Put another way, when an array includes only six photos, like the arrays Lipson used here, other suggestive aspects of the identification process have a greater potential to lead the witness to misidentify the wrongly accused.

Further, Mr. Galloway has proffered evidence that after Hernandez and Anyosa made their respective selections from the photo arrays, Lipson impermissibly told each of them that they had selected the suspect in police custody. As this Court has

long recognized, "the danger of 'irreparable misidentification' is great[] in cases where the witness is told that the 'right' person or the suspect has been selected" because "the witness' belief [that he made a correct identification] may be improperly reinforced by the confirmatory remarks of the agents." *United States v. Moskowitz*, 581 F.2d 14, 20 (2d Cir. 1978). This improper reinforcement "reduces the trustworthiness of any subsequent . . . identification because it increases the possibility that the witness will 'retain in his memory the image of the (person selected) rather than of the person actually seen.'" *Id.* (quoting *Simmons*, 390 U.S. at 383-84); *see also United States v. Leonardi*, 623 F.2d 746, 755 (2d Cir. 1980) ("[T]he police officer's comment following the selection of [the accused's] picture from the photo-spread that the witness had chosen the individual under suspicion . . . may tend to reinforce an otherwise weak or tentative identification and therefore lend a later in-court identification greater conviction than it deserves.").

The numerous suggestive aspects of the photo identification procedures here caused exactly the problems that have led this Court and others to hold that they violate clearly established law. Here, the constitutionally infirm procedures produced a misidentification, and obscured the fact that Appellants knew from the very start of their investigation that nothing about Mr. Galloway's appearance matched any part of Anyosa's description of his assailant, other than his race. Mr. Anyosa described the shooter as a man between 25 to 30 years of age; Mr. Galloway was 21. SPA39. Anyosa said the shooter was 5'10" or 5'11" tall; Mr. Galloway stood nearly half a foot shorter at 5'5". *Id.* Anyosa described the shooter's hair as "short"; when Mr. Galloway was arrested just three weeks later, his hair was long enough to be in

messy braids. *Id*. Finally, Anyosa told Defendants-Appellants that his assailant spoke with an accent; Mr. Galloway conspicuously did not. *Id*.

More than a decade ago, this Court declined to reverse the district court's denial of qualified immunity to defendant police investigators on nearly identical facts. *See Harewood*, 508 F.App'x at 62. The plaintiff in *Harewood* alleged he was falsely arrested due to an inherently flawed eyewitness photo identification. *Harewood v. City of New York*, No. 09-cv-2874(FB)(RML), 2012 U.S. Dist. LEXIS 194186, *6 (E.D.N.Y. Feb. 10, 2012). The defendants moved for summary judgment on qualified immunity grounds, which the district court denied, citing the evidence that the plaintiff's appearance differed in significant ways from the eyewitness's initial description of the suspect that were known to the investigating officers but not readily apparent in the photo array. *Id*. at *8-*9. This Court dismissed the defendants' interlocutory appeal because the district court's denial of qualified immunity was based on a genuine dispute of fact as to whether the investigators "deliberately sought to bias [the eyewitness's photo] identification" in light of the differences between the suspect's and the plaintiff's ages, heights, and weights. 508 F.App'x at 62.

Here, as in *Harewood*, the summary judgment record shows that Defendants-Appellants knew of significant discrepancies between the assailant and Mr. Galloway, including discrepancies not apparent in a photo array: age, height, and in Galloway's case, manner of speech. Just as a reasonable jury in the Eastern District of New York found that no reasonable officer with knowledge of these discrepancies could have believed the eyewitness's photo identification provided probable cause to arrest, *see Harewood v. Braithwaite*, 64 F.Supp.3d 384, 398-400 (E.D.N.Y. 2014), a

reasonable jury in the same district could find that Lipson conducted plainly unreliable photo arrays that were substantially likely to—and indeed did—result in Mr. Galloway's misidentification. Accordingly, as the District Court rightly determined below, Appellant Lipson is not entitled to qualified immunity, and other Appellants who declined to intervene are not either.

### 2. The Lineups

The District Court also properly identified facts and disputes precluding summary judgment and qualified immunity on Mr. Galloway's claims that Appellants Ross and D'Luginski conducted an unduly suggestive lineup, deliberately designed to falsely implicate him, that resulted in his misidentification. Specifically, the summary judgment record shows that Ross and D'Luginski orchestrated a seated lineup, with Mr. Galloway perched atop two phonebooks to make him appear taller, and then covered everyone in the lineup with white sheets from the neck down to hide the make-shift booster seat. *See* SPA57-58. The record also shows that Ross and D'Luginski placed all the lineup participants in hats to obscure their hair. SPA58. Further, the record contains evidence of Ross admitting that he and D'Luginski conducted the lineup in this manner for the specific purpose of hiding the significant discrepancies between Mr. Galloway and the eyewitness description of the shooting suspect. SPA58.

Appellants do not meaningfully dispute these facts. *See* Opening Br. at 17-19.[9] Instead, they ask this Court to condone their deliberate manipulation of the lineup

---

[9] *But see id*. at 18 (arguing that the District Court acted "in error" by identifying disputes of material fact about the lineup procedures).

process to frame Mr. Galloway, a man they knew to be innocent. They argue that because the procedures they used in Mr. Galloway's lineup are generally accepted as adequate methods of concealing differences between an accused and the fillers—a safeguard required by the due process clause—they cannot be liable for using those procedures to pervert due process by concealing exonerating differences between an accused and the suspect. *See id.* at 19. Appellants' brazen request flouts this Court's precedent and makes a mockery of the fair trial protections of the Fourteenth Amendment.

Like pretrial photo identification procedures, a lineup identification procedure is unduly suggestive if it lacks sufficient "filler" participants or otherwise draws the witness's attention to the accused. *Abdur Raheem*, 257 F.3d at 134. Generally, "[a] lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Id.* Of course, investigators may not find enough acceptable fillers who also fairly match each physical feature described by the eyewitness. For example, the fillers and the accused may all be within the suspect's described age and weight range, with similar haircuts and facial features, but with wide variation in height. Or the fillers and the accused may all be roughly the same height, weight, and age of the suspect, but only the accused's haircut matches the suspect description. To account for this inevitability, courts in this Circuit have occasionally allowed investigators to conduct seated lineups with sheets draped over the participants' bodies to hide significant height variations, and lineups with all participants wearing caps to

obscure differences in hairstyle. *See, e.g.*, *Ashby*, 269 F.Supp.2d at 117; *Roldan v. Artuz*, 78 F.Supp.2d 260 (S.D.N.Y. 2000).

These practices are permitted insofar as they minimize differences between the accused and the fillers to avoid prejudicing an accused person with distinctive features. *See e.g.*, *Roldan*, 78 F.Supp.2d at 264 (rejecting the accused's claims that he was unduly prejudiced by a lineup because "[w]hile the physical appearance of the fillers could have been closer, they were not so dissimilar as to be unduly suggestive"). By deemphasizing potentially distracting discrepancies between the accused and the fillers, the investigators enable the witness to focus on the similarities between each participant in the lineup and the memorable features of the suspect. In *Ashby*, for example, the use of hats and white sheets allowed the investigators to "counteract any differences in [hairstyle,] clothing or height" so that the witness could focus on one of the key features she recalled about the suspect—his "rounded drooping eyes." 269 F.Supp.2d at 116. When the witness viewed the line-up, it took her only "thirty to forty-five seconds" to confidently identify the defendant, "exclaim[ing]: I told you, the eyes[!]" *Id.* at 118. Under those circumstances, the use of a seated lineup with sheets and hats was not unduly suggestive.

Here, however, Appellants twisted the lineup procedure to obscure the manifest discrepancies between Mr. Galloway and the suspect description, not to make up for unsuitable fillers. Anyosa and Hernandez described an assailant by age, height, hairstyle, skin color, and voice—all in ways that differed starkly from Mr. Galloway's own characteristics. By conducting a seated, non-speaking lineup, with all participants wearing caps, Appellants eliminated three of the five features integral

to Anyosa and Hernandez's descriptions, leaving them with only two general features—age range and skin color—by which to identify a suspect. Under these circumstances, a lineup procedure that only allowed the witnesses to view the participants' faces was unduly suggestive. *Cf. People v. Bermudez*, 25 Misc. 3d 1226(A), 906 N.Y.S.2d 774 (N.Y. Sup. Ct., Nov. 9, 2009) ("the witnesses could not see the defendant's actual size, viewing either head shots or the seated lineup. The combined effect of all of these procedures rendered their identifications at trial tainted and unreliable."); *Bermudez v. City of New York*, 790 F.3d 368, 373 (2d Cir. 2015) (citing the *People v. Bermudez* opinion with approval in Mr. Bermudez's § 1983 case involving misidentification through unduly suggestive photo and lineup procedures). *See also Young v. Conway*, 698 F.3d 69, 80 (2d Cir. 2012) (describing an experiment showing that eyewitness identifications were only 27% accurate when the accused wore a hat compared to 45% accurate when the accused did not wear a hat). And because Appellants falsely—and unduly suggestively—told both Anyosa and Hernandez that they had picked the "right person" out of the photo array, Appellants ensured that they would select the one person from the lineup whom they had previously seen: Mr. Galloway.[10] The District Court correctly concluded that there is, at minimum, a fact question as to whether they could have made an independently reliable identification at a lineup that prevented them from evaluating anything but the participants' faces. *See Abdur Raheem*, 257 F.3d at 138-39.

---

[10] *See Young*, 698 F.3d at 82 (discussing the prevalence of "the 'mugshot exposure effect,' . . . whereby a witness selects a person in a later identification procedure based on a sense of familiarity deriving from her exposure to him during a prior one" rather than any recognition of him from the scene of the alleged crime).

The District Court also correctly described the significant discrepancies between Mr. Galloway's appearance and Mr. Anyosa's description of the shooting suspect as further evidence a reasonable jury could use to conclude the lineup procedure was unduly suggestive. As discussed, Mr. Galloway had braided, not close-cropped hair; lacked the accent described by Mr. Anyosa; was several years younger than the assailant; and, most notably, stood five+ inches shorter than the described subject. But for the photo array and lineup procedures, these differences would have been readily apparent. *See Young*, 698 F.3d at 83. In *Young*, this Court explained that "[t]he two-inch height differential between [the witness's] estimated and [the accused's] actual height is significant" on the way to holding that the lineup was unduly suggestive "for at least two reasons: first, the difference between 5'10" and six feet is the difference between a man of average height and a tall man. Second, and more important, [the witness] estimated the perpetrator's height in relative terms—in relation to her own height of 5'8" or 5'9"—based on her ability essentially to stand 'face-to-face' with him." *Id.* (internal citations omitted). Indeed, Mr. Anyosa assumed Mr. Galloway "was about 5 foot 10['] or 5'11" maybe," SPA49, because that is how tall he knew the shooter to be, after arguing with him "face to face," A5757. He added that if the "police had told him [Mr. Galloway] was 5'6" he would have told them that Josiah didn't do it." SPA49. Mr. Galloway presented evidence that Appellants understood that Anyosa would likely fail or refuse to identify Mr. Galloway if he knew of Mr. Galloway's actual height and other defining features. And so a reasonable jury could find that Ross and D'Luginski conducted a seated lineup, placed Mr. Galloway

on phonebooks, and had everyone cover their hair precisely because they did not want Anyosa to see the five+ inch height differential or significant difference in hairstyles.

Contrary to Appellants' assertions, the "use of hats, sheets, and elevated seats," Opening Br. at 18, is not *per se* immunized in this context. Indeed, this Court has held otherwise on remarkably similar facts. In *Harewood*, this Court determined that the law was clearly established as of 2007 that an officer could not use otherwise permissible identification procedures—seated lineups with all participants wearing head coverings—for the plainly unconstitutional purpose of framing an individual accused of a crime. 508 F.App'x at 62. Indeed, a jury ultimately agreed. *See Harewood*, 64 F.Supp.3d at 394. The plaintiff in *Harewood* argued that the defendant officer conducted a seated lineup because "there was a discrepancy between [the plaintiff's] actual height (5'6") and the height of the perpetrator as described by [the witness] during her initial statement (6'2")." *Id*. The defendant officer also required everyone in the lineup to wear shower caps to hide their hair. *Id*. At this unconstitutional lineup, the witness, who had already seen the plaintiff's photograph in an unduly suggestive photo array, identified the plaintiff as the suspect. *Id*. The jury determined that the defendant officer's conduct "shocked the conscience," returning a verdict for the plaintiff. *Id*. at 403.[11]

_____

[11] The district court ultimately granted the defendants' post-verdict motion for judgment as a matter of law on the plaintiff's lineup claim, but only because the plaintiff, unlike Mr. Galloway, was never criminally tried and therefore did not have a Fourteenth Amendment due process claim. *Id*. The court made clear, however, that the jury's condemnation of the officer's actions was supported by the evidence and that the officer's conduct could have supported a due process claim had the plaintiff been tried. *Id*.

Because no reasonable officer could have thought they could deliberately manipulate pretrial identification procedures to obtain a false identification, the District Court did not err in denying qualified immunity. *See Harewood*, 508 F.App'x at 62 ("A police officer's knowing efforts to secure a false identification by unlawfully influencing witnesses is not entitled to qualified immunity.") (cleaned up) (quoting *Good v. Curtis*, 601 F.3d 393, 398 (5th Cir. 2010)).

**B.    Appellants violated Mr. Galloway's clearly established right not to be charged and prosecuted with fabricated or coerced evidence, and without access to exculpatory evidence.**

1.    Coerced witness statements.

Outside of one short paragraph, Appellants failed to address Mr. Galloway's fabrication-of-evidence claims in their opening brief and thus have forfeited any objection to the District Court's denial of summary judgment on these claims. *See* Section III, *infra* 48-50. Whatever argument exists depends upon Appellants' refusal to accept the facts identified by the District Court. *See* Opening Br. at 31-32 (discussing "presumption of probable cause" in cases with grand jury indictments, refusing to acknowledge that a reasonable jury could conclude it was obtained here with fabricated evidence). This Court should treat any fabrication argument as forfeited, but even on the merits, the summary judgment record amply supports the District Court's decision.

This Court clearly established long ago that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm

occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). To succeed on a fabrication-of-evidence claim, "a plaintiff must establish that (1) the officer created false information, (2) the officer forwarded the false information to prosecutors, (3) the false information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation of life, liberty, or property as a result of the officer's actions." *Kee v. City of New York*, 12 F.4th 150, 168 (2d Cir. 2021). "False information" includes witness statements falsely inculpating the accused, and those obtained through coercive police interrogations. *Frost v. New York City Police Dep't.*, 980 F.3d 231, 240 (2d Cir. 2020) (analyzing fabrication-of-evidence claim based on a witness's statement falsely inculpating the plaintiff, which police allegedly obtained by conditioning the witness's felony plea deal on his willingness to sign the false statement). Officers who fabricate inculpatory witness statements simply cannot hide behind qualified immunity. *Id.* at 248 n.12 (citing *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 276 (2d Cir. 2016)).

Here, the District Court correctly identified disputed facts from which a reasonable jury could find a violation of clearly established law. The summary judgment record shows that Appellants subjected Mr. Ogletree to an hours-long coercive interrogation in which they repeatedly threatened to charge him with various crimes if he did not sign a statement implicating Mr. Galloway. *See* SPA52. The District Court did not describe the full context bolstering this, evidence showing that when Appellants failed to induce Mr. Ogletree to inculpate Mr. Galloway, they wrote up a statement outside of Mr. Ogletree's presence and placed it in a stack of

41

documents for him to sign. A5746, 5743. Exhausted after his coercive interrogation, Mr. Ogletree signed the paper without first reading it. *Id*. Appellants forwarded Mr. Ogletree's fabricated statement to the prosecutors, who used it to charge Mr. Galloway with attempted murder. A5746. A reasonable jury presented with these facts could easily find that Appellants fabricated evidence against Mr. Galloway.

To the minimal extent that Appellants argue that knowing coercion or fabrication cannot support a fabrication-of-evidence claim because the grand jury indicted Mr. Galloway without the Ogletree statement, Opening Br. at 31, that argument is foreclosed by this Circuit's precedent. The right to a fair trial "protects against the deprivation of liberty that results when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, *were that evidence presented to the jury*." *Kee*, 12 F.4th at 168 (emphasis in original) (cleaned up). Because the violation occurs the moment the officer forwards the false information to the prosecutor, the information need not actually be presented to a jury for a fabrication-of-evidence claim to lie. *Id*.; *Garnett*, 838 F.3d at 280. For the purposes of Mr. Galloway's fabrication claim, it matters only that Appellants fabricated a witness statement falsely implicating Mr. Galloway and forwarded that statement to the prosecutors; whether any jury—be it the indicting grand jury or even the subsequent criminal trial jury—ever heard evidence of Mr. Ogletree's statement is irrelevant. *See Garnett v. Undercover Officer C0039*, No. 1:13-cv-7083-GHW, 2015 U.S. Dist. LEXIS 45232, at *23-24 (S.D.N.Y. Apr. 6, 2015), *aff'd Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016) ("[T]he phrase 'likely to influence a jury's decision' evidently describes the materiality of the information. It does not require

that the falsified evidence be likely to be presented to a jury—again, the cause of action accrues when the information is presented to the *prosecutor*, not when it is presented to the jury.") (emphasis in original). Because the record shows that the prosecutor relied on the Ogletree statement in initiating the grand jury proceedings, a reasonable jury could find for Mr. Galloway here. *See Barnes v. City of New York*, 68 F.4th 123, 129-30 (2d Cir. 2023) ("The use of fabricated evidence in initiating a prosecution or at trial may amount to a deprivation of liberty even in the absence of a conviction based on the fabricated evidence[.]").

Regardless, this Court has made clear that "probable cause is no defense to a denial of the right to a fair trial claim." *Garnett*, 838 F.3d at 278; *see also Ricciuti*, 124 F.3d at 130 ("No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. . . [The alternative] would make a mockery of the notion that Americans enjoy the protection of due process of the law"). Because a fabrication-of-evidence claim is a Fourteenth Amendment due process claim that is entirely distinct from a Fourth Amendment false arrest or malicious prosecution claim, the grand jury's finding of probable cause to indict Mr. Galloway is irrelevant to the question of whether Defendants-Appellants framed Mr. Galloway by fabricating Mr. Ogletree's statement. *See Garnett*, 838 F.3d at 278.

### 2. Suppression of exculpatory evidence.

The District Court also correctly pointed to clearly established law holding that investigating officers violate an individual's due process rights by withholding material exculpatory or impeaching evidence from prosecutors, and identified a set of

43

facts under which a jury could conclude that happened here. The right of defendants to material exculpatory information has been clearly established since the 1960s. *See Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)). And showing "materiality" of any one piece of evidence is not a heavy burden. "Materiality is assessed in light of the evidence adduced against the defendant at trial," *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001), and when withheld evidence "could have been used to render the evidence of guilt ambiguous[,] [it] has a more significant impact than where the evidence of guilt is otherwise ample." *Id.* (quoting *Spicer v. Roxbury Correctional Inst.*, 194 F.3d 547, 561 (4th Cir. 1999)). Put another way, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Here, Appellants have two key materiality problems. First, the withheld evidence was considerable, and second, the trial was a close call even without it. As to the trial, because Mr. Galloway's criminal jury deliberated for four days, reported a deadlock to the Court, and ultimately only convicted him after an *Allen* charge, even small evidentiary differences could have tipped the scales in the other direction. As to withheld evidence, Lipson suppressed the circumstances of the photo identification procedures he conducted from the prosecutor, including Mr. Anyosa's inability to identify a suspect without several tries. Appellants DeCaro and Darienzo suppressed the coercive circumstances under which Mr. Ogletree 'signed' the statement

inculpating Mr. Galloway.[12] Because the eyewitness misidentifications and Appellants' fabricated 'admission' of Mr. Galloway to Mr. Ogletree were the only pieces of evidence linking Mr. Galloway to the crime, any information tending to cast doubt on the reliability of that evidence was plainly "material" for *Brady* purposes. *See Leka*, 257 F.3d at 99 ("Leka's *Brady* argument cites eyewitness testimony in a murder case in which there was no evidence of Leka's guilt other than eyewitness identification. The evidence at issue was therefore of a kind that would suggest to any prosecutor that the defense would want to know about it.").

Appellants' other arguments on this point make little difference. They cite *Fappiano v. City of New York*, No. 07-CV-2476 (SLT) (SMG), 2014 U.S. Dist. LEXIS 179584 (E.D.N.Y. Dec. 31, 2014), which is simultaneously an unpublished district court decision, with inapposite facts, and insufficient support for the argument they make anyway. The *Fappiano* plaintiff, like Mr. Galloway, brought § 1983 claims for the suppression of photo array evidence. *Id.* at *43. But the similarities end there. During the investigation at issue in *Fappiano*, the victim, who "saw her attacker's face for a period of around 45 minutes, including in a 'well lit' kitchen and bathroom," *id.* at *47, allegedly participated in multiple photo showings. The plaintiff's photo was not included in the first showing, nor did the victim identify her assailant. *Id.* at *6-9. The investigator did not disclose this showing to the prosecutor. *Id.* at *43. At a subsequent showing, the victim looked through an entire drawer of photographs and

---

[12] Because Appellants only mention the *Brady* claim against Lipson in their opening brief, they have forfeited or waived any objection to the District Court's denial of summary judgment to DeCaro and Darienzo on Mr. Galloway's *Brady* claims. *See* Section III, *infra* 48-50.

picked out two; both were photos of the plaintiff taken at different times. *Id*. at *9-10. The prosecution disclosed this and subsequent identification procedures to the defense. *Id*. at *43. The *Fappiano* court reasoned that the first photo showing "had no exculpatory value for the defense" because it was "undisputed that the array did not include a photograph of Plaintiff and that [the victim] did not positively identify her attacker from that array." *Id*. at *45. Further, the victim's subsequent positive identification of her attacker had all the indicia of reliability, rendering the "impeachment value" of the first photo showing "minimal." *Id*. at *47.

Here, by contrast, the first photo array Mr. Anyosa was shown *did* include Mr. Galloway, and Mr. Anyosa failed to positively identify his shooter. So unlike the first photo showing in *Fappiano*, this first photo array had exculpatory value to Mr. Galloway. Further, unlike the later array resulting in positive identification in *Fappiano*, which included thousands of photos, the photo array from which Mr. Anyosa selected Mr. Galloway had only six photos, and Appellants included only Mr. Galloway's photo—an outdated one of him with short hair—repeatedly in each array. Unlike Lipson, the investigator in *Fappiano* did not make any suggestive opening or confirmatory remarks likely to skew the victim's selection. Finally, the victim in *Fappiano* was confident in her selection of her assailant's photo, and remained confident throughout the prosecution. Even if *Fappiano* could bind the Court, it does not stand for the proposition that Mr. Anyosa's repeated initial failures to identify his assailant from photo arrays including Mr. Galloway's photo were not material exculpatory evidence.

Instead, this Court applies *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny. In *Giglio*, the Supreme Court made clear that where, as here, "the Government's case depended almost entirely on [a witness's] testimony," any information tending to impeach that witness's testimony is material and must be disclosed to the defense. 405 U.S. at 154-55. This Court has faithfully followed *Giglio* for decades, holding that the suppression of impeachment evidence plainly violates the criminal defendant's fair trial right in cases where witness testimony is the sole evidence linking the accused to the crime. *See, e.g.*, *Boyette v. Lefevre*, 246 F.3d 76, 91, 92 (2d Cir. 2001) (holding that evidence of eyewitness's initial uncertainty in identifying the accused's photograph was "classic *Brady* material" because "the only evidence against [the accused] was [the eyewitness's] testimony"); *United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998) (noting that impeachment evidence is "material where the witness in question supplied the only evidence linking the defendant to the crime"). Here, because the prosecution's case against Mr. Galloway "depended almost entirely" on the eyewitness testimony of Mr. Anyosa and Mr. Hernandez, no reasonable officer could have believed information concerning the circumstances of their initial photo identifications was immaterial.

*Giglio*'s teaching applies just as much to evidence that Appellants coerced Mr. Ogletree's statement implicating Mr. Galloway. The Supreme Court "has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). The District Court correctly concluded that a

47

reasonable jury could find that Appellants fabricated Mr. Ogletree's statement and withheld its fabricated nature from the prosecution to ensure its presentation instead as reliable, truthful testimony. Because no reasonable officer could have believed it lawful to prosecute a criminal defendant with knowingly perjured testimony, or, stated differently, no reasonable officer could have doubted the materiality of evidence showing that a witness's testimony was perjured, the District Court properly denied Appellants qualified immunity. *See id.*; *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment[.]").

## III. Appellants have waived or forfeited all argument relating to the failure-to-intervene and malicious prosecution claims.

If it has jurisdiction at all, this Court should also affirm the District Court because Appellants waived or forfeited several arguments by not developing them sufficiently or making them at all.

This Court treats arguments not made as forfeited, and arguments not sufficiently developed as waived. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and generally will not be addressed on appeal."); *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2000) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) ("Merely mentioning or simply stating an issue in an appellate brief is insufficient to preserve

it for our review: an appellant must advance an argument, and we generally will decline to consider issues that are not sufficiently argued."). This is particularly true for arguments as to "remaining claims" in a multi-issue appeal, when "not mentioned at all" or "alluded to in a conclusory manner," *Biosafe-One, Inc. v. Hawks*, 379 F.App'x 4, 8 (2d Cir. 2010), and issues that the party cannot assert on collateral attack later, which might have justified excusing waiver. *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993).

Here, Appellants' briefing waives or forfeits several arguments and even entire issues. After erroneously arguing that Ross should get immunity for the lineup he designed to frame Mr. Galloway, Opening Br. at 23, Appellants summarily argue that Ross should get immunity for his failure to intervene, *see id*. Because this bare conclusory paragraph fails to develop any argument, Appellants have waived the issue of Ross's failure to intervene. Appellants do not mention Lipson's failure to intervene at all, *see generally* Opening Br. at 24-30, thus waiving or forfeiting that argument. Appellants hardly develop their argument that DeCaro and Darienzo should get immunity for coercing Mr. Ogletree's false statement, and make no argument at all for their failure to intervene, *see generally* Opening Br. at 31-32. As to D'Luginski, Appellants offer barely five lines in total, saying "the same arguments apply" as to "aspects of the [unspecified] claim that are effectively duplicates," Opening Br. at 32, and offering one total (fact-based) sentence on the failure-to-intervene claim against him, *id*. Those arguments are "unaccompanied by some effort at developed argumentation," and so "deemed waived." *Tolbert*, 242 F.3d at 75.

Further, none of the Appellants make any delineated arguments at all about the District Court's denial of summary judgment and qualified immunity as to Mr. Galloway's malicious prosecution claims. Though they gesture at or allude to probable cause—one element of that claim—in different contexts, *see* Opening Br. at 22, 31, 32, they do not "advance an argument" as to the claim or its elements, *Niagara Mohawk Power Corp.*, 673 F.3d at 107. Indeed, by fitting three argument sections purporting to address DeCaro, Darienzo, and D'Luginski's individual defenses, the County's request for pendent appellate jurisdiction, and the County's defense on the merits into a mere two and a half pages, Opening Br. at 31-33, Appellants' brief looks much like the one in *Biosafe-One*, where "remaining issues" were deemed waived or forfeited because of conclusory treatment, 379 F.App'x at 8. To the extent this Court exercises jurisdiction at all and reaches these issues, *see* Section I, *supra*, it should reject Appellants' arguments on the merits or treat them as waived or forfeited.

## CONCLUSION

This Court should dismiss for lack of jurisdiction, or, alternatively, it should affirm the judgment of the District Court.

Respectfully submitted,

/s/ Jim Davy

Gabriel P. Harvis
Baree N. Fett
ELEFTERAKIS, ELEFTERAKIS &
  PANEK
80 Pine Street
38th Floor
New York, NY 10005
(212) 532-1116
gharvis@eeplaw.com

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Eliana Machefsky
NATIONAL POLICE ACCOUNTABILITY
  PROJECT
P.O. Box 2981
Berkeley, CA 94702
(314) 440-3505
eliana.npap@nlg.org

Counsel for Appellee

Jan. 17, 2025

**CERTIFICATE OF COMPLIANCE**

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4) because it contains 13,924 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word version 16.92, set in Century Schoolbook font in 12-point type.

/s/ Jim Davy

Jim Davy

**CERTIFICATE OF SERVICE**

I certify that on January 17, 2025, this brief was filed using the Court's ACMS system. All participants in the case are registered ACMS users and will be served electronically via that system.

I further certify that, after receiving notice that the brief has been accepted for filing, I will file 6 paper copies of this brief with the Clerk of Court within the required time.

/s/ Jim Davy

Jim Davy